# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Peter Marcus, and others similarly situated, | : <br> : <br> : |
| PLAINTIFFS | : <br> : Civil Action Number: 17-11165 |
| v. | : <br> : |
| The American Contract Bridge League | : <br> : |
| DEFENDANT | : <br> : |

## **COMPLAINT**

**I.　INTRODUCTION**

1.　The plaintiff Peter Marcus brings this Complaint for and on behalf of himself and other similarly situated employees and former employees against the defendant The American Contract Bridge League, Inc. (ACBL), seeking payment of overtime wages earned pursuant to 29 U.S.C. §207(a) of the Fair Labor Standards Act (FLSA). The plaintiff and other similarly situated employees and former employees are or were employed by defendant ACBL as "salaried" Tournament Directors, in which position they were or are from time to time required to work more than forty hours in a one week period. The defendant does not pay overtime premium pay to salaried Tournament Directors. The plaintiff seeks, for himself and for all other similarly situated employees and former employees, including all salaried Tournament Directors, payment of overtime wages earned pursuant to 29 U.S.C. §207(a) of the FLSA, and an additional equal amount as liquidated damages and a reasonable attorney's fee to be paid by the defendant, and costs of this action pursuant to 29 U.S.C. §216(b).

2. The plaintiff Peter Marcus further alleges that defendant ACBL discriminated against him and constructively discharged him because on two occasions he has filed a complaint or instituted or caused to be instituted a proceeding to seek payment of overtime wages to himself and others similarly situated, in violation of 29 U.S.C. §215(a)(3). Plaintiff Marcus seeks such legal or equitable relief as may be appropriate to effectuate the purposes of that section of the FLSA, including without limitation reinstatement, promotion, and the payment of wages lost; an additional equal amount as liquidated damages; compensation for pain, suffering, and emotional distress, and a reasonable attorney's fee to be paid by the defendant, and costs of the action pursuant to 29 U.S.C. §216(b).

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. §§1331 and 1337.

4. This Court also has jurisdiction over plaintiff's claims brought under the FLSA pursuant to 29 U.S.C. §216(b).

5. Venue is appropriate in the District of Massachusetts pursuant to 28 U.S.C. §1391(b), because a substantial part of the events giving rise to this claim occurred within this judicial district.

## III. THE PARTIES

### A. Plaintiff Peter Marcus

6. Plaintiff Peter Marcus resides at 7 Lowell Street, Lynnfield, Massachusetts. Marcus performed services for defendant ACBL as a Tournament Director from 1980 until in or about August 2016. At times relevant to this Complaint, Marcus was an employee of the defendant within the meaning of 29 U.S.C. §203(e)(1).

### B. Defendant The American Contract Bridge League

7.      The defendant The American Contract Bridge League, Inc. ("ACBL") is a New York corporation, with its corporate headquarters located at 6575 Windchase Boulevard, Horn Lake, Mississippi. Defendant's website states that it has an annual budget of $16 million dollars, a membership of more than 167,000 individuals, and employs fifty-nine staff and one hundred and seventy tournament directors. Defendant conducts business in various states, including Massachusetts and other states, by assigning tournament directors to work at tournaments in those states.

8.      At all times relevant to the Complaint, the defendant had and has an Annual Business Volume in excess of $500,000.00.

9.      At all times relevant to this complaint, the defendant has been an employer within the meaning of 29 U.S.C. §203(d), and has been an enterprise engaged in commerce within the meaning of 29 U.S.C. §203(s)(1)(A).

**C.      Collective Action, or "Opt-In" Plaintiffs**

10.     Plaintiff brings this action on behalf of himself and other similarly situated employees and former employees who work or have worked for the Defendant as salaried Tournament Directors, and who elect to opt into this action pursuant to the Fair Labor Standards Act, 29 U.S.C. §201 et seq., and specifically the collective action provision of the FLSA, 29 U.S.C. § 216(b), to remedy the ACBL's violations of the overtime provisions of the FLSA.

11.     In the world of competitive contract bridge, a Tournament Director or "TD," is akin to a referee in many other sports and has the primary duty of officiating at ACBL-sanctioned tournaments. The Tournament Director enforces the rules, assigns penalties for violations, and oversees the progress of the game. The Tournament Director is also responsible for the final scoring. At an ACBL tournament there may be several Tournament

Directors, reporting to a head director who has the final say with respect to rulings and enforcement decisions.

