UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PETER MARCUS, MATT KOLTNOW, DIANNE BARTON-PAINE, AND OTHERS SIMILARLY SITUATED, <br><br> PLAINTIFFS, <br><br> v. <br><br> THE AMERICAN CONTRACT BRIDGE LEAGUE, <br><br> DEFENDANT. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 17-11165-FDS |

**DEFENDANT THE AMERICAN CONTRACT BRIDGE LEAGUE'S MEMORANDUM
IN SUPPORT OF MOTION TO DECERTIFY CLASS**

Before the Plaintiffs Peter Marcus, Matt Koltnow, and Dianne Barton-Paine may proceed to a collective trial on behalf of themselves and sixteen other people who worked in *seven* different positions (collectively the "Opt-In Plaintiffs"), they must demonstrate that they are similarly situated to each other for purposes of their claims and the defenses asserted by The American Contract Bridge League ("ACBL"). The Opt-In Plaintiffs hope to prove that ACBL misclassified each of them as exempt and denied them overtime pay in violation of the Fair Labor Standards Act ("FLSA"). However, the named Plaintiffs are not even similarly situated to one another, let alone the Opt-In Plaintiffs. The Opt-In Plaintiffs: had a range of different positions and job duties; worked at tournaments of varying complexity; exercised different forms and degrees of discretion and independent judgment; and had different levels of authority to make decisions or recommendations as to the employment status and work of others. The employment settings of the Opt-In Plaintiffs are too fragmented for a collective trial, individualized issues will predominate over collective issues, and a collective trial would be procedurally unwieldy and unfair. Accordingly, the Court must decertify the class.

I.      **BACKGROUND**

A.      **ACBL's Business Promoting, Growing and Sustaining the Game of Bridge**

ACBL is the governing body for contract bridge in the United States, Canada, Mexico and Bermuda. Declaration of Nancy Rosenbury, Doc. No., 35-1 (("First Rosenbury Decl."), ¶ 3. Its mission is to promote, grow and sustain the game of bridge and serve the bridge-related interests of its members. Deposition of Matthew Koltnow, 31:1-31:9.[1] Among its many services in support of its members and the game of bridge, ACBL certifies bridge directors and teachers, participates in drafting and enforcing laws governing bridge play at clubs and tournaments, including the "Laws of Duplicate Bridge," and provides staff for contract bridge tournaments sanctioned by ACBL. Second Declaration of Nancy Rosenbury ("Second Rosenbury Decl.") filed herewith,[2] ¶ 5. ACBL has over 162,000 members. Second Rosenbury Decl., ¶3. Some play in competitive bridge tournaments sanctioned by ACBL where they can earn what is known as ACBL "masterpoints®." *Id.*; Koltnow Dep., 30:19-25; Deposition of Peter Marcus, 81:9-23. ACBL's masterpoint system permits its members to know their ranking relative to other members who play competitive bridge. Rosenbury Decl., ¶ 6; Koltnow Dep., 30:24-25.

B.      **ACBL Sanctioned Tournaments.**

ACBL divides the United States, Canada, Mexico and Bermuda geographically into 25 districts with each district divided into a varying number of units. First Rosenbury Decl., ¶ 7; Koltnow Dep., 29:13-30:6; Marcus Dep., 79:5-10. Although recognized by ACBL through charters granted to them, the districts and units are separate legal entities, not owned or operated by ACBL. First Rosenbury Decl., ¶ 7. ACBL sanctions tournaments at three different levels: the North American Bridge Championships ("NABCs") (involving all districts, held three times a year and averaging eleven or twelve days in length); regionals (usually involving one district and

---

[1] Relevant excerpts from the deposition transcripts and deposition exhibits cited herein are attached to the Declaration of Melissa L. McDonagh filed herewith.

[2] For the convenience of the Court and the parties, ACBL submits a single declaration from Ms. Rosenbury in support of both the instant motion and the motions for summary judgment being filed herewith.

averaging five to seven days in length); and sectionals (usually involving one unit or club and averaging two to four days in length). First Rosenbury Decl., ¶ 8; Koltnow Dep., 28:3-5. ACBL sponsors and runs the three NABCs, but regional and sectional tournaments are sponsored and run by districts and units. First Rosenbury Decl., ¶ 10; Koltnow Dep., 29:6-18; Marcus Dep., 79:5-19. The bridge games played at a tournament may differ depending on local preferences of the tournament sponsor. Deposition of Nancy Boyd, 21:21-22:7.[3]

For regional and sectional tournaments, staffing of the tournament will be part of the arrangement between ACBL and the district or unit sponsoring the tournament. First Rosenbury Decl., ¶ 11. ACBL employs individuals to direct and support the tournaments, and will bill the tournament sponsor for each tournament session directed by ACBL employees. First Rosenbury Decl., ¶ 12; Koltnow Dep., 34:1-2. Some of the individuals ACBL employs to direct tournaments have the job title Tournament Director. First Rosenbury Decl., ¶ 13. However, others who direct tournaments may have a different job title, because they have other primary job duties. *Id.* An example prior to January of 2018 would be a Field Supervisor, and an example after January 2018 would be a Mentor, National Tournament Director or Area Manager. *Id.*; Koltnow Dep., 66:8-66:21; 74:8-74:17. Nonetheless, all ACBL employees involved in directing a tournament will hold some tournament director *rank* which is distinguishable from their *job title*. First Rosenbury Decl., ¶ 14. The number of tournament directors working at a tournament will vary. NABCs may have as many as seventy tournament directors whereas the regional tournaments may have from six to forty tournament directors. *Id.*, ¶ 15.

