UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PETER MARCUS, MATT KOLTNOW, DIANNE BARTON-PAINE, AND OTHERS SIMILARLY SITUATED, <br><br> PLAINTIFFS, <br><br> v. <br><br> THE AMERICAN CONTRACT BRIDGE LEAGUE, <br><br> DEFENDANT. | CIVIL ACTION NO. 17-11165-FDS |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO LYNN YOKEL**

For the majority of the relevant time period, Opt-In Plaintiff Lynn Yokel ("Yokel") either was paid hourly and received overtime or worked as an exempt Mentor whose primary job duty was supervising five tournament directors for the Defendant The American Contract Bridge League ("ACBL" or the "Company"). Since June 2019, Yokel worked as a salaried ACBL Tournament Director whose responsibility was to supervise and referee sanctioned bridge tournaments on behalf of ACBL. Yokel claims she was misclassified as exempt from overtime under the Fair Labor Standards Act ("FLSA"), but her job duties show that ACBL properly classified her as exempt under both the FLSA's executive and administrative exemptions. Accordingly, the Court should award summary judgment to ACBL and dismiss Yokel's claims.

If the Court declines to do so, the Court should then issue two rulings regarding damages. First, this dispute is governed by a two-year statute of limitations measured against the date Yokel filed her opt-in consent form because there is no evidence that ACBL willfully violated the FLSA.

To the contrary, ACBL relied in good faith on legal advice stating that employees like Yokel were exempt under the FLSA. Second, if Yokel were found to be non-exempt, the appropriate way to calculate damages is by adding 50% to her hourly pay – not 150% – for all hours exceeding 40 per week.

## I. BACKGROUND

### A. ACBL's Business Promoting, Growing and Sustaining the Game of Bridge

ACBL is the governing body for contract bridge in North America. ACBL's Statement of Undisputed Material Facts ("SOF") ¶ 1. For a summary of ACBL's business, the job duties involved in directing bridge tournaments and acting as a director-in-charge, and the various ACBL tournament director ranks, *see* Section I.A. of the Memorandum of Law in Support of ACBL's Motion for Summary Judgment as to Matt Koltnow (the "Koltnow Memorandum") (submitted herewith and incorporated by reference.)

### B. Yokel's Employment as Tournament Director and Mentor.

ACBL hired Yokel as a part-time Tournament Director in 2013. SOF ¶ 292. During that period, Yokel received an hourly rate and overtime for all hours worked in excess of forty per week. SOF ¶ 293. In December of 2016, Yokel became a full-time Tournament Director, but ACBL continued paying her by the hour because ACBL had recently changed its pay practice to begin paying full-time Tournament Directors on an hourly basis and overtime. SOF ¶ 294. As a full-time Tournament Director, Yokel served as DIC for tournaments. SOF ¶ 295. On January 1, 2018, ACBL promoted Yokel promoted to Mentor, a newly-created salaried position. SOF ¶ 297. The purpose of the Mentor position was to "prepare the next generation of ACBL tournament director leadership," which required Yokel to travel to various tournaments and provide guidance to part-time Tournament Directors. SOL ¶¶ 63, 297.

As a Mentor, Yokel's primary job duties were to (i) recruit, lead, motivate, and evaluate a

team of Tournament Directors; (ii) manage a group of direct reports through coaching sessions; (iii) assist an Area Manager (similar to a Field Supervisor) with the administration of long-range staffing goals; and (iv) serve as a role model for direct reports to "consistently deliver flawless service to players and tournament organizers." SOF ¶ 64. Mentors also served as DIC for large tournaments where they worked with Area Managers to make decisions as to staffing for the tournaments. SOF ¶ 65. Mentors like Yokel acted as a "buffer" between Area Managers and Tournament Directors, answering Tournament Directors' questions, checking their hours, and giving performance reviews, among other tasks. SOF ¶ 66. Yokel testified that the performance evaluation she completed for her direct reports affected their merit pay. SOF ¶ 298. Yokel was a mentor to five Tournament Directors, a group she referred to as "[her] staff," and they often worked with her at tournaments. SOF ¶¶ 299, 302. In addition to completing their annual evaluations, Yokel provided performance coaching throughout the year and did what she could to help develop them as TDs. SOF ¶ 301. Mentors like Yokel also had the authority to recruit and train part-time Tournament Directors. SOF ¶¶ 64, 67. Although Mentors did not have the authority to fire ACBL employees, ACBL generally deferred to their opinions and recommendations about such decisions. SOF ¶ 68. As a Mentor, Yokel promoted one member of her "staff" to the Tournament Director rank in April 2018. SOF ¶ 302.