12. The position of full time Tournament Director includes ranks that reflect differences in status and some differences in duties, though the primary duty of all Tournament Directors is to officiate at ACBL-sanctioned tournaments. A full time Tournament Director may hold the rank of Tournament Director, Associate National Tournament Director or National Director.

13. The ACBL also makes dual job assignments to some full time Tournament Directors to the positions of Field Supervisor and Field Manager. As with other Tournament Directors, those holding dual job assignments as Field Supervisors also have as their primary duty the task of officiating at ACBL-sanctioned tournaments.

14. Prior to January 11, 2017, defendant ACBL employed approximately 40 full time Tournament Directors. Full time Tournament Directors were often required to work more than forty hours in a one week period, and were not paid overtime premium pay when they did so.

15. Beginning on or about January 11, 2017, defendant ACBL commenced paying overtime premium pay to all full time Tournament Directors except for those who are dual-assigned as Field Supervisors or Field Managers. These dual-assigned Tournament Directors continue to be treated as "salaried" and therefore not eligible to be paid overtime premium pay when they work more than forty hours in a one week period.

16. This action is brought to recover unpaid compensation owed to the plaintiff and all current and former employees of the defendant who are similarly situated in that they work or worked as full time Tournament Directors who were or are treated as salaried employees, and who were or are not paid overtime premium pay for working more than forty hours in a one week period.

17. The defendant is liable under the FLSA for, *inter alia*, failing to properly compensate plaintiff and similarly situated employees and former employees and, as such, notice should be sent to the FLSA Class. There are many similarly situated current and former employees of the defendant who have been underpaid in violation of the FLSA, and who would benefit from the issuance of a court supervised notice of the present lawsuit and the opportunity to join in the present lawsuit. Those similarly situated employees are known to the defendant, are readily identifiable, and can be located through the defendant's records.

## IV. PLAINTIFF PETER MARCUS

18. In or about 2001, ACBL assigned plaintiff Peter Marcus to the rank of Assistant National Director.

19. On or about November 15, 2007, plaintiff Peter Marcus was one of two named plaintiffs who commenced a civil action against defendant ACBL for, inter alia, violations of the Fair Labor Standards Act, including failing to pay tournament directors overtime pay and retaliating against plaintiff Marcus.[1] That civil action was docketed in the U.S. District Court for the District of Connecticut as 3:07-cv-1687, the district court granted conditional certification of a class, and the matter was subsequently resolved by settlement on or about October 2, 2009.

20. Among the career paths that may be available to Tournament Directors, one is to become a National Director for the defendant. Typically, doing so would require that the employee first become an Associate National (AN) Director, move up to either a Director in Charge (DIC) or Assistant Director in Charge (AIC) of the North American Bridge Championships ("Nationals," or "NABC's"), or become a Field Supervisor.

---

1 The other named plaintiff, Susan Petricelli, is now retired from her position as a tournament director for the ACBL.

21. At all times relevant to the Complaint, defendant ACBL has had written policies providing for open position posting and job hiring and written polices prohibiting unlawful discrimination or retaliation.

22. In or about Spring 2011, Marcus spoke with Jeff Johnston, ACBL's Director of Field Operations about his interest in two positions that were soon to become available as Assistant-in-Charge (AIC) of the Spring and Summer NABCs. Johnston told Marcus that he would consider Marcus for the positions.

23. Three weeks later, and without conducting any interviews, defendant ACBL announced the hiring of two less senior, less experienced, and less qualified for the AIC positions.

24. In or about Fall 2011, Marcus (residing at that time in Dallas, Texas), applied for the posted position of Field Supervisor for the Southwest District. The contending candidates for the position were Marcus and another applicant. As part of the promotion process, Johnston sent a detailed questionnaire for each of them to complete in advance of the interviews.

25. Marcus provided detailed and careful responses to the questionnaire. Upon information and belief, the other applicant spent little time or effort in completing the questionnaire.

26. Johnston conducted the interviews for the Field Supervisor position with defendant's then-Director of Human Resources, Sylvia Hardin.