Each tournament is broken into sessions. *Id.*, ¶ 10. A session is the period of bridge playing time for which the bridge player paid an entry fee to compete. Koltnow Dep., 34:1-6. For an ACBL employee, the session includes the amount of time for the bridge play as well as the time before and after the session for performing related duties, such as selling entries or posting

---

[3] For example, in the Northeast, it is not common for tournaments to include compact knockout games, which is a one day and two session game as opposed to two days and four sessions played at other tournaments. Boyd Dep., 20:15-22:7.

scores. Koltnow Dep., 34:7-11. The sessions can take place in the morning, afternoon, evening or night, with the number of sessions played varying depending on the size of the tournament. Koltnow Dep., 39:7-23.

The sessions can also vary greatly in length, from 3.5 hours to occasionally as long as 7.5 hours. Koltnow Dep., 34:10-16. The hours each individual works relative to a particular tournament varies depending on a number of factors, such as whether the individual is the Director-In-Charge ("DIC"), the particular type of game the tournament director is supervising, any required score corrections, number of disputes and rulings, and whether there is an appeal of a ruling requiring the tournament director's attention. Koltnow Dep., 131:4-132:13; Barton-Paine Dep., 117:4-119:3, 131:19-132:10; Boyd Dep., 88:3-10. There may also be variations in work hours because of a tournament director's particular style. Koltnow Dep., 129:19-130:17. For example, Barton-Paine was told she could be slow in making decisions when she was refereeing so she may take longer to complete a session. Barton-Paine Dep., 120:17-121:12. Consequently, it is not possible to compute the number of hours any individual worked as a tournament director based solely on the number of sessions worked because each tournament and each tournament director would have their own peculiar factors impacting the number of hours worked.[4] Koltnow Dep., 34:17-35:18, 130:8-134:21; Barton-Paine Dep., 119:4-13, 147:21-148:17; Marcus Dep., 311:22-312:11. Indeed, Plaintiff Barton-Paine acknowledged that she would not be able to compute the hours she worked prior to 2016. Barton-Paine Dep., 139:12-140:16.

### C.    Opt-In Plaintiffs Held Seven Different Positions.

While all of the Opt-In Plaintiffs were involved in some fashion in directing tournaments, their primary job duties and the terms and conditions of their employment varied greatly from one another. During the relevant time period, the Opt-In Plaintiffs held the following positions: Tournament Director, Field Supervisor, STaC Coordinator, Mentor, Area Manager, Associate National Tournament Director and National Tournament Director. Second Rosenbury Decl., ¶7 &

---

[4] For STaCs, ACBL charges based on the number of tables rather than by session, which further complicates the calculation of hours worked by TDs who directed STaCs. Marcus Dep., 112:24-113:4.

Ex. 1. The job duties for each position varied. Each Opt-In Plaintiff's primary duties, level of discretion and supervision varied from one another. Tournament Directors are located throughout North America and some will travel hundreds of miles to direct a tournament (and/or supervise other Tournament Directors) whereas others typically direct tournaments within their metropolitan area, and, at least one, Plaintiff Peter Marcus, worked often at home as a STaC Coordinator. Second Rosenbury Decl. ¶ 9.

### 1.    Tournament Directors and Directors-in-Charge

When working as a tournament director ("TD"), the primary duty is to act as a referee for the games played at the tournament to ensure they are played fairly and with integrity for all the players in accordance with the Laws of Duplicate Bridge. Koltnow Dep., 128:15-129:18; Barton-Paine Dep., 63:8-11, 65:16-19, 66:14-24; Barton-Paine Dep. Ex. 11; Marcus Dep., 295:22-302:15. This is true for any of the Opt-In Plaintiffs when they were acting in this role. As the referee, the TD ensures the games are moving along at the correct speed (since the game is a timed event), and, if the players have a dispute, the TD will rule on the dispute based on the Laws of Duplicate Bridge. Koltnow Dep., 96:8-97:25; Barton-Paine Dep., 56:20-57:8; 65:16-19, 66:14-71:8; Marcus Dep., 295:22-302:15. A TD's job duties can vary from tournament to tournament based on the size of the tournament and the specific duties assigned. Weinstein Dep., 70:25-71:11.

As noted above, the TDs hold ranks which determines (or at least strongly influences) the complexity of the tournaments they are assigned to work and the supervisory responsibilities they can exercise.[5] There are five ranks for TDs: Local Tournament Director, Associate Tournament Director, Tournament Director, Associate National Tournament Director, and National Tournament Director. Koltnow Dep., 24:8-17; Barton-Paine Dep., 32:20-33:24. The

---

[5] When asked the difference in ranks, Marcus testified, "A tournament director…is a lieutenant, maybe a captain, a national tournament director is a three-star general. They have different expectations, different skills, different responsibilities." Marcus Dep., 264:1-19.

rank has no direct relationship to an individual's job title[6] but instead determines the level of tournaments an individual can oversee as the Director-in-Charge ("DIC"), his/her job duties for the tournament and whether he/she is able and expected to take on special projects. Koltnow Dep., 28:3-22, 146:12-22; Barton-Paine Dep., 33:25-35:19.[7] For example, a TD with the rank of Tournament Director is able to be a DIC for a sectional tournament, but it would be atypical for a person holding the Tournament Director rank to be assigned as a DIC for a regional.[8] Weinstein Dep., 30:10-31:4.