ACBL eliminated the Mentor position on June 1, 2019. SOF ¶ 71. After the Mentor position was eliminated, Yokel became a full-time, salaried Tournament Director for the final eleven months of the relevant period. SOF ¶ 303.

        C.      **Yokel's Compensation as Tournament Director and Mentor**

In early 2014, ACBL asked legal counsel to evaluate the question of whether full-time TDs had been classified as exempt under the FLSA. SOF ¶ 75. Based on this advice received from counsel, ACBL decided to continue classifying its full-time TDs as exempt. SOF ¶ 77. However,

3

in 2016, the ACBL was faced with being forced to substantially increase the minimum salary paid to its Tournament Directors to satisfy the increased minimum salary required for overtime exemptions under the then-new revised white collar regulations being released by the United States Department of Labor. SOF ¶ 78.[1] Therefore, beginning on or about January 11, 2017, ACBL re-classified full-time employees with the Tournament Director job title as non-exempt. SOF ¶ 79.

As noted above, ACBL re-organized its Field Operations Department in January 2018, eliminating the Field Supervisor position and adding the Area Manager, Mentor, and National Tournament Director positions, all of which ACBL classified as exempt from overtime pay requirements. SOF ¶ 56. After the Mentor position was eliminated in 2019, Yokel became a full-time Tournament Director and was classified as exempt from overtime because her salary exceeded the minimum threshold under federal law and otherwise met the requirements for the administrative exemption. SOF ¶¶ 303-304. As a Mentor, Yokel earned a salary of $41,449.98, or $797.12 per week. SOF ¶ 300. In Yokel's current position as full-time Tournament Director, Yokel earns a salary of $46,556.64, or $805.32 per week. SOF ¶ 304.

### D. Procedural History

Yokel filed a consent to join this Action on April 24, 2019. Doc. Nos. 1, 49-1.[2]

## II. ARGUMENT

### A. Yokel Cannot State a Claim for Overtime Pay Before January 1, 2018 Because She Received Overtime Pay.

Until December 2016, Yokel worked part-time and was eligible for overtime. SOF ¶¶ 292-294. Yokel remained over-time eligible until she was promoted to the Mentor position effective

---

[1] Enforcement of the new white collar regulations was enjoined by the courts in 2017 and were later abandoned by the Department of Labor. *See Nevada v. U.S. Dep't of Labor*, 275 F. Supp. 3d 795, 807 (E.D. Tex. 2017).

[2] The FLSA operates with a two- or three-year "look back" from the date an employee files a claim. As explained below, Yokel's claim is based on the date of her filing of her consent. 29 U.S.C. § 255(a).

4

January 1, 2018. SOF ¶¶ 297, 300. Thus, Yokel cannot state a claim for unpaid overtime prior to 2018.

> **B.   Yokel's Claim for Overtime Pay From January 1, 2018 through June 1, 2019 Fails Because the Mentor Position Satisfies the Executive Exemption.**

Yokel's overtime claim fails at the outset because her job as Mentor was exempt under the FLSA's executive exemption. "The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the" criteria for the relevant exemption. 29 C.F.R. § 541.2. To qualify as an exempt executive employee, the employee must:  (1) be compensated on a salary basis of not less than $455 per week, or $684 per week after January 1, 2020[3]; (2) have a primary duty involving "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; (3) customarily and regularly direct the work of two or more other employees[4]; and (4) have the authority to hire or fire other employees or make suggestions and recommendations as to the hiring, firing, advancement or promotion or any other change of status of other employees which are given particular weight. 29 C.F.R. § 541.100(a)(4). As explained below, Yokel's job duties as Mentor fall squarely within this exemption.

> 1.   *ACBL Paid Yokel a Salary of at Least $455 Per Week.*

First, there is no dispute that Yokel earned a salary of at least $455 per week, and Yokel received this guaranteed salary regardless of whether or not she worked during any particular workweek. SOF ¶¶ 300, 304-305. Thus, the salary basis requirement is met.

> 2.   *As a Mentor, Yokel's Primary Duty Was Management.*

Second, Yokel's primary duty involved management. The DOL regulations define

---

[3] 29 C.F.R. § 541.200(a)(1) (2020).
[4] To meet this prong, the employee must customarily and regularly direct the work of two or more full-time employees or their equivalent. 29 C.F.R. § 541.104.

"management" to include activities such as "interviewing, selecting and training" employees; "setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used;" apportioning work among employees; "determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures." 29 C.F.R. § 541.102.