27. When Johnston and Hardin interviewed Marcus, Johnston did not ask any questions relating to the questionnaire responses and Hardin asked no questions at all. When Marcus asked if the questionnaire responses were going to be considered, Johnston responded that he had not printed out the questionnaire responses or shown them to Hardin.

28. When Johnston and Hardin interviewed the other individual being considered for the position, Johnston and Hardin both questioned the applicant and both had access to and asked questions about the applicant's questionnaire responses.

29. Subsequently, there was to be a "final" interview for the Field Supervisor position, which would be conducted when the applicants were introduced to the defendant's new CEO, Robert Hartman. In Marcus's case, the meeting with Hartman lasted no more than five minutes, during which the CEO did not mention the Field Supervisor position or Marcus's interest in the position.

30. The defendant awarded the position of Field Supervisor to the other applicant. While Marcus had more than ten years of supervisory and managerial experience, the other applicant had none.

31. The defendant's manipulation of its interview process to disfavor Marcus, and its decision to award the position of Field Supervisor to a less senior, less experienced, and less qualified applicant instead of Marcus was caused by the defendant's animus toward Marcus because he had previously brought a legal claim against the defendant alleging violations of the Fair Labor Standards Act.

32. The ACBL Finance Officer is responsible for counting, depositing, and reporting all income from each of the three NABC's held each year. Typically, the amount of money, checks and script handled by the Finance Officer is approximately one million dollars ($1,000,000) for each NABC.

33. In or about Fall 2012, Marcus applied for the position of Finance Officer, which was to become vacant when then-Finance Officer Michael Carroad retired.

34. Marcus and the other applicants for the position were given the opportunity to "audition" for the position by each spending a day or two working in the Finance Office under the supervision of Carroad and his assistant, Marilyn Wells.

35. At the close of the "auditions", Carroad and Wells told Marcus that he was clearly the best candidate for the job, and that they intended to give that recommendation to Johnston.

36. Shortly before Carroad's retirement, and notwithstanding the recommendation of Carroad and Wells that Marcus was the best qualified applicant for the position, Johnston sent a letter to all Tournament Directors stating that the defendant was seeking applicants for the Financial Office position, and listed as "requirements" for the position that the applicant have experience in positions such as casino cashier or banker. Johnston was aware that Marcus did not have any such experience.

37. Johnston's failure to accept the recommendations of Carroad and Wells that Marcus be hired to head the Finance Office, and his decision to seek out additional candidates and to impose new requirements was motivated by the defendant's animus toward Marcus because he had previously brought a legal claim against the defendant alleging violations of the Fair Labor Standards Act.

38. Marcus made a complaint to the Human Resources Director about Johnston failing to accept the recommendation that Marcus be given the position, overturning the process that had previously been used to select someone for the position, and adding new requirements that were intended to keep Marcus out of the position. Marcus specifically told Johnston and HR Director Hardin that he believed the defendant's actions were retaliatory and that he was considering taking legal action against the defendant.

39. Only after Marcus complained and demanded an investigation of the process did the defendant relent and give Marcus the position.

40. In or about November 2014, Marcus contacted the United States Department of Labor (USDOL) office in Jackson, Mississippi, to complain about what he reasonably believed to be two violations of federal wage laws. Marcus complained that 1) the defendant failed to

properly pay tournament directors travel time (specifically, for travel time that did not meet the definition of "commute time" under USDOL regulations); and 2) the defendant did not pay overtime wages to "salaried" full time Tournament Directors, even though they performed the same duties as those Tournament Directors who were paid hourly.

41. The USDOL office in Jackson opened an investigation of the ACBL based on Marcus's compalint.

42. On or about February 19, 2015, a USDOL investigator held an initial meeting regarding Marcus's complaint with Robert Hartman, then-CEO of defendant ACBL.

43. In the meeting with Hartman, the USDOL investigator advised Hartman not to discriminate or harass any employees because of the investigation.

44. In March, 2015, Sylvia Hardin, ACBL Director of Field Operations announced to the Tournament Directors that the department was reorganizing, including increasing the number of Field Supervisors from six to twelve, and adding a new management role, Field Manager.