Other than small non-Life Master tournaments for lower-ranked players, each tournament has one TD working as a DIC who supervises all the other TDs and other staff assigned to work the tournament. First Rosenbury Decl., ¶ 15; Koltnow Dep., 27:2-28:2. In addition to playing a role in refereeing, the DIC typically determines the nature and type of the bridge games to be played in consultation with the sponsor, the set up of the tables, the movement of the boards of playing cards between tables, the number of TDs required for the tournament, who will be assigned to work the tournament, what shifts each TD will work, the supervisory duties each will perform, and what other tasks each TD may perform. Koltnow Dep., 27:2-28:2, 40:6-8. The larger a tournament, the greater and more complicated a DIC's supervisory responsibility. Barton-Paine Dep., 58:14-59:1, 126:3-8. For the smallest of tournaments, the DIC may be the only TD working the tournament. Barton-Paine Dep., 35:23-36:11. For example, if Barton-Paine accepts an assignment as the DIC for a sectional tournament, she runs the tournament independently, including setting her own work schedule. Barton-Paine, 23:16-23, 104:17-24; 114:21-115:2. Typically, the DIC will also collect and hold the tournament financial proceeds

---

[6] The ACBL job title Tournament Director is distinct from the rank of "Tournament Director" – the third of the five ranks described above – and the Tournament Director job title was held by individuals holding any of the five ranks. Koltnow Dep., 26:1-26:10.

[7] For example, an appeals committee (to review a DIC ruling) would be staffed by Associate National Tournament Directors and National Tournament Directors. Hartman Dep., 64:12-24.

[8] The typical DIC assignment for a regional tournament is a Tournament Director who holds the rank of Associate National Tournament Director or higher. Weinstein Dep., 31:5-12.

(often cash) until it is time to turn them over to the sponsor, and will account for such money in a financial report to the sponsor. Koltnow Dep., 27:13-15; Barton-Paine Dep., 50:18-21.

### 2. Peter Marcus's Employment as STaC Coordinator.

Of the nineteen opt-in plaintiffs, Plaintiff Marcus is the only one who worked as a STaC Coordinator. STaC stands for Sectional Tournament at a Club. Marcus Dep., 68:15-69:11. STaCs involve players from various clubs coming together to compete in a tournament hosted by the clubs in a specific geography even though the players in the STaC are playing in different physical locations. Marcus Dep., 73:3-12, 116:22-117:12. When directing a STaC, Marcus worked from his home, compiling the results from the STaC remotely and acting as a resource over email or the telephone for on-site club directors needing assistance in directing the games at their clubs. *Id*., 74:24-75:23. In contrast, when he was directing a tournament in person, 90-percent of the time was spent face-to-face with players, making rulings based on facts gathered on the floor. *Id.*, 106:23-109:7, 119:24-121:8. According to Marcus, directing a STaC is distinct from live tournament directing and more administrative in nature. *Id*. STaCs also require TDs to spend much more time calculating and posting scores cumulatively across several clubs compared to the time they would spend on the same task at a single site tournament. *Id*., 119:2-23; 120:8-9. As STaC Coordinator, Marcus was also responsible for developing effective training, processes and programs to manage STaC tournaments. *Id.*, 85:18-86:9, 90:4-91:1; Marcus Dep. Ex. 5.

### 3. Five Plaintiffs Worked as a Field Supervisor.

Five of the nineteen opt-in plaintiffs worked as Field Supervisors from the beginning of the relevant time period until the elimination of the position in January 2018. Second Rosenbury Decl. ¶8. Field Supervisors typically work fewer sessions as TD because they had other primary job duties, and the number of sessions varied substantially among those holding this position. Koltnow Dep., 40:25-41:21; Blevins Dep., 29:20-30:4. Field Supervisors were responsible for "the technical operation of all sanctioned tournament bridge play" in their geographical area of responsibility and had four focus areas: (1) tournament organizers; (2) workforce supervision; (3)

tournament operations; and (4) executing the strategic direction of field operations. Koltnow Dep. Ex. 2. For example, Field Supervisors were responsible for assigning the DIC for tournaments, completing performance reviews for the TDs, hiring, firing, promoting and recruiting TDs; and otherwise observing, training and offering assistance to their direct reports. Koltnow Dep., 42:11-15, 82:2-15, 89:16-93:25; Blevins Dep., 25:7-19. When working at a tournament, Field Supervisors operated in a dual capacity, working as both a TD and as a supervisor for their direct reports. Boyd Dep.,118:3-119:6; Hartman Dep., 83:7-84:6.

Outside of tournaments, Field Supervisors were involved in a variety of special projects and assignments, e.g., Koltnow served on the ACBL Laws Commission[9] and Field Supervisor Arleen Harvey worked on Tournament Director University, authoring training materials for more junior TDs, and also was responsible for staffing ACBL's Regionals-at-Sea. Deposition of Arlene Harvey, 65:6-20.