The term "primary duty" means "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700. The focus is on "the character of the employee's job as a whole," with the following factors to be considered:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."

*Id*. Yokel's employment as a Mentor easily fits within this framework. The essential purpose of the Mentor position was to supervise a group of part-time Tournament Directors and take responsibility for their training and development and to prepare them to "move on to the next level of expertise of tournament direction." SOF ¶ 63. The "key role and responsibilities" of the position included recruiting, leading, motivating, and evaluating a team of Tournament Directors, which Yokel referred to as "[her] staff." SOF ¶¶ 64-65, 67, 302. Thus, it is beyond dispute that Yokel's primary duty was to manage other Tournament Directors.

Yokel may argue that she is exempt because she performed certain nonexempt tasks that were non-managerial and/or routine in nature. Even if Yokel performed *some* non-managerial tasks as a Mentor, however, there is no genuine dispute that the "character of [her] job as a whole" was management. *Cf.* 29 C.F.R. § 541.700, 29 C.F.R. § 541.700(b) ("Time alone … is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt duties."). Indeed, courts have repeatedly upheld employees' status as exempt under the FLSA when their essential function in the organization is management, even when they perform far beyond 50% of their job duties on non-managerial tasks.[5] Importantly, Yokel could manage other employees concurrently with any non-managerial tasks she needed to perform. For example, any time Yokel was working as a TD with others on her "staff," she was in a position to be observing the work of others for evaluation and coaching purposes. SOF ¶¶ 301-303. And like other Mentors, Yokel generally worked free from any direct supervision. *See, e.g., In re Family Dollar FLSA Litig.,* 637 F.3d 508, 516 (4th Cir. 2011). In short, there is no genuine dispute that Yokel's primary duty as a Mentor was management.

### 3. *Yokel Supervised Two or More Employees.*

Third, Yokel customarily and regularly directed two or more employees. In fact, as noted above, she supervised five part-time Tournament Directors as a Mentor. SMF ¶ 299.

---

[5] *See, e.g., Soehnle v. Hess Corp.*, 399 F. Appx. 749, 751-752 (3d Cir. 2010) (sole gas station manager found exempt despite spending 85 percent of her time on nonexempt tasks); *Moody v. Family Dollar Stores, Inc.*, No. 3:08-cv-1935, 2014 U.S. Dist. LEXIS 49961, *27-28 (W.D.N.C. Apr. 8, 2014) (summary judgment granted to employer despite manager's claim of spending majority of time on nonexempt tasks where she had discretion to determine what tasks to perform and admitted to running the store and engaging in other managerial duties); *Scott v. SSP Am., Inc.*, No. 09-CV-4399, 2011 WL 1204406, *10-11 (E.D.N.Y. Mar. 29, 2011) (summary judgment for defendant granted despite plaintiff's claim to have spent 90 percent of her time on nonexempt tasks).

        4.     *Yokel Had Authority to Recruit and Train Other Employees, and Her Suggestions as to Important Employment Decisions Were Given Particular Weight.*

Finally, as a Mentor, Yokel had authority to recruit and train other employees as a Mentor. SOF ¶ 67. The DOL regulations state that exempt executives must have *either* (i) had the authority to hire or fire *or* (ii) made "recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees" which were given "particular weight" at other levels of management. *All* Mentors – Yokel included – had the authority to make recommendations as to important employment decisions, and higher-level managers generally deferred to those recommendations; *i.e.*, give them "particular weight." 29 C.F.R. § 541.100; SOF ¶¶ 68-69. Indeed, as noted above, Yokel promoted one of her subordinates – Gregory Vance – to a Tournament Director rank in April 2018. In short, as a Mentor, Yokel was exempt from overtime under the executive exemption, and her claim as to that position should be dismissed.

    **C.**    **Yokel's Claim for Overtime Fails Because the Mentor and Full-Time Tournament Director Positions Satisfy the Administrative Exemption.**

Yokel's positions as Mentor and full-time, salaried Tournament Director also qualify under the FLSA's administrative exemption, which applies when an employee (a) receives a salary of at least $455 per week (or $684 per week after January 1, 2020); (b) has a primary duty performing "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (c) has a primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. §541.200. Yokel's duties as Mentor and Tournament Director satisfy this test.

1.  *ACBL Paid Yokel a Salary of at Least $455 Per Week, and at Least $684 Per Week After January 1, 2020.*

As noted above (*supra* at 3-4), Yokel's positions as Mentor and salaried Tournament Director (the two positions she held after January 1, 2018) satisfy the salary basis test. *See* SOF ¶ 300.