45. Hardin made a presentation on the reorganization, which included an organization chart showing four Field Managers, with two of those positions filled and two open job postings for the position.

46. Based on Hardin's presentation, Marcus applied for a position as Field Manager, rather than applying to be a Field Supervisor.

47. Hardin interviewed Marcus for the position of Field Manager.

48. Marcus was the only applicant for Field Manager at that time.

49. Subsequently, Hardin told Marcus that, despite the written organizational presentation showing four Field Manager positions, including two open job postings for the position, ACBL did not intend to hire more than two Field Managers in the reorganization and therefore no positions were open.

50. The apparent change in availability of the two purportedly open Field Manager positions was made in order to prevent Marcus from obtaining a Field Manager position, and to punish him for making a complaint to the USDOL.

51. As a result of Marcus's complaint to the USDOL, within a few months' time the defendant had revised its travel time policy, paying hourly Tournament Directors for each hour of travel time, but paying salaried Tournament Directors a flat $1,500 annual stipend to cover travel time. Upon information and belief, the defendant's change to its travel time policy was the result of communications between the USDOL and the defendant arising from Marcus's complaint about the travel time policy.

52. On or about October 26, 2015, the USDOL investigator held a final telephone conference with ACBL's legal counsel, Paul Prather, for the purpose of discussing her investigation and the findings.

53. Prather stated that he did not want to review the FLSA and various regulations with the investigator and only wanted to discuss the findings.

54. The investigator advised Prather that she had found that Marcus was not exempt from overtime because he did not supervise two or more employees, did not have authority to hire or fire or make recommendations; and he did not have seem to have management as his primary duty. In addition, she advised Prather that Marcus did not appear to have any authority to make decisions, his duties were routine in nature, and he did not perform duties that were directed related to the management of the firm and/or the general business operations.

55. The investigator advised Prather that the ACBL owed Marcus overtime back wages.

56. Prather, on behalf of the ACBL said that the organization was going to discontinue the Tournament Director position. He said that the ACBL disagreed that overtime

was due to Marcus as a salaried tournament director and the ACBL was not agreeing to pay Marcus any back wages.

57. The ACBL assured the USDOL of future compliance with the FLSA but refused to pay back wages to Marcus.

58. In or about February, 2016, the ACBL discharged Marcus's immediate supervisor, Sylvia Hardin and informed Marcus that he would report directly to CEO Robert Hartman.

59. In or about March 2016, Hartman conducted Marcus's annual performance review.

60. At the time of his annual performance review of Marcus, Hartman had not contacted or spoken to anyone, including Hardin and the directors or sponsors for tournaments for which Marcus was DIC, to obtain input regarding Marcus's performance.

61. Notwithstanding Hartman's failure to obtain any meaningful input regarding Marcus, Hartman used the review to criticize Marcus for alleged performance issues.

62. Hartman's motivation for criticizing Marcus's performance was retaliatory animus toward Marcus due to his complaint to the USDOL.

63. In or about April, 2016, Marcus applied for the open position of Director of Field Operations. Marcus was the only internal candidate.

64. Marcus was told by the senior managers that interviewed him that he had a very strong interview but that Robert Hartman felt that there was concern about Marcus's "attitude."

65. Defendant ACBL did not give Marcus the position of Director of Field Operations.

66. As there were no other candidates at that time, the position of Director of Field Operations was not filled.

67. Hartman's motivation for not giving Marcus the position of Director of Field Operations was retaliatory animus toward Marcus due to his complaint to the USDOL.

68. Having been informed that he would not be given the position of Director of Field Operations and that the position would remain vacant, Marcus volunteered to perform the job on an interim basis for six months with no raise in salary, in order to demonstrate that he was capable of doing the job and did not have "attitude" issues. At that time, the salary for the Director of Field Operations position was in the vicinity of $100,000 a year, while Marcus's salary was $45,000 a year.

69. Hartman rejected the offer.

70. Hartman's motivation for not accepting Marcus's offer to function in the position of Director of Field Operations on an interim basis – at a cost savings to the ACBL of more than $50,000 – was retaliatory animus toward Marcus due to his complaint to the USDOL.