### 4.    One Plaintiff Held the National Tournament Director Position.

In January 2018, when ACBL eliminated the Field Supervisor position, it created the following positions: Area Manager, Mentor, Associate National Tournament Director and National Tournament Director. Second Rosenbury Decl. ¶ 8. Although he was offered the Area Manager position, Plaintiff Koltnow chose to accept the National Tournament Director position. Koltnow Dep., 66:18-67:3. From January 1, 2018 through August 31, 2019, Koltnow's job duties as National Tournament Director included: (i) managing large tournaments and associated staff; (ii) training and mentoring others in movement selection, room and game setup, and fixes to the same; (iii) training and mentoring others in evaluating and providing feedback on tournament schedules; (iv) guiding disputes and bad behavior through appeals and conduct committees; (v) drafting and updating tournament regulations; and (vi) training and mentoring others in the application of laws and delivering rulings (among others). Koltnow Dep. Ex. 1. These job duties

---

[9] The Laws Commission is responsible for interpreting the meaning of laws in the Laws of Duplicate Bridge and updating them for the ACBL once every decade, most recently in 2017.

were considered to require a higher level of expertise than that possessed by TDs. Blevins Dep., 83:20-84:6.

### 5.     One Plaintiff Held the Associate National Tournament Director

Opt-In Plaintiff Van Cleve is the only plaintiff who worked as an Associate National Tournament Director. Second Rosenbury Decl., Ex. 1. The job duties of the Associate National Tournament Director are to: (i) train and mentor others in movement selection,[10] room and game setup, and fixes to the same; (ii) train and mentor others in evaluating and providing feedback on tournament schedules; (iii) manage large tournaments and associated staff; (iv) guide appeals and/or conduct committees, (v) train and mentor others in matters of convention and alert charts; and (vi) participate in drafting and updating ACBL tournament regulations. Koltnow Dep. Ex. 1.

### 6.     Six of the Plaintiffs Held the Position of Area Manager.

In January 2018, four plaintiff Field Supervisors accepted the promotion to Area Manager. In December 2018, ACBL promoted one Mentor to Area Manager, and beginning in September 2019, Koltnow applied for and was promoted to Area Manager. Second Rosenbury Decl. ¶10. The Area Manager position is functionally similar to the Field Supervisor position but includes a larger geography and, until June 2019, typically had a smaller number of direct reports. Wells Dep., 58:25-60:24; Blevins Dep., 102:2-103:9. While the Area Managers were still responsible for part-time Tournament Directors, the primary day-to-day supervision of the part-time Tournament Directors fell on the Mentors. *Id.* However, Area Managers supervised the Mentors, Associate National Tournament Directors and National Tournament Directors. Harvey Dep., 63:20-64:4; Blevins Dep., 116:1-11.[11]

Like Field Supervisors, Area Managers working at tournaments filled a dual role as they both worked the tournament as a referee or director and supervised their direct reports. Boyd Dep., 119:7-16. Area Managers could also attend tournaments they were not working to

---

[10] Movement selection refers to the proper selection among myriad alternatives of the movement of players.
[11] After ACBL eliminated the Mentor position in June 2019, the Area Manager assumed direct managerial responsibility over additional part-time Tournament Directors. Second Rosenbury Decl. ¶12.

supervise their direct reports. For instance, Area Manager Harvey's territory spanned from Canada down to San Diego, and multiple times a year, she would travel to a tournaments solely for the purpose of observing and training more junior TDs. Harvey Dep., 80:21-82:17. Area Managers also took on more special projects for the ACBL than had been expected of Field Supervisors. Blevins Dep., 102:2-103:9; Harvey Dep., 62:19-22. Finally, Area Managers had an increased role in hiring, firing and recruiting. Blevins Dep., 117:11-118:18.

### 7.    Eight of the Plaintiffs Held the Mentor Position.

When the Mentor position was established in January 2018, six full-time TDs became Mentors, and about eight months later, in August 2018, two part-time Tournament Directors were promoted into the role. Second Rosenbury Decl. ¶11. The purpose of the Mentor position was to "prepare the next generation of ACBL tournament director leadership." Blevins Dep., 45:8-46:3. The Mentor's primary job duties were to (i) recruit, lead, motivate, and evaluate a team of Tournament Directors; (ii) manage a group of direct reports through coaching sessions; (iii) assist an Area Manager with the administration of long-range staffing goals; and (iv) serve as a role model for direct reports to "consistently deliver flawless service to players and tournament organizers." Carmichael Dep. Ex. 5. Mentors also served as DIC for large tournaments where they worked with Area Managers to make decisions as to staffing for the tournaments and acted as a "buffer" between Area Managers and TDs, answering TDs' questions, checking their hours, and giving performance reviews, among other tasks. Yokel Dep., 28-29; Carmichael Dep. Ex. 5. The goal was to have Mentors supervise the equivalent of two and one-half full-time employees, but the number supervised varied depending on the number of part-time Tournament Directors residing in a Mentor's geographic area. Blevins Dep., 105:5-13.

In addition to completing annual evaluations, Mentors provided performance coaching throughout the year. Yokel Dep., 40:12-45:7. Mentors also had the authority to recruit and train part-time Tournament Directors. Blevins Decl., ¶ 4. Although Mentors did not have the authority to hire, fire or promote ACBL employees, ACBL generally deferred to their opinions and

recommendations about such decisions. Blevins Decl., ¶ 5; Yokel Dep., 38:17-38:23. ACBL eliminated the Mentor position on June 1, 2019. Second Rosenbury Decl., ¶ 9.