2.  *Yokel's Primary Duty Included Non-Manual Work Directly Related to ACBL's General Business Operations*

Yokel's job duties also satisfy the second prong of the administrative exemption. The DOL regulations define the phrase "directly related to the management or general business operations" as "assisting with the running or servicing of the business." 29 C.F.R. § 541.201(a). As set forth in Section II.B.2. of the Koltnow Memorandum (incorporated by reference), courts have interpreted positions akin to a referee as exempt under the FLSA's administrative exemption because they involve, among other duties, mediating and solving problems for customers, managing game pace, observing and enforcing game rules and liaising with tournament sponsors. *See Allen v. Harrah's Entm't Inc.*, No. 2:04 cv 128, 2006 WL 3513857, at *1-2 (N.D. Ind. Dec. 4, 2006); *Fetrow-Fix v. Harrah's Entm't, Inc.*, No. 2:10-CV-00560-RLH, 2011 WL 5827199, at *8-9 (D. Nev. Nov. 18, 2011); *Mutch v. PGA Tour, Inc.*, No. 3:04-cv-97-J-25TEM, 2007 WL 9718940 (M.D. Fla. Mar. 30, 2007).

As in the foregoing cases, Yokel's primary duty involved non-manual labor directly related to ACBL's general business operations. The primary duty of a Tournament Director was to "*supervise* duplicate bridge contests in accordance with the Laws of Duplicate Bridge" – just as a table game supervisor's job is to supervise games at a casino, and a golf official's job is to supervise the game of golf. *See* SOF ¶ 17. Indeed, the Tournament Director job description contains a laundry list of key duties that are quintessentially administrative in nature and go to the heart of ACBL's general business operations, e.g., "mak[ing] decisions in establishing suitable

9

conditions of play and announce them to the contestants"; imposing discipline and ensuring the orderly progression of the game, and "[a]judicat[ing] disputes after determining the relevant facts and various possibilities" (among other duties). SOF ¶ 18. Further, just as PGA officials serve as "tour liaison" with local golf tournament sponsors and golf courses, TDs serve as ACBL's liaison with local tournament sponsors. *See Mutch*, 2007 WL 9718940, at \*2. Similarly, both PGA officials and TDs penalize players for improper conduct and make "on-the-spot rulings during tournament play." *Id*. Nor is there any dispute that TDs actually performed these job duties on a regular basis. SOF ¶¶ 17-18. Similarly, it is undisputed that the primary duty of a Mentor is to "recruit, lead, motivate and evaluate" a team of Tournament Directors. SOF ¶ 64.

These duties go to the core of ACBL's general business operations, and to its very reason for existing: to grow and sustain the game of bridge and serve the bridge-related interest of its members. *See* SOF ¶ 2. Tournament Directors and Mentors are not at all akin to employees who work "on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Rather, their job requires the consistent and undisputed exercise of administrative discretion aimed at establishing a fair and appropriate contest for play, facilitating the smooth flow of play, resolving disputes, enforcing the laws of bridge, disciplining players for rules and conduct violations, satisfying sponsors' expectations about the quality of the contest and ACBL's organization, and safeguarding the integrity of the game. SOF ¶ 27. In short, there is no genuine dispute of material fact as to the primacy of the administrative duties of TDs or their importance to the management of ACBL and its customers. Thus, Yokel's job duties – as both Mentor and salaried Tournament Director – satisfy the second prong of the administrative exemption.

       3.     *Yokel Exercised Discretion and Independent Judgment as to Significant Matters.*

Finally, Yokel's positions as Mentor and Tournament Director involved the exercise of discretion and independent judgment as to matters of significance. Discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Factors to consider for this requirement include, but are not limited to, whether the employee has authority to interpret or implement management policies or operating practices; whether the employee represents the company in handling complaints; whether the employee carries out major assignments in conducting business operations; and whether the employee performs work that affects business operations to a substantial degree. 29 C.F.R. § 541.202(b).