71. In or about August 2016, and following the ACBL's discriminatory and retaliatory conduct toward Marcus described in paragraphs 46 through 72, supra, Marcus resigned his position from the ACBL.

72. At the time of his resignation, Peter Marcus had been a Tournament Director for the ACBL for approximately thirty-six years.

73. Peter Marcus was constructively discharged from his position with the ACBL because he reasonably believed that the ACBL would continue to refuse any opportunities for him to advance and would continue to unfairly criticize his performance and/or take other action against him in retaliation for his complaint to the USDOL.

74. Approximately nine months after Marcus had been denied the position of Director of Field Operations, the ACBL filled the position by hiring an individual with no previous knowledge of the game of bridge, bridge directing, or bridge tournaments.

**COUNT ONE: FAILURE TO PAY OVERTIME AS REQUIRED BY 29 U.S.C. §207**

1. The plaintiff re-states, incorporates and includes by reference paragraphs 1 through 74, above.

75. The defendant has failed to pay overtime to the plaintiff and to similarly situated employees and former employees at the rate of one and one-half times the employee's regular hourly rate for all hours worked in excess of forty hours in a one week period. The amount of unpaid overtime owed to misclassified non-exempt Tournament Directors cannot be accurately calculated without additional information from the employer, but the amount is believed to be in excess of Five Hundred Thousand Dollars ($500,000.00).

76. The defendant's failure to pay overtime to the plaintiff and to similarly situated employees was in willful violation of overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §207, in that the defendant knew or was reckless with regard to its knowledge of its violations of the FLSA.

**COUNT TWO: DISCRIMINATION AND RETALIATION FOR PROTECTED ACTIVITY**

1. Plaintiff Marcus re-states, incorporates and includes by reference paragraphs 1 through 76, above.

77. Marcus' efforts to obtain payment from the defendant for unpaid overtime wages for himself and other similarly situated employees and former employees in 2007 and again in 2014, as described above, constitute protected activities pursuant to the Fair Labor Standards Act, 29 U.S.C. §215(a)(3).

78. The actions of the defendant, including refusing to promote Marcus to the position of Field Manager; unfairly criticizing his performance; refusing to promote Marcus to the position of Director of Field Operations; and constructively discharging Marcus were in retaliation against Marcus for his protected activity in 2009 and/or 2014.

79. Defendant ACBL's discrimination and retaliation against Marcus was in willful violation of the Fair Labor Standards Act, in that the defendant knew or was reckless with regard to its knowledge that its treatment of Marcus was in violation of the FLSA.

80. As a result of the defendant's wrongful conduct as described above, Marcus has suffered a loss of wages and work assignments; experienced harm to his reputation and good name; and experienced pain, suffering, and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff on behalf of himself and all similarly situated employees and former employees asks the Court to grant relief, including:

1. Award all unpaid overtime wages to the plaintiff and to all similarly situated employees and former employees pursuant to 29 U.S.C. §216(b);

2. Award an equal amount as liquidated damages pursuant to 29 U.S.C. §216(b);

3. Award reasonable attorney's fees and costs pursuant to 29 U.S.C. §216(b) to the plaintiff and all similarly situated employees and former employees;

4. Award all prejudgment and postjudgment interest to the plaintiff and to all similarly situated employees and former employees.

5. Enjoin the defendant to pay all Tournament Directors consistent with the requirements of the Fair Labor Standards Act, including but not limited to the payment of all overtime wages as required by 29 U.S.C. §207.

6. Enjoin the defendant to take all additional action necessary to make plaintiff Marcus whole, including reinstating Marcus as an ACBL employee and promoting him to the position of Director of Field Operations, and making a public apology for its disparaging remarks made about Marcus and its attempts to intimidate and coerce others in the world of professional contract bridge to dissociate themselves from Marcus and to refuse to offer professional opportunities to Marcus;

7. Enjoin the defendant to distribute to all directors a copy of any judgment in this matter, along with a statement in plain language reflecting the defendant's compliance or planned compliance with the Court's judgment; and

8. Craft such other relief as the Court may deem appropriate.

Attorneys for the Plaintiffs,

_____/s/ Oren Nimni_____
Oren Nimni Esq. (BBO #691821)
14 Dudley Street #1
Cambridge, MA 02140
206-200-9088