>   **D.      Tournament Director Compensation Changes**

In early 2014, ACBL asked legal counsel to evaluate the question of whether full-time TDs had been properly classified as exempt under the FLSA. Hartman Decl. ¶ 6. Based on this advice received from counsel, ACBL decided to continue classifying its full-time TDs as exempt. *Id.* ¶ 9. However, some Opt-In Plaintiffs were part-time Tournament Directors who were classified as non-exempt and paid hourly and overtime for their part time work. *See, e.g.*, Second Rosenbury Decl. ¶14. In 2016, the ACBL was faced with being forced to substantially increase the minimum salary for full-time Tournament Directors to satisfy the increased minimum salary required for overtime exemptions under the then-new white collar regulations being released by the United States Department of Labor. First Rosenbury Decl., ¶ 28; *see also* Hartman Dep., 20, 26-27.[12] Therefore, beginning on January 11, 2017, ACBL re-classified full-time employees with the TD job title as non-exempt. First Rosenbury Decl., ¶ 28. ACBL continued to classify its Field Supervisors (with higher salaries) as exempt. *Id.*

In January 2018, ACBL re-organized its Field Operations Department eliminating the Field Supervisor position and adding the Area Manager, Mentor, and National Tournament Director positions, all of which ACBL classified as exempt from overtime pay requirements. First Rosenbury Decl., ¶¶ 20-21. A few opt-in plaintiffs continued to work as part-time, non-exempt employees for all or a majority of the year. *See* Rosenbury Decl., ¶¶17, 18, 38. Three other plaintiffs became part-time, non-exempt employees in 2018 and 2019. See Second Rosenbury Decl., ¶14, Ex. 1. After the Mentor position was eliminated in 2019, some plaintiffs returned to working as a full-time salaried Tournament Directors and were classified as exempt

---

[12] Enforcement of the new white collar regulations was enjoined by the courts in 2017 and were later abandoned by the Department of Labor. *See Nevada v. U.S. Dep't of Labor*, 275 F. Supp. 3d 795, 807 (E.D. Tex. 2017).

from overtime pay requirements because their salary exceeded the minimum required threshold and otherwise met the requirements for the administrative exemption.

## II.     PROCEDURAL HISTORY

Plaintiff Marcus filed this lawsuit on June 23, 2017, and on November 14, 2017, Marcus filed an Amended Complaint, adding Plaintiffs Koltnow and Barton-Paine. Doc. Nos. 1, 16. In their amended complaint, Plaintiffs assert that ACBL failed to pay overtime to all Tournament Directors in violation of the Fair Labor Standards Act ("FLSA").[13] Am. Compl. ¶¶ 12-13. The Court conditionally certified the collective action on September 28, 2018. Doc. No. 39. Notice was issued to putative members of the conditionally certified class. McDonagh Decl. ¶ 3. The proposed collective action consists of the three named plaintiffs and sixteen opt-in plaintiffs. Doc. No. 49-1.

## III.    DISCUSSION

### A.     Plaintiffs Bear the Burden to Establish They Are Similarly Situated

A plaintiff may bring an FLSA action on his behalf and on behalf of other employees "similarly situated." *See* 29 U.S.C. § 216(b). To certify a FLSA class action, district courts have applied a two-step approach involving initial notice to prospective plaintiffs followed by a final evaluation whether such plaintiffs are similarly situated. *Kane v. Gage Merch. Serv., Inc.*, 138 F. Supp. 2d 212, 214 (D. Mass. 2001). At the second step, "[a]fter discovery is complete, the party opposing the conditional class may file a motion for decertification." *Id.* If the Court concludes that the putative class members are not "similarly situated," it may decertify the class and dismiss the opt-in plaintiffs without prejudice. *Id.* On the other hand, if the court finds that the putative class members are similarly situated, the case may go to trial as a class action. *Id.*

"The burden of demonstrating that members of the collective action are similarly situated is to be borne by the plaintiffs, who must show by a preponderance of the evidence that they are

---

[13] Plaintiffs include Field Supervisors in their definition of Tournament Director, and, though they never amended their complaint to add the Mentor, National Tournament Director or Area Manager positions ACBL understands Plaintiffs reference to "tournament directors" includes anyone who is involved in directing tournaments.

similarly situated." *Zavala v. Wal Mart Stores Inc*., 691 F.3d 527, 534 (3d Cir. 2012). *See also Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1261 (11th Cir. 2008); *Gonpo v. Sonam's Stonewalls & Art LLC*, No. 16-40138-MGM, 2018 WL 1725695, at *4 (D. Mass. Apr. 9, 2018) (noting that a "more stringent" standard applies at second stage of certification process). "Factors relevant to the stage-two determination include: (i) factual and employment settings of the individual plaintiffs, (ii) the different defenses to which the plaintiffs may be subject on an individual basis, and the degree of fairness and procedural impact of certifying the action as a collective action." *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 364-65 (D. Me. 2010). *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) (the certification becomes more akin to the familiar Rule 23 class certification standard).