Here, there is no genuine dispute that Yokel's duties as Mentor and Tournament Director required the exercise of discretion and independent judgement as to matters of significance. It is undisputed, for example, that TDs like Yokel had authority to "interpret" or "implement" ACBL's "operating practices" (29 C.F.R. § 541.202(b)); indeed, that was their primary function in the organization. *See, e.g.*, SOF at ¶ 27-28. The primary duty of any TD running a tournament is to "supervise a duplicate bridge contest in accordance with the Laws of Duplicate Contract Bridge," which involves (i) interacting with tournament sponsors, (ii) making decisions in establishing suitable conditions of play, (iii) appointing and supervising assistants, as necessary, (iv) enforcing and maintaining discipline among players (including decisions regarding suspension or disqualification), (v) making rulings from the rules of contract bridge, and (vi) adjudicating disputes between players (among other duties). SOF ¶ 17. Multiple TDs (Yokel included) testified that their jobs involved the exercise of discretion akin to a referee. *See, e.g.*, SOF ¶¶ 29, 296. TDs must consistently exercise independent judgment, a dynamic exemplified by one TD's admission

11

that she "oftentimes" faced situations in which two TDs at a tournament would believe a ruling should go one way and two others would believe the ruling should go the other way. SOF ¶ 32. In a similar vein, Yokel's positions regularly required her to hear and address players' concerns – *i.e.*, to "handl[e] complaints." 29 C.F.R. § 541.202(b). *See, e.g.*, SOF ¶¶ 17-18. Moreover, as the DIC, Yokel could (i) award penalties against a player for playing too slowly; (ii) determine staffing levels and select staff for each tournament; (iii) assign work to staff; (iv) make decisions about disputes related to game play; and (v) "ensur[e] that ACBL regulation and policy are followed." SOF ¶ 41.

These are exactly the kinds of duties the DOL regulations contemplate when they define discretion as the "comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). As the court noted in *Fetrow-Fix*, the implementation of a company's "policies and operating practices, as well as evaluating different circumstances and deciding if action needed to be taken," are the *"essence of exercising discretion and independent judgment*." 2011 WL 5827199, at *8 (emphasis added). Moreover, as a Mentor, Yokel also exercised discretion and independent judgment in her supervision of five Tournament Directors, including assigning them work, training them, evaluating their performance (which affected their merit pay), coaching on performance issues, developing them as Tournament Directors and determining when one was ready for promotion. SOF ¶¶ 64, 299, 301-302.

In sum, there is no genuine dispute of material fact as to Yokel's exercise of independent judgment or the importance of her job duties to the management of ACBL. Thus, Yokel's job duties satisfy all three requirements of the administrative exemption.

**D.  Yokel's Claims are Barred to the Extent that She Seeks Damages for More than Two Years Before She Filed a Consent to Join this Action.**

As explained in Section II.C. of the Koltnow Memorandum (incorporated herein by reference), there is no evidence that ACBL committed a willful violation of the FLSA. To the contrary, the record shows that ACBL took active steps to ascertain the dictates of the FLSA and then acted to comply with them. Thus, Yokel cannot recover for more than two years before she filed a consent to join this action (29 U.S.C. § 255(a)).

**E.  Even if Yokel Were to Prevail, She Would Be Entitled to an Extra 50% - not 150% - for All Hours Worked In Excess of 40 in Each Workweek.**

As also explained in Section II.D. of the Koltnow Memorandum (which is incorporated herein by reference), Yokel's recovery in this matter, if she were to prevail, is limited to an additional 50% of her regular rate – not 150% – because, at all times relevant to her claims, she worked variable hours in exchange for a fixed salary and understood that the salary compensated her for all hours worked. SOF ¶¶ 300, 304-305.

## III. CONCLUSION

For all the foregoing reasons, ACBL respectfully requests that the Court grant its motion for summary judgment and dismiss Yokel's claims in their entirety. In the alternative, ACBL requests a ruling that (a) the statute of limitations applicable to Yokel's claim is limited to two years, and (b) the fluctuating workweek method is the correct way to calculate Yokel's overtime damages.

Respectfully submitted,

THE AMERICAN CONTRACT BRIDGE LEAGUE INC.

By its attorneys,

/s/ Melissa L. McDonagh
Melissa L. McDonagh (BBO NO. 569023)
Francis J. Bingham (BBO NO. 682502)
LITTLER MENDELSON, P.C.
One International Place
Suite 2700
Boston, MA  02110
Phone:  617.378.6000
Fax:  617.737.0052
mmcdonagh@litler.com
fbingham@littler.com

Paul E. Prather (admitted *Pro Hac Vice*)
LITTLER MENDELSON, P.C.
3725 Champion Hills Drive
Suite 3000
Memphis, TN  38125
Phone:  901.795.6695
Fax:  901.271.7189
pprather@littler.com

May 11, 2020

**CERTIFICATE OF SERVICE**

    I, Melissa L. McDonagh, hereby certify that on this 11th day of May 2020, the foregoing document was filed electronically through the ECF system, is available for viewing and downloading from the ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

                                                /s/ Melissa L. McDonagh
                                                Melissa L. McDonagh

4850-1491-0908.3 070438.1015