ACBL maintains that it properly classified Plaintiffs employed full-time as exempt under the FLSA's executive and/or administrative exemptions, depending on the individual circumstances of each plaintiff's case.[14] "The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet" criteria for the relevant exemption. 29 C.F.R. § 541.2. As relevant here, the administrative exemption applies when an employee (a) receives a salary of at least $455 (or $684 post January 1, 2020) per week; (b) has a primary duty involving non-manual work directly related to the employer or employer's customers; and (c) has a primary duty involving the exercise of discretion and independent judgment. 29 C.F.R. §541.200. The executive exemption applies when an employee (a) receives a salary of at least $455 (or $684 post January 1, 2020) per week; (b) has a primary duty involving management of the enterprise or a recognized department or subdivision thereof; (c) customarily and regularly directs the work of two or more other employees; and (d) has the authority to hire and fire, or whose recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given

---

[14] Two of the plaintiffs were always part-time and received overtime during the relevant time period. *See* Second Rosenbury Decl., ¶¶17-18. Five other plaintiffs worked as part-time, non-exempt employees for part of the relevant time period. *See id.* ¶¶17, 18, 24, 38, 43.

particular weight. 29 C.F.R. § 541.100. In this case, the relevant statutory exemption criteria will require an individualized, fact-specific analysis of each of the nineteen plaintiff's job title, job duties and compensation, making this case inappropriate for resolution on a collective basis. Indeed, some Plaintiffs themselves held three different positions during the relevant time period. *See* Second Rosenbury Decl. Ex. 1. Thus, the Court should decertify the collective action.

**B.      The Opt-In Plaintiffs Are Not Similarly Situated To Each Other.**

The Opt-In Plaintiffs are not similarly situated to each other because, during the period relevant to this dispute, they had a range of different job titles and duties, exercised different forms of "discretion and independent judgment," had different levels of authority to hire and fire (or make recommendations as to employment status), and had different degrees of supervision over other employees. All told, the opt-in plaintiffs had <u>seven</u> different job titles between 2016 and 2019: Tournament Director, Field Supervisor, National Tournament Director, Associate National Director, STaC Coordinator, Area Manager, and Mentor. Within the Tournament Director job, some were part-time (non-exempt and paid over-time) and others were full-time, some exempt and some non-exempt (depending on the year). Despite this, Plaintiffs assert that Field Supervisors, STaC Coordinator and other positions are properly included within the collective action and their claims may be resolved on a collective basis. Doc. No. 16. Notably, of the nineteen opt-in plaintiffs in this action, six never held the title "Tournament Director" during the relevant time period. Second Rosenbury Decl. ¶ 8.[15]

The Opt-In Plaintiffs had a variety of the job titles and duties (as described above) and their job duties varied significantly. For example:

- Barton-Paine was primarily a TD and can only serve as a DIC at sectional tournaments, whereas Koltnow held the position of Field Supervisor where he supervised twelve TDs, wrote and published appeals, and held (and continues to hold) a role as a member of the influential ACBL Laws Commission. (Koltnow Dep., 41:14-17, 82:2-22, 89:16-93:25, 98:3-5, 141:7-143:11; Barton-Paine Dep., 23:16-23). In contrast, Marcus testified that he

---

[15] ACBL acknowledges that each held a Tournament Director rank but the rank is distinct from the job title dictating the employee's job duties. First Rosenbury Decl. ¶ 14; Koltnow Dep., 28:3-22, 146:12-22; Barton-Paine Dep., 33:25-35:19.

was the only TD who focused primarily on STaCs which he supported from his home and required far more administrative work than tournaments directed in person. Marcus Dep., 74:24-75:23, 106:23-109:7, 119:2-121:8.

- Opt-In Plaintiff Arlene Harvey testified that as a Field Supervisor, she evaluated TDs directly and was involved in promoting other employees. Harvey Dep., 41:2-43:10. Harvey worked on Tournament Director University, authoring training materials and standard operating procedures for more junior TDs, and also was responsible for staffing ACBL's Regionals-at-Sea. Harvey Dep., 65:6-20.

- Yokel was an hourly TD (and was overtime-eligible) until she became a Mentor on January 1, 2018. Yokel Dep., 27-28. As a Mentor, Yokel was neither a TD – whom she managed – nor a Field Supervisor. Instead, the Mentor position was created to prepare the next generation of ACBL tournament director leadership, including recruiting, leading, motivating, and evaluating a team of TDs. Yokel Dep., 38:13-16; Blevins Dep., 45:8-46:3.

These differences in position and job duties underscore that the Opt-In Plaintiffs are not similarly situated. *See also* Second Rosenbury Decl. Ex. 1. While all of these individuals have directed bridge tournaments in some capacity, the differences between the positions are substantial and weigh against collective resolution. Even within one position, there could be further variations in the work performed depending on the geographic location of a Plaintiff and the complexity of the tournaments directed. For example, Koltnow observed that his direct report, Opt-In Plaintiff John Gram's moved to Idaho changed his workload somewhat, causing Gram to run fewer Sectionals with staff. Second Rosenbury Decl.¶29, Ex. 8.

The Field Supervisors (and later Area Managers) are executive exempt employees because they customarily supervised others and had hiring and firing authority.  29 C.F.R. § 541.100. Field Supervisor Job Description, Koltnow Dep. Ex. 2. (key role is "workforce supervision"). In contrast, the Tournament Directors reported to the Field Supervisors  and ACBL does argue that Tournament Directors fall within the executive exemption. Yokel Dep. Ex. 3. On its own, the fact that Field Supervisors exercised direct management over TDs and Area Managers exercised control over Mentors, National Tournament Directors and TDs, makes it inappropriate to include all of those positions within a single collective action or to conclude that ACBL subjected the positions to a single unlawful policy.

Other courts have ruled against collective treatment under similar circumstances. *See*

*Bradford v. CVS Pharmacy, Inc.*, 308 F.R.D. 696, 701 (N.D. Ga. 2015) (decertifying a group of thirty-nine regional loss prevention managers because discovery revealed material differences in the plaintiffs' job duties as they related to the executive and administrative exemptions); *Aquilino v. Home Depot, U.S.A., Inc.*, No. 04-04100 PGS, 2011 WL 564039, at *1 (D.N.J. Feb. 15, 2011) (the court decertified a group of assistant store managers because there was a wide range of evidence relating to the FLSA's executive exemption, e.g., how each opt-in plaintiff viewed their role in hiring, firing, discipline and employee evaluations.[16]

Here, as in the foregoing cases, there is a wide divergence in testimony among the Opt-In Plaintiffs about the key elements of the executive and administrative exemptions. *See* Second Rosenbury Decl., Ex. 1. Some Opt-In Plaintiffs testified that they supervised and had authority to hire and fire other employees; others did not. *Compare, e.g.*, Koltnow Dep. at 82:2-15; Wells Dep. at 44:1-4 *with* Harvey Dep. at 40:22-24; Marcus Dep. at 52:17-22.. Some Opt-In Plaintiffs organized large tournaments and directed a staff; others did not. *Compare* Koltnow Dep., 82:2-22 *with* Carmichael Dep., 55:17-24. Some Opt-In Plaintiffs touted themselves as exemplary leaders with substantial influence in the organization (Koltnow Dep. Ex. 9); others did not. *See, e.g.*, Yokel Dep. at 38:11-39:3 (testifying that "I wasn't looking for a management position."). Some Opt-In Plaintiffs thrived in the Mentor role, embracing their supervisory responsibilities; others did not. (*Compare* Yokel Dep. Ex. 7 (noting that other TDs find Yokel "a pleasure to work for" and "routinely" ask for her as their DIC) *with* Carmichael Dep., 57:12-57:20 & Ex. 3 at 7 (in self-evaluation, stating that she had "a lot of problems" as a mentor). While Mentors, Yokel and Carmichael shared a supervisor, Harvey, who observed Yokel was an "excellent" supervisor but Carmichael was "challenging." Harvey Dep., 87:13-88:10. The Opt-In Plaintiffs' "day-to-day job duties vary substantially." and these differences demonstrate that the Opt-In

---

[16] *See also Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 108 (N.D. Ill. 2013); *Guanzon v. Vixxo Corp.*, No. CV-17-01157-PHX-DWL, 2019 WL 1586873, at *7 (D. Ariz. Apr. 12, 2019); *Stevens v. HMSHost Corp.*, No. 10 CV 3571 (ILG) (VVP), 2014 WL 4261410, at *7 (E.D.N.Y. Aug. 27, 2014).

Plaintiffs are not "similarly situated" for purposes of the FLSA. *Aquilino*, 2011 WL 564039, at *8.

      **C.**      **Proceeding as a Collective Action Requires Unmanageable and Prejudicial Mini-Trials.**

Because individualized inquiries abound in this case, a collective action would be unmanageable. As noted, ACBL's key defenses in this matter are that it properly classified each of the full-time Opt-In Plaintiffs as exempt based on the administrative and/or executive exemptions to the FLSA, and that it paid overtime to the part-time, non-exempt Opt-In Plaintiffs and full-time non-exempt Opt-In Plaintiffs during certain periods. Assessing these defenses will involve a highly-individualized inquiry focusing on whether the Opt-In Plaintiffs satisfied the criteria for exemption for each position held (with three Opt-In Plaintiffs holding three positions). Importantly, the Opt-In Plaintiffs are seeking to certify a collective action consisting of not *only* Tournament Directors; they are trying to prosecute this case for employees who had multiple different titles at different levels of the organization. *See* Amended Complaint ¶¶ 12 & 13. As depositions in this case revealed, determining whether employees with these varying titles – and the varying job responsibilities they entail – will require specific, individualized inquiries as to their primary duties.

For example, the job description for a Tournament Director lists the following "essential duties and responsibilities": answering director calls, booking and judging rulings, and ensuring players are comfortable; ensuring playing rounds are completed on time; scoring; setting up the logistics of the room; and preparing and selling entries. Yokel Dep. Ex. 3. For someone like Barton-Paine, who has only been a TD, ACBL will elicit testimony that she exercised independent judgment in handling players and that she performed non-manual work directly related to ACBL and its customers. *See, e.g.*, Barton-Paine Dep., 100:13-16 (stating she uses her judgment and experience to refocus players on the game rather than issues that are agitating them). In contrast, ACBL's focus with Lynn Yokel, who assumed the newly-created Mentor position on January 1, 2018, will be on her managerial duties, as she testified that as a Mentor

she was "assigned several directors generally in our area" and "did their performance reviews." Yokel Dep., 28:21-29:12. This testimony goes to the heart of the executive exemption; yet it has nothing to do with Barton-Paine or her claims. The inquiry for a plaintiff like Koltnow will also focus on the criteria for executive and/or administrative exemptions for his positions as Field Supervisor, National Tournament Director and Area Manager, in ways that differ substantially from the analysis to be applied the Mentor position. Even though he is a named plaintiff, Koltnow is particularly ill-suited to represent a group of plaintiffs claiming entitlement to overtime, as he testified that he had "approximately a dozen" direct reports (far beyond the two required under the executive exemption) and his manager remarked in 2016 that he "considers himself part of management." Koltnow Dep., 89:16-18 & Ex. 9.

In a similar vein, there are highly individualized inquiries with respect to the calculation of hours each plaintiff worked. For example, Barton-Paine and Koltnow both recognize that the hours each individual works relative to a particular tournament vary depending on the individual and a number of other factors, such as whether the individual is the DIC, the particular type of game the TD is supervising, any required score corrections, whether there is an appeal to a ruling requiring the TD's attention. Koltnow Dep., 129:19-130:17, 131:4-132:13; Barton-Paine Dep., 117:4-119:3, 131:19-132:10. Perhaps for these reasons, Barton-Paine conceded she could not even calculate her own hours prior to 2016. Barton-Paine Dep., 139:12-140:16. Many of the plaintiffs work part-time and were paid on an hourly basis with overtime, and, therefore, would not be entitled to *any* overtime pay during those periods. *See, e.g.*, Lavender Dep., 21:5-22:23; Second Rosenbury Decl., Ex. 1. Thus, there is no representative way to determine how many hours an individual spent performing job duties related to directing a tournament because each tournament and each TD would have their own peculiar factors that could affect the number of hours worked. Koltnow Dep., 34:17-35:18, 130:8-134:21; Barton-Paine Dep., 119:4-13, 147:21-148:17; Marcus Dep., 311:22-312:11.

Each putative plaintiff would need to be individually examined to evaluate whether they were properly classified and to determine how many hours he/she may have worked over forty.

Because this case "would require the parties, the Court, and perhaps eventually a jury, to engage in an unmanageable assortment of individualized factual inquiries … this is not a case that lends itself to the sort of efficient adjudication of multiple claims by 'similarly situated' persons that § 216(b) contemplates." *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 688-89 (D. Md. 2010). Therefore, the Court should decertify this matter as a collective action. *See Botero v. Commonwealth Limousine Serv. Inc.,* No. 12-10428-NMG, 2014 WL 1248158 at *6 (D. Mass. Mar. 25, 2014) (denying certification due to individualized inquiry needed to determine what constituted 'working time').[17] As the Third Circuit noted in *Zavala*, 691 F.3d at 537-38: "The similarities among the proposed plaintiffs are too few, and the differences among the proposed plaintiffs are too many."

### D.      Fairness and Procedural Considerations Command Decertification

Finally, the Court must consider the "degree of fairness and procedural impact of certifying the action as a collective action." *Prescott*, 729 F. Supp. 2d at 364-65. Courts evaluating this factor should consider "the primary objectives" of FLSA collective actions, which are "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000). Courts should balance those considerations with the "likelihood of 'mini-trials' and the risk of prejudice to both parties.'" *Martin v. Citizens Fin. Grp., Inc.*, No. 10-260, 2013 WL 1234081, at *8 (E.D. Pa. Mar. 27, 2013).

Here, because the facts relevant to the Opt-In Plaintiffs' overtime claims and ACBL's defenses to those claims are so individualized, it would be impossible to proceed with this action using representative testimony, creating an unwieldy and unfair process for *all* parties. To present its defenses, ACBL will need to call every Opt-In Plaintiff to the witness stand to elicit

---

[17] *See also Adams v. Hy-Vee, Inc*., No. 11-00449-CV-W-DW, 2012 U.S. Dist. LEXIS 98590, *14 (W.D. Mo. May 22, 2012) (denying certification of department manager class due to the need for individualized inquiries).

testimony regarding the degree to which each employee performed duties that satisfy the relevant criteria for exemption. Because *multiple* different positions and two overtime exemptions are involved here, the testimony of each witness will not necessarily shed any light on issues common to other purported plaintiffs. For example, ACBL's defenses against claims of a TD like Barton-Paine will be that they satisfy the administrative exemption. In contrast, ACBL's defenses against a plaintiff like Koltnow, who was a Field Supervisor, a National Director and Area Manager, will focus on his duties with respect to both the executive exemption and the administrative exemption, with an entirely different focus. As to some of the Opt-in Plaintiffs, both exemptions may apply simultaneously or in different time periods.

Just as Barton-Paine's or Koltnow's individual testimony will be needed to defend against their individual claims, ACBL will also need to call other Opt-In Plaintiff as a witness to describe their job duties and employment histories. This will devolve into numerous mini-trials (as explained above), which in turn will do nothing to promote the goals of the collective action process.: As such, proceeding on a collective basis runs a risk of prejudicing not only ACBL, which would be forced to prepare for nineteen individual trials in one long proceeding, but also the Opt-In Plaintiffs, whose individual claims will not receive the focused attention they would receive through individual suits. In short, presenting such a complex panoply of facts to a jury (if the case is not disposed of through motion practice) is incompatible with collective actions.

## IV.    CONCLUSION

For all the foregoing reasons, Defendant respectfully requests that the Court issue an order decertifying the collective action.

Respectfully submitted,

THE AMERICAN CONTRACT BRIDGE
LEAGUE INC.

By its attorneys

/s/ Melissa L. McDonagh
Melissa L. McDonagh (BBO #569023)
Francis J. Bingham (BBO #682502)
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA 02110
Phone 617.378.6000
Fax 617.737.0052
mmcdonagh@littler.com
fbingham@littler.com

Paul E. Prather (admitted *Pro Hac Vice*)
LITTLER MENDELSON, P.C.
3725 Champion Hills Drive, Suite 3000
Memphis, TN 38125
(901) 322-1257 (t)
(901) 271-7189 (f)
pprather@littler.com

Dated: May 11, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of May, 2020, a true and accurate copy of this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/Melissa L. McDonagh*
Melissa L. McDonagh

4812-7261-8172.1 070438.1015

22