UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————— )
)
PETER MARCUS, MATT KOLTNOW, )
and DIANNE BARTON-PAINE, on behalf )
of themselves and all others similarly )
situated, )
)
        Plaintiffs, )       **Civil Action No.**
)       **17-11165-FDS**
        v. )
)
AMERICAN CONTRACT BRIDGE )
LEAGUE, INC., )
)
        Defendant. )
———————————————————————— )

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT, DEFENDANT'S
MOTION TO DISMISS, DEFENDANT'S MOTION TO STRIKE,
<u>AND DEFENDANT'S MOTION TO DECERTIFY CLASS</u>

SAYLOR, C.J.

     This case involves claims by current and former tournament directors for American

Contract Bridge League, Inc. ("ACBL") for violations of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. §§ 201-219.  Section 207 of the FLSA requires employers to compensate

all non-overtime-exempt employees at not less than one-and-one-half times their regular rate for

each hour worked in excess of 40 hours per workweek.  Those who work in *bona fide* executive,

administrative, or professional capacities are exempt from that requirement.  Plaintiffs contend

that ACBL improperly classified all tournament directors as exempt and thus denied them

overtime compensation to which they were entitled.  On September 28, 2018, the Court

conditionally certified a collective action.

     The parties have cross-moved for summary judgment as to plaintiffs' claims for unpaid

overtime and related issues concerning the limitations period and damages.  ACBL has also moved to strike an affidavit and two exhibits that plaintiffs have submitted in support of their motion.  It has further moved to decertify the conditionally certified class.

In addition, one named plaintiff, Peter Marcus, contends that ACBL also violated the FLSA by retaliating against him after he filed a complaint with the Department of Labor seeking unpaid overtime.  ACBL has moved for summary judgment as to Marcus's individual claim of retaliation.

For the reasons set forth below, the Court concludes that Tournament Directors are not exempt under the FLSA, but National Tournament Directors, Associate National Tournament Directors, Field Supervisors, Area Managers, and Mentors are subject to the administrative exemption.  It does reach the issue of whether the STaC Coordinator is subject to an exemption. The Court further concludes that plaintiffs' claims, to the extent that plaintiffs worked in a non-exempt position and were wrongly denied overtime pay, are subject to a two-year limitations period.

Accordingly, as to liability under Count 1, the Court will grant plaintiffs' motion for summary judgment to the extent that it seeks to recover unpaid overtime for plaintiffs who worked as salaried Tournament Directors since April 24, 2017 (and will otherwise deny the motion).  It will deny defendant's motions to the same extent (and otherwise grant them).[1]  As to damages under Count 1, the Court will grant defendant's motion for summary judgment as to the method of calculating plaintiffs' overtime damages and deny plaintiffs' motion for summary

---

[1] There are two exceptions.  First, the job positions of one plaintiff, Arleen Harvey, during the relevant time period are not clear from the record.  The Court will therefore deny the parties' motions for summary judgment as to Harvey's claim for unpaid overtime.  Second, the Court will grant defendant's motion to dismiss the claim of plaintiff Kenneth Van Cleve.  It will therefore deny as moot defendant's motion for summary judgment as to Van Cleve.

judgment as to liquidated damages.  In light of the disposition of the motions for summary judgment related to Count 1, the Court will deny as moot defendant's motion to decertify the collective action.  Finally, the Court will grant defendant's motion for summary judgment as to the claim of retaliation by Marcus.

# **Table of Contents**

I.  Background ........................................................................................................... 6

   A.  Factual Background .......................................................................................... 6

      1.  American Contract Bridge League ............................................................. 6

      2.  Relevant ACBL Job Positions ................................................................... 6

         a.  Tournament Director ........................................................................... 7

         b.  Field Supervisor ................................................................................. 8

         c.  Area Manager ..................................................................................... 9

         d.  Mentor ............................................................................................. 10

         e.  National Tournament Director and Associate National Tournament Director ...... 10

         f.  STaC Coordinator ............................................................................ 11

      3.  Tournament Director Compensation ........................................................ 12

      4.  Marcus's Retaliation Claim .................................................................... 17

   B.  Procedural Background .................................................................................. 19

II.  Legal Standard ................................................................................................... 21

III.  Analysis ............................................................................................................ 22

   A.  Defendant's Motion to Strike ....................................................................... 22

      1.  Affidavit of Plaintiff Peter Marcus ........................................................ 23

      2.  Exhibits 5 and 6 to Plaintiffs' Statement of Material Facts .................... 26

   B.  FLSA Exemption of Defendant's Job Positions ........................................... 27

      1.  Overtime Generally ................................................................................. 28

      2.  The Administrative Exemption ............................................................... 29

      3.  Analysis .................................................................................................. 31

         a.  Tournament Directors ....................................................................... 31

         b.  National Tournament Directors, Associate National Tournament Directors, Field Supervisors, Area Managers, and Mentors ........................................ 37

         c.  STaC Coordinator ............................................................................ 42

   C.  Cross-Motions for Summary Judgment as to the Limitations Period Under Count 1 ...... 43

   D.  Cross-Motions for Summary Judgment as to Liability Under Count 1 ........... 50

      1.  Dianne Barton-Paine ............................................................................... 51

      2.  Eric Bell ................................................................................................. 51

      3.  Jennifer Carmichael ................................................................................ 52

      4.  Susan Doe and Terry Lavender ............................................................... 53

      5.  Harry Falk .............................................................................................. 54

6.     John Gram ....................................................................................... 55

7.     Arleen Harvey ................................................................................. 56

8.     Jeffery Jacob ................................................................................... 57

9.     Matt Koltnow .................................................................................. 58

10.    Candace Kuschner ......................................................................... 58

11.    Peter Marcus .................................................................................. 59

12.    Karl Miller ...................................................................................... 59

13.    McKenzie Myers ............................................................................ 60

14.    Joan Paradeis ................................................................................. 61

15.    Nancy Watkins ............................................................................... 61

16.    Marilyn Wells ................................................................................. 62

17.    Lynn Yokel ..................................................................................... 63

E.    Defendant's Motion to Dismiss and Motion for Summary Judgment as to Plaintiff
Kenneth Van Cleve ..................................................................................... 63

F.    Motions for Summary Judgment as to Damages ............................................ 64

1.     Fluctuating Workweek .................................................................. 65

2.     Liquidated Damages ..................................................................... 69

G.    Defendant's Motion to Decertify the Collective Action .............................. 70

H.    Defendant's Motion for Summary Judgment as to Count 2 ......................... 71

IV.    Conclusion ...................................................................................................... 75

# I.  Background

## A.  Factual Background

The following facts are as set forth in the record and are undisputed except as noted.

### 1.  American Contract Bridge League

American Contract Bridge League is the governing body for contract bridge in North America.  (Def. SMF ¶ 1).  Its mission is "to promote, grow and sustain the game of bridge and serve the bridge-related interests" of its more than 160,000 members.  (*Id.* ¶¶ 2, 6).

In pursuit of that mission, ACBL provides staff for ACBL-sanctioned bridge tournaments.  (*Id.* ¶ 4).  Each year, it sanctions more than 3.5 million tables of bridge, played in more than 3,000 clubs and 1,100 sectional and regional tournaments across North America.  (Pl. SMF ¶¶ 2, 28).  It divides the United States, Canada, Mexico, and Bermuda into 25 districts, with each district further divided into a varying number of units.  (*Id.* ¶ 27; Def. SMF ¶ 9).  The districts and units are separate legal entities that are not owned by ACBL.  (Def. SMF ¶ 10).

ACBL sanctions three levels of tournaments:  the North American Bridge Championships ("NABCs"), regionals, and sectionals.  (*Id.* ¶ 11; Pl. SMF ¶¶ 27, 30).  The NABCs involve every district; regional tournaments usually involve one district; and sectional tournaments usually involve one unit or club.  (Def. SMF ¶ 11).  ACBL sponsors and runs the NABCs, but districts and units sponsor and run regional and sectional tournaments.  (*Id.* ¶ 12; Pl. SMF ¶¶ 27, 30).  Although ACBL does not sponsor regional and sectional tournaments, it provides staff to direct those tournaments and bills the sponsors based on the number of tournament sessions directed by ACBL employees.  (Def. SMF ¶ 13).

### 2.  Relevant ACBL Job Positions

ACBL uses a somewhat bewildering variety of job titles and rankings.  Most ACBL employees who direct ACBL-sanctioned tournaments have the job title of Tournament Director.

(*Id.* ¶ 14).  Others who direct tournaments, however, have different job titles.  (*Id.* ¶ 15).  Those

job titles include Field Supervisor, Area Manager, Mentor, National Tournament Director,

Associate National Tournament Director, and Sectional Tournaments at Clubs ("STaC")

Coordinator.  (*Id.*).[2]

Regardless of title, all ACBL employees who direct tournaments hold a tournament-

director rank that is distinct from their job title.  (*Id.* ¶ 16).  The ranks of tournament director,

from most junior to most senior, are Local Tournament Director, Associate Tournament

Director, Tournament Director, Associate National Tournament Director, and National

Tournament Director.  (*Id.* ¶ 33).  ACBL requires that all employees who work as tournament

directors, regardless of title or rank, work approximately 270-300 tournament sessions each year.

(Pl. SMF ¶ 42).[3]

### a.    **Tournament Director**

Tournament Directors act as referees at ACBL-sanctioned tournaments.  (Def. SMF ¶¶

20, 28-29).  During games, they make rulings on disputes, enforce and maintain discipline

among players, keep score and verify the accuracy of the scores reported by players, and ensure

timely play.  (*Id.* ¶¶ 17-18, 20-21, 27).  They have the power to penalize players, either by

deducting points or ejecting them from the game.  (*Id.* ¶¶ 22-23, 27).  Tournament Directors also

have job duties at tournaments outside of games.  They set up the tournament sites, sell entries to

the tournament, and coordinate with tournament sponsors and ACBL headquarters.  (*Id.* ¶¶ 17-

---

[2] ACBL states that the employees who direct tournaments but have different job titles have those titles because "they have other primary job duties."  (Def. SMF ¶ 15).  Plaintiffs dispute that characterization.  (Pl. Resp. to Def. SMF ¶¶ 14-15).

[3] ACBL does not dispute that all employees who work as tournament directors, regardless of title or rank, work approximately 270-300 tournament sessions each year.  (Def. Resp. to Pl. SMF ¶ 42).  It disputes, however, whether employees in certain "managerial" positions, such as Field Manager or Area Manager, were "expected to work the same number of sessions as those who were employed as the full-time Tournament Directors."  (*Id.* ¶ 44).

18, 24, 25, 27).

The number of directors at each tournament varies depending on the level of tournament. Generally, sectionals require three to seven directors; regionals require eight to 20 directors; and the NABCs require up to 50 directors. (Barton-Paine Dep. at 35). Each tournament has one director working as the Director-in-Charge ("DIC"). (Pl. SMF ¶ 36). The DIC determines the number of directors required for the tournament, selects those directors, and oversees their work during the tournament. (*Id.* ¶¶ 36-37, 41; Koltnow Dep. at 27). The DIC also assists in refereeing games, resolves disputes that arise during games, and ensures that ABCL regulations and policies are followed. (Def. SMF ¶¶ 37, 41). For the smallest tournaments, the DIC may be the only director working at the tournament. (*Id.* ¶ 39).

An employee's rank affects the level of tournament he can oversee as DIC. (*Id.* ¶ 34). Typically, the DIC for a sectional tournament must have a rank of Tournament Director; the DIC for a regional tournament must have a rank of Associate National Tournament Director; and the DIC for the NABCs must have a rank of National Tournament Director. (Koltnow Dep. at 28; Barton-Paine Dep. at 33-35). However, exceptions are occasionally made to that policy. (Koltnow Dep. at 28).

### b.    **Field Supervisor**

Before January 2018, Tournament Directors reported to Field Supervisors. (Def. SMF ¶ 48). Field Supervisors were responsible for "the technical operation of all sanctioned tournament bridge play." (*Id.* ¶ 49). They had four areas of focus: (1) tournament organization, (2) tournament operations, (3) workforce supervision, and (4) field-operations strategy. (*Id.*). Their responsibilities included assigning DICs for sectional and regional tournaments, and recruiting,

hiring, training, supervising, reviewing, and firing Tournament Directors.  (*Id.* ¶¶ 50-53).[4]  They

also worked at tournaments, where they would officiate games as tournament directors and

supervise and provide feedback to their direct reports.  (*Id.* ¶ 54).[5]  ACBL's job description for

the Field Supervisor position stated that "[t]ournament directing (DiC and staffing assignments)

will represent approximately 75% of the Field Supervisor's time."  (Pl. SMF ¶ 52; Pl. SMF Ex.

7, at 1).

In January 2018, ACBL reorganized its Field Operations Department.  (Def. SMF ¶ 56).

It eliminated the Field Supervisor position and added the positions of Area Manager, Mentor,

Associate National Tournament Director, and National Tournament Director.  (*Id.*).

### c.   **Area Manager**

The job duties of Area Managers are similar to those of Field Supervisors.  (*Id.* ¶ 59).

---

[4] Plaintiffs contend that "[s]ome of the highest ranking Tournament Directors have had, in addition to their [Tournament Director] rank, additional titles—at varying times being called Field Supervisors, Field Managers, or Area Managers.  The change in these titles did not include a significant change in responsibilities.  They reflected a change in titles, not duties.  In 2018, for a brief time, there was an additional title of Mentor, but that has since been eliminated."  (Pl. SMF ¶ 43).

To the extent that plaintiffs are contending that there was not a "significant change in responsibilities" when a Tournament Director became a Field Supervisor, Field Manager, Area Manager, or Mentor, the record evidence does not support that contention.  Plaintiffs rely entirely on the deposition of Sol Weinstein, who testified that "when people went from being field managers to area managers . . . there was [not] a serious change of responsibilities."  (Weinstein Dep. at 25).  But Weinstein was not discussing individual changes in title; instead, he was discussing ACBL's reorganization of its Field Operations Department in January 2018.  That month, ACBL eliminated the Field Supervisor position and created the Area Manager, Mentor, Associate National Tournament Director, and National Tournament Director positions.  (Def. SMF ¶ 56).  Weinstein was explaining that, as a result of that reorganization, "there was [not] a serious change of responsibilities" for individuals whose titles changed from Field Supervisors to Area Managers; "[t]here was just a name change."  (Weinstein Dep. at 25).

[5] Plaintiffs contend that "[t]he evidence cited [in defendant's Statement of Material Facts] does not support the proposition that, while directing tournaments, a Field Supervisor [was] 'at the same time supervising the other tournament directors working the tournament.'"  (Pl. Resp. to Def. SMF ¶ 54).  But Nancy Boyd, an Area Manager at ACBL, when discussing the job duties of a Field Supervisor, testified that "even though you are there fulfilling your duties as a [tournament director] and doing the assignments that you have, you are also able to see the people that report to you in the environment that you are helping them grow in."  (Boyd Dep. at 118-19).  Plaintiffs do not offer contrary evidence, but instead contend that she only "speculat[ed] about what she would do if she were a Field Supervisor directing a tournament."  (*Id.*).  But it is undisputed that her position as Area Manager has duties similar to those of Field Supervisors.  (Def. SMF ¶ 59).  She therefore appears to be competent to provide testimony concerning the duties of other ACBL jobs, including Field Supervisors, at tournaments.

They have the same areas of focus, serve as the "[f]irst point of contact" for any issues concerning the operation of a tournament and staff, and "[a]dminister long-range workforce planning goals." (Second Rosenbury Dec. Ex. 13). Area Managers hire, fire, and review Tournament Directors; assign DICs to tournaments; and adjudicate appeals made by players concerning the rulings of tournament directors. (Def. SMF ¶ 61). Like Field Supervisors, Area Managers also work as tournament directors, where they officiate games and supervise their direct reports. (Boyd Dep. at 118-19). Weinstein testified that he estimates that Area Managers do not spend more than 25% of their time doing work that is not directing tournaments. (Weinstein Dep. at 54).

### d.   Mentor

The role of Mentors was to recruit, train, manage, and evaluate Tournament Directors. (Def. SMF ¶¶ 64, 67). They acted as a "buffer" between Area Managers and Tournament Directors by answering Tournament Directors' questions, checking their hours, and giving performance reviews. (*Id.* ¶ 66). They also assisted Area Managers with long-term staffing issues. (*Id.* ¶ 64). Like Field Supervisors and Area Managers, they served as tournament directors, where they officiated games and supervised their direct reports. (Carmichael Dep. Ex. 5).

Mentors did not have authority to fire ACBL employees. (Def. SMF ¶ 68). However, ACBL generally deferred to their recommendations as to such decisions. (*Id.* ¶¶ 68-69).

On June 1, 2019, ACBL eliminated the Mentor position. (*Id.* ¶ 71).

### e.   National Tournament Director and Associate National Tournament Director

National Tournament Directors and Associate National Tournament Directors manage large tournaments and the associated staff; train and mentor other directors in making rulings,

movement selection, game setup, and tournament scheduling; guide disputes concerning gameplay and poor behavior through appeals committees; and draft and update tournament regulations. (*Id.* ¶¶ 42-43).[6]

### f.   STaC Coordinator

The STaC Coordinator oversees Sectional Tournaments at Clubs. (*Id.* ¶ 44). STaCs are online tournaments that consist of players from several clubs competing remotely. (*Id.*). Approximately 90 to 100 STaCs are run each year, and the STaC Coordinator effectively functions as the DIC for those tournaments. (Def. SMF ¶ 322; Pl. SMF ¶ 53). Club directors administer the games, and the directors e-mail the results to the STaC Coordinator, who reviews and compiles the results to create the equivalent of an in-person tournament. (Def. SMF ¶¶ 45, 47). Throughout the tournament, the STaC Coordinator also acts as a resource for club directors who are directing the games at the clubs. (*Id.* ¶ 46). The job description for the STaC Coordinator states that "[t]ournament directing (DiC STaC's) should represent approximately 70% of the Coordinator's time. STaC coordinators will be required to work at least (ten) 10 tournaments per year outside STaC and online assignments." (Pl. SMF Ex. 8).

Peter Marcus is the only plaintiff who worked as a STaC Coordinator. (Dkt. No. 125-1). In that role, he was responsible for developing training and processes to manage STaC tournaments. (Def. SMF ¶ 321). For example, during 2016, Marcus revised the Conditions of Contest for STaCs, which he planned to present to the ACBL Board of Directors that fall. (*Id.* ¶ 323). He also worked with club directors to address any payment issues related to STaCs. (*Id.* ¶

---

[6] Plaintiffs dispute these statements to the extent that they distinguish between the positions and ranks of National Tournament Director and Associate National Tournament Director. (Pl. Resp. to Def. SMF ¶¶ 42-43). They do not, however, dispute that these are the job duties of employees who hold the positions of National Tournament Director and Associate National Tournament Director. They also offer no affirmative evidence to support their dispute. Indeed, they appear to make the same distinction between positions and ranks in their own Statement of Material Facts. (*See, e.g.*, Pl. SMF ¶ 25 n.1).

325).  Marcus continued to direct in-person tournaments, including as DIC.  (*Id.* ¶¶ 324, 327).

He did not directly supervise any employees.  (*Id.* ¶ 319).

### 3.   Tournament Director Compensation

As of 2014, ACBL classified its full-time Tournament Directors as exempt under the

FLSA.  (*Id.* ¶ 75; Pl. SMF ¶ 64).  That year, ACBL asked its legal counsel at the law firm Littler

Mendelson to determine whether they were properly classified.  (Def. SMF ¶ 75; Pl. SMF ¶ 65).

In March 2014, Littler provided ACBL a memorandum that concluded that "ACBL has a strong

argument that both full-time and part-time Tournament Directors may be classified as

administratively exempt."  (Hartman Dec. Ex. A ("Littler Memo"), at 5).  It further concluded

that Tournament Directors who "typically work as a DIC" would "almost certainly qualify as

exempt" under either the executive or administrative exemption.  (*Id.*).  ACBL continued to

classify its full-time Tournament Directors as exempt.  (Def. SMF ¶ 77).

In November 2014, Peter Marcus, who at that time was a full-time, salaried Tournament

Director, filed a complaint with the Department of Labor.  (Pl. SMF ¶ 18).  That complaint

alleged that he had been misclassified as an exempt employee.  (*Id.*).  The Department of Labor

investigator eventually concluded that Tournament Directors were not exempt under either the

executive exemption or the administrative exemption.  (Pl. SMF Ex. 5, at 3).  In October 2015,

the investigator communicated those findings to ACBL's counsel and advised him that ACBL

owed Marcus $3,883.14 in overtime back wages.  (*Id.* at 5, 7).

Counsel for ACBL informed the investigator that he disagreed that salaried Tournament

Directors were due overtime and that therefore ACBL would not pay back wages.  (*Id.* at 7).  He

further informed the investigator that ACBL was going to discontinue the Tournament Director

position.  (*Id.*).  The investigator's report states that ACBL "assured future compliance but

refused to pay the back wages" and that the investigator "recommended that the file . . . be

administratively closed after review." (*Id.* at 8).

The exemption status of Tournament Directors following the Labor Department's investigation appears to be in dispute. In 2016, the Department of Labor released new regulations that would have forced ACBL to increase the minimum salary paid to its Tournament Directors. (Def. SMF ¶ 78). As a result, according to ACBL, it began to classify its full-time Tournament Directors as non-exempt in January 2017. (*Id.* ¶ 79). It contends that it switched them back to exempt on June 1, 2019. (Def. Resp. to Pl. SMF ¶ 22).[7]

Plaintiffs do not dispute any facts submitted by ACBL related to that timeline. Arguably, those facts may therefore be deemed admitted under Local Rule 56.1. But in their "Statement of Material Facts Not in Dispute" that they submitted in support of their motion for summary judgment, however, plaintiffs offer a different timeline. They say that "[o]n or about January 1, *2016*, the ACBL changed its compensation for most full time Tournament Directors and began treating full time Tournament Directors as hourly employees, including for purposes of overtime pay." (Pl. SMF ¶ 21 (emphasis added)). Plaintiffs further state that "on or about January 1, *2017*, the ACBL reverted to its previous compensation scheme for full time Tournament Directors, paying them on a salary basis and not paying them overtime wages." (*Id.* ¶ 22 (emphasis added)). ACBL disputes both assertions. (Def. Resp. to Pl. SMF ¶¶ 21-22). It appears then that the parties may dispute when ACBL classified Tournament Directors as non-exempt and when it subsequently reclassified them as exempt.

Plaintiffs' timeline is based on Marcus's affidavit. Marcus attests that "[o]n or about January 11, 2016, the ACBL began paying most full time Tournament Directors overtime wages

---

[7] In support, ACBL cites to the section of its Statement of Material Facts that focuses on one plaintiff—John Gram—who was a Tournament Director who switched from being paid hourly to salaried on June 1, 2019. (Def. SMF ¶ 157). But it does not state whether that was a global change or a change specific only to Gram.

for hours worked in excess of forty (40) in a one week period." (Marcus Aff. ¶ 43).[8]  He further attests that "[t]he practice of paying overtime to full time Tournament Directors continued for about one year, until about January 1, 2017, after which the ACBL reverted to paying full-time Tournament Directors a fixed salary with no overtime for weeks in which a Tournament Director worked over forty (40) hours." (*Id.* ¶ 44).

ACBL has moved to strike, among other things, specific paragraphs from Marcus's affidavit.  It contends that Marcus is not competent to testify about ACBL's field-service operations, including the terms and conditions of plaintiffs' employment, following his August 2016 resignation.  For some reason, however, ACBL did not move to strike paragraph 44, the paragraph that concerns Tournament Director compensation starting in January 2017, even though it plainly addresses matters after Marcus's resignation.[9]  The Court will nonetheless, for the reasons set forth below, strike Marcus's affidavit to the extent that it addresses matters after August 2016.  As a result, plaintiffs are left without evidence to support the second half of their timeline—namely, that ACBL reclassified Tournament Directors as exempt at the beginning of 2017.

Elsewhere in the record, plaintiffs actually contradict their own timeline.  For example, in support of their opposition to ACBL's motions for summary judgment, plaintiffs submitted a two-part document titled "Plaintiffs' Statement of Facts." (Dkt. No. 153).  The first part, "Contravention of Defendant's Statement of Facts," disputes certain facts that ACBL included in its statement of material facts.  The second part, "Plaintiffs' Statement of Material Facts in

---

[8] Marcus's affidavit uses the date January 11, 2016, whereas plaintiffs' Statement of Material Facts Not in Dispute uses January 1, 2016.  (*Compare* Marcus Aff. ¶ 43, *with* Pl. SMF ¶ 21).  That difference is immaterial for present purposes.

[9] ACBL has moved to strike paragraphs 6-20, 22-25, 27, and 37-38.  (*See* Dkt. No. 143, at 1; Dkt. No. 144, at 1; *id.* at 3; *id.* at 4).

Dispute," are "those facts that the plaintiffs allege are material and in dispute, for purposes of opposing the defendant's motions for summary judgment." (*Id.* at 1, 9).  The first 71 paragraphs of that part are nearly a word-for-word copy of "Plaintiffs' Statement of Material Facts *Not* in Dispute."  (*See* Pl. SMF ¶¶ 1-71 (emphasis added)).[10]  Small but significant changes, however, were made to paragraphs 21 and 22:

| Plaintiffs' Statement of Material Facts Not in Dispute (Dkt. No. 81) | Plaintiffs' Statement of Material Facts in Dispute (Dkt. No. 153) |
|---|---|
| 21.  On or about January *1, 2016*, the ACBL changed its compensation for most full time Tournament Directors and began treating full time Tournament Directors as hourly employees, including for purposes of overtime pay.  (Pl.Ex. 02, ¶ 43) | 21.  On or about January *11, 2017*, the ACBL changed its compensation for most full time Tournament Directors and began treating full time Tournament Directors as hourly employees, including for purposes of overtime pay.  (Pl.Ex. 02, ¶ 43) |
| 22.   Beginning on or about January 1, *2017*, the ACBL reverted to its previous compensation scheme for full time Tournament Directors, paying them on a salary basis and not paying them overtime wages.  (Pl.Ex. 02, ¶ 44) | 22.  Beginning on or about January 1, *2018*, the ACBL reverted to its previous compensation scheme for full time Tournament Directors, paying them on a salary basis and not paying them overtime wages.  (Pl.Ex. 02, ¶ 44) |

It is not clear why plaintiffs' statements of material facts use different dates for ACBL's changes to its exemption classification of Tournament Directors.[11]  Both statements rely on the

---

[10] It is unclear, to say the least, why the same facts are "in dispute" for the purposes of ACBL's motions for summary judgment but "not in dispute" for the purposes of plaintiffs' motion for summary judgment.

[11] Paragraphs 21 and 22 are not the only paragraphs with changes to dates relevant to the exemption status of Tournament Directors.  Plaintiffs made a related change, again without pointing to different underlying evidence, to paragraph 17:

17.  From 2007 to *2016*, the ACBL paid Tournament Directors designated as "full time" a weekly salary, and were not eligible for overtime for hours worked in excess of forty (40) in a one week period.  Full time, salaried Tournament Directors were classified by the ACBL as "exempt."  (Pl.Ex. 02, ¶ 5, 42, 44; Pl. Ex. 04, p. 35)

(Dkt. No. 81, ¶ 17 (emphasis added)).

17.  From 2007 to *2017*, the ACBL paid Tournament Directors designated as "full time" a weekly salary, and were not eligible for overtime for hours worked in excess of forty (40) in a one week period.  Full time, salaried Tournament Directors were classified by the ACBL as "exempt."  (Pl.Ex. 02, ¶ 5, 42, 44; Pl. Ex. 04, p. 35)

same affidavit from Marcus (even though it does not support paragraphs 21 and 22 in plaintiffs' Statement of Material Facts in Dispute). And it appears that ACBL did not notice that plaintiffs made those changes. When responding to plaintiffs' Statement of Material Facts in Dispute, ACBL incorporated by reference its earlier objections to plaintiffs' Statement of Material Facts Not in Dispute. (Dkt. No. 160, at 1).

Not only do plaintiffs offer different timelines across their statements of material facts, but they also offer a timeline in their opposition to ACBL's motions for summary judgment that appears to include a typographical error:

> It is undisputed that when the ACBL changed its treatment of full time Tournament Directors (except for Field Supervisors) in *2017*, paying them on an hourly basis for one year, it did so to address new Department of Labor regulations that, if they had gone into effect, would have significantly raised the minimum dollar threshold for exempt employees. (Pl.Ex. SOF #21) In January *2017*, the ACBL reverted to its previous position of treating all full time Tournament Directors as exempt employees, and it continues to do so. (Pl.Ex. SOF #22)

(Pl. Opp. at 21 n.9 (emphasis added)). In light of the two timelines plaintiffs offer in their statements of material facts, it is unclear which "2017" was unintended.

As a result, despite the conflicting timelines in the parties' initial statements of material facts, it is unclear whether there is a genuine dispute concerning how and when the exemption status of Tournament Directors changed during the time period relevant to this lawsuit. Plaintiffs did not object to ACBL's timeline; they do not offer competent evidence for part of their timeline; and they offer a different timeline, which in part mirrors ACBL's timeline, in a subsequent statement of facts and a related memorandum.[12]

---

(Dkt. No. 153, ¶ 17 (emphasis added)).

[12] It is worth noting that if the impetus for reclassifying Tournament Directors as non-exempt was the new DOL regulations, which were issued in 2016, plaintiffs' original timeline in its Statement of Material Facts Not in Dispute does not seem to make sense from a chronological standpoint.

In any event, to the extent that a dispute does exist concerning the company-wide classification of Tournament Directors, it is ultimately of little significance.  First, for the reasons set forth below, plaintiffs' claims are subject to a two-year limitations period.  Because plaintiffs opted-in to this lawsuit on April 24, 2019, the two-year period extends back to April 24, 2017.  And because plaintiffs do not offer competent evidence concerning Tournament Director compensation after August 2016, it is not in dispute for the entirety of the relevant period.  Second, there is evidence in the record concerning the compensation and exemption status of each individual plaintiff during the relevant two-year period.  Defendant also details that information in its Statement of Material Facts, and plaintiffs do not dispute any facts concerning their compensation and exemption status.  The Court will therefore rely on that evidence as to the timing of compensation changes when resolving the parties' motions for summary judgment, rather than the conflicting and inconsistent positions taken by the parties concerning ACBL's global classification of Tournament Directors.

### 4.    Marcus's Retaliation Claim

In March 2015, ACBL announced that it planned to reorganize its Field Operations Department and created two new Field Manager positions and the STaC Coordinator position.  (Def. SMF ¶ 313).[13]  Marcus applied and interviewed for a Field Manager position and the STaC Coordinator position.  (*Id.* ¶ 314).  He did not receive a Field Manager position.  (*Id.* ¶ 315).  Instead, the Director of Field Operations, Sylvia Hardin, informed Marcus that ACBL did not intend to fill either Field Manager position.  (*Id.*; Marcus Dep. at 187).  At her deposition, Hardin stated that the reason ACBL did not fill either Field Manager position was "[m]ainly financial."

---

[13] The position of STaC Coordinator was originally called STaC Supervisor.  (Def. SMF ¶ 319).  Marcus believed that STaC Coordinator was a more appropriate title because "(a) the position does not have any supervisory functions and (b) [he saw the position] as a function being done by a Tournament Director, not a distinct job title." (Marcus Dep. Ex. 5).

(Hardin Dep. at 75-76).  The following month, Marcus began performing the STaC Coordinator job duties, and ACBL officially promoted Marcus to that position in June 2015.  (Marcus Dep. at 86; First Rosenbury Dec. ¶ 17).

In February 2016, the Chief Executive Officer of ACBL, Robert Hartman, informed Marcus that Hardin, who was Marcus's supervisor, was separating from ACBL.  (Def. SMF ¶ 330).  The next month, Hartman conducted Marcus's performance review.  (*Id.* ¶ 332).  He gave Marcus a "meets expectation" rating.  (Marcus Dep. Ex. 27, at 1).  Following the performance review, ACBL increased Marcus's salary.  (Def. SMF ¶ 334).[14]

In June 2016, Marcus interviewed for the vacant Director of Field Operations position.  (Pl. SMF ¶ 83).  He was the only candidate interviewed for the position that month.  (*Id.*).  Later that month, Marcus spoke with Hartman about the position; Hartman stated that he had not made a decision but expected to do so soon.  (Marcus Dep. at 139).  Shortly thereafter, Nancy Rosenbury, Human Resources Manager for ACBL, informed Marcus that he would not be hired for the position.  (*Id.*).  At his deposition, Marcus testified that Rosenbury told him that his interview had "gone well," but there were "some concern[s] . . . about [his] approach to things." (*Id.*).  In Marcus's words, there were "attitudinal concerns . . . personal, not professional concerns."  (*Id.* at 140).

The following month, in July 2016, Hartman and Marcus met at the NABCs.  (*Id.*; Marcus Dep. Ex. 8, at 5).  During that meeting, Marcus proposed that he work as the Director of Field Operations on a trial basis.  (Marcus Dep. at 140).  On August 9, 2016, Hartman responded to that proposal by informing Marcus that ACBL had "decided not [to] bring anyone in on an

---

[14] The deposition testimony on which this assertion is based is not included in the record, but plaintiffs do not dispute it (or any facts related to Marcus).

interim or trial basis" and was "still considering" the Director of Field Operations position. (Marcus Dep. Ex. 11, at 1).

Two days later, Hartman received an e-mail from a district manager asking why ACBL had not posted scores for an ongoing STaC tournament. (Marcus Dep. Ex. 9, at 1). Hartman reached out to Marcus to determine what had happened. (*Id.*). The next day, on August 12, 2016, Marcus resigned his employment effective immediately. (Marcus Dep. at 128). During his deposition, Marcus stated that he resigned because he was frustrated and felt that there was no future for him at ACBL because of his March 2016 performance evaluation and ACBL's rejection of his proposal that he work as Director of Field Operations on a trial basis. (Def. SMF ¶¶ 344-45).[15]

In April 2017, ACBL hired Gary Blevins as Director of Field Operations. (Pl. SMF ¶ 85). Blevins testified that before he was hired, his experience with the game of bridge was that he "was familiar that it existed." (Blevins Dep. at 7). Instead, his experience was in the gaming industry in "many kinds of casino-type of environment[s]." (Hartman Dep. at 119). Hartman testified that this "gave a fresh perspective to the organization." (*Id.*).

### B.   Procedural Background

On June 23, 2017, Marcus filed the complaint in this action. Count 1 alleges that ACBL failed to pay overtime to Marcus and similarly situated plaintiffs in violation of the FLSA. Count 2 alleges that ACBL retaliated against Marcus in violation of the FLSA. On November 14, 2017, Marcus filed an amended complaint that added Matt Koltnow and Dianne Barton-Paine as named plaintiffs.

On September 28, 2018, the Court granted plaintiffs' motion to conditionally certify a

---

[15] Again, the deposition testimony on which this undisputed assertion is based is not included in the record.

collective action.  Notice was issued to "[a]ll persons who work or have worked for The

American Contract Bridge League, Inc. as a full time Tournament Director in the period from

June 23, 2014[,] to the present and who at any time during that period was not paid overtime at

one and one-half their regular hourly rate for all hours worked in excess of forty (40) hours in

any one week period."  (Dkt. No. 40-1, at 1).[16]  On May 29, 2019, after potential class members

consented to the action, the Court granted plaintiffs' motion to recognize Marcus, Koltnow,

Barton-Paine, and 16 opt-in plaintiffs as a collective action.

On May 11, 2020, the parties cross-moved for summary judgment on Count 1.  Plaintiffs

filed a single motion.  They contend that they are entitled to summary judgment on their claims

for unpaid overtime under the FLSA; that a three-year limitations period, rather than the standard

two-year limitations period, applies to their claims because the violations of the FLSA were

willful; and that they are entitled to liquidated damages because the violations of the FLSA were

not in good faith.  Plaintiffs have not moved for summary judgment as to Count 2, Marcus's

individual claim for retaliation under the FLSA.

ACBL filed 18 separate motions for summary judgment; with one exception, each motion

is directed to the claim of a specific plaintiff.[17]  The motions are largely duplicative.  ACBL

contends that it is entitled to summary judgment on Count 1 because plaintiffs were properly

---

[16] The Notice states that "[t]he term 'Tournament Director' includes, for purposes of this Notice, a person who holds or held the title of Tournament Director, Associate National Tournament Director or National Tournament Director."  (Dkt. No. 40-1, at 1).  It does not appear that defendant takes issue with the fact that Field Supervisors, Mentors, and Area Managers are included in the conditionally certified class.  In their motion to decertify, defendant points out that the complaint includes Field Supervisors in its definition of Tournament Director but that plaintiffs never amended their complaint to add the Mentor, National Tournament Director, or Area Manager positions after the reorganization.  (Dkt. No. 83, at 12 n.13).  Defendant states that it "understands [plaintiffs'] reference to 'tournament directors' [to] include[] anyone who is involved in directing tournaments."  (*Id.*).

[17] ACBL filed a single motion for summary judgment on Count 1 as to plaintiffs Terry Lavender and Susan Doe.  It has also moved to dismiss the claim of plaintiff Kenneth Van Cleve.

classified as exempt under the FLSA.  It contends that all plaintiffs, regardless of the positions they held, were properly classified as exempt under the administrative exemption.  It further contends that plaintiffs who held Field Supervisor, Area Manager, or Mentor positions were also properly classified as exempt under the executive exemption.

To the extent that plaintiffs' claims for unpaid overtime have merit, ACBL contends that its violations of the FLSA were not willful and therefore that the two-year limitations period applies.  It further contends that the fluctuating workweek method of calculating overtime damages applies to plaintiffs' claims.

ACBL has further moved to strike portions of Marcus's affidavit that plaintiffs have submitted in support of their motion for summary judgment.  It contends that certain statements are not based on his personal knowledge and therefore constitute inadmissible hearsay.  It has also moved to strike Exhibit 5 and Exhibit 6 to plaintiffs' Statement of Material Facts—two documents created by the Wage and Hour Division of the Department of Labor—because it contends that they are not properly authenticated.

ACBL has also moved to decertify the class.  It contends that plaintiffs are not similarly situated because they held different positions, worked at different tournaments, had different levels of decision-making authority, and exercised different forms and degrees of discretion.

Finally, ACBL has moved for summary judgment as to Count 2, the retaliation claim by Marcus.  It contends that Marcus did not suffer an adverse employment action and that, even if he did, no evidence in record indicates that it was causally linked to protected activity.

## II.    Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (internal citation omitted). When evaluating a summary-judgment motion, the court makes all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). "[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.   Analysis

### A.   Defendant's Motion to Strike

Because the disposition of the motion to strike will affect the evidentiary record, the Court will address it first. Defendant has moved to strike paragraphs 6-20, 22-25, 27, and 37-38 of Marcus's affidavit that plaintiffs have submitted in support of their motion for summary judgment. It has also moved to strike Exhibit 5 and Exhibit 6 to plaintiffs' Statement of Material Facts—two documents created by the Wage and Hour Division of the Department of Labor.

As an initial matter, plaintiffs contend that "a motion to strike is not the appropriate manner to object to a dispute over an asserted statement of fact or the evidence offered in support . . . ." (Dkt. No. 154, at 3). But that is incorrect. On summary judgment, a court may consider only facts that would be admissible at trial. *See Garside,* 895 F.2d at 49-51. And "[a] motion to strike is the proper vehicle for challenging the admissibility of evidence offered at the

summary judgment stage." *Federico v. Town of Rowley & MaryBeth Wiser*, 2016 WL 7177888, at *1 (D. Mass. Dec. 7, 2016) (citing *Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 682 (1st Cir. 1994)). Indeed, courts regularly consider motions to strike affidavits and exhibits submitted in support of summary-judgment motions. *See, e.g.*, *Gordon v. EarthLink, Inc.*, 2017 WL 3203385, at *6 (D. Mass. July 27, 2017); *Robert Reiser & Co. v. Scriven*, 2016 WL 4579966, at *4 (D. Mass. Sept. 1, 2016). The Court will therefore consider the motion to strike.

### 1.    <u>Affidavit of Plaintiff Peter Marcus</u>

Defendant contends that several paragraphs of Marcus's affidavit are not based on his personal knowledge and thus constitute inadmissible hearsay. In particular, defendant contends that Marcus is not competent to testify to defendant's practices after his resignation in August 2016 and is further not competent to testify about positions that he did not hold while he was employed by defendant.

Under Fed. R. Civ. P. 56(c)(4), affidavits—although not themselves admissible at trial—may be offered in support of, or in opposition to, summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence. *See Garside,* 895 F.2d at 49-50. "An affidavit . . . used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In making that inquiry, "personal knowledge is the touchstone." *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001) (citing *Sheinkopf v. Stone*, 927 F.2d 1259, 1271 (1st Cir. 1991)). The affiant's personal knowledge "must concern facts as opposed to conclusions, assumptions, or surmise." *Id.* at 316 (citing *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999)).

Marcus's affidavit states the following concerning the basis for his knowledge of the

information provided in the affidavit:

> 3.      The information I provide herein reflects my personal observations and experience as a Tournament Director for more than thirty-five years, having provided bridge directing services at hundreds of ACBL tournaments of all kinds and levels.

> 4.      I have provided bridge directing services, as a Tournament Director for American Contract Bridge League (ACBL) tournaments since August, 1980.  During that time, I have held a variety of ranks, increasing over time from promotions, starting in 1980 as a Local Tournament Director and being promoted, in March 2001, to Associate National Tournament Director.

> 5.      From 1992 until June[] 2010, I was a part-time employee of the ACBL.  I received overtime pay for weeks in which I worked more than forty (40) hours from June 2007 through June 2010.  In June 2010, I was offered and accepted a position as a salaried director, after which I received no overtime pay. This continued until August 2016.

(Marcus Aff. ¶¶ 3-5).[18]  It therefore appears, based on the affidavit, that Marcus's personal knowledge ends in August 2016, when his employment with defendant ended.

Plaintiffs contend, however, that his knowledge of defendant's operations did not end coterminously with his employment.  They state that Marcus has continued to serve on defendant's Board of Governors, which operates as an "advisory board" to defendant, and have submitted an exhibit to that effect identifying the Board's membership as of August 2020.  They further state that Marcus has continued to serve as a DIC for most ACBL-sanctioned regional tournaments conducted by defendant's New England affiliate.  They offer an October 2016 e-mail from the affiliate's president indicating that Marcus agreed to remain as a DIC and a February 2018 tournament worksheet that identifies Marcus as the DIC for that tournament.

Marcus did not submit an affidavit authenticating those exhibits, but it does not appear that defendant objects to them on that basis.  For present purposes, the Court will assume that he

---

[18] Paragraph 5 includes handwritten changes that are initialed "PM".  (Marcus Aff. ¶ 5).  Defendant does not dispute that these changes were made by Marcus.

did in fact serve on the Board of Governors and that he continued to serve as a DIC through February 2018.  A more fundamental problem is that Marcus himself provided no testimony as to his personal knowledge after August 2016.  In particular, he did not indicate how his service on the board, and his service as a DIC for one district, placed him in a position to have personal knowledge of the job duties of various positions for the entire organization after August 2016.  It is certainly possible, of course, that he did have such knowledge, but he did not submit an affidavit so stating, and it is not a reasonable inference to make from the single e-mail and worksheet in evidence.  The Court will therefore strike Marcus's affidavit to the extent that it addresses matters occurring after August 2016.

Defendant specifically moved to strike paragraphs 6-20, 22-25, 27, and 37-38.  All but two of those paragraphs, however, do not explicitly state whether they concern matters before or after August 2016.  The paragraphs will be struck only to the extent that they purport to describe matters after August 2016, such as describing positions that did not exist when Marcus was employed by defendant.

Defendant did not, however, move to strike paragraph 44.  That paragraph plainly concerns, at least in part, matters following Marcus's resignation.  (*See* Marcus Aff. ¶ 44 ("The practice of paying overtime to full time Tournament Directors continued for about one year, until about January 1, 2017, after which the ACBL reverted to paying full-time Tournament Directors a fixed salary with no overtime for weeks in which a Tournament Director worked over forty (40) hours.")).  Even though defendant did not move to strike paragraph 44, it disputed plaintiffs' Statement of Material Facts when they relied on that paragraph.  (*See* Def. Resp. to Pl. SMF ¶ 22 ("ACBL dispute[s] this allegation because it relies on a statement by Peter Marcus for which he lacks personal knowledge, as he resigned in August 2016, before the events described in

Paragraph 22.")).  The Court will not strike paragraph 44, but it will not consider it to the extent that it concerns events after August 2016.

Accordingly, the Court will grant defendant's motion to strike Marcus's affidavit to the extent that it addresses matters occurring after August 2016.[19]

### 2.    Exhibits 5 and 6 to Plaintiffs' Statement of Material Facts

Defendant also contends that Exhibits 5 and 6 to plaintiffs' Statement of Material Facts should be struck.  Exhibits 5 and 6 are documents created by the Wage and Hour Division of the Department of Labor that plaintiffs' counsel obtained through a Freedom of Information Act request.  Defendant contends that the documents are not properly authenticated.

"Documents supporting or opposing summary judgment must be properly authenticated." *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) (citing Fed. R. Civ. P. 56(e)).  Typically, authentication requires competent testimony, such as an affidavit that meets the requirements of Fed. R. Civ. P. 56(e), concerning the document.  *See id.* ("To be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)." (quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)) (internal quotation marks omitted)); *see also* Fed. R. Evid. 901(b)(1).  Certain categories of documents are self-authenticating and require no extrinsic testimony.  *See* Fed. R. Evid. 902. "The authentication requirement is rarely onerous; in many instances, a single sentence will suffice, indicating that the document is what it appears to be."  *DiMaria v. Concorde Entm't, Inc.*, 2014 WL 991567, at *3 (D. Mass. Mar. 12, 2014) (citing *Goguen ex rel. Estate of Goguen v. Textron, Inc.*, 234 F.R.D. 13, 16-17 (D. Mass. 2006)).

---

[19] The Court will also disregard Marcus's testimony to the extent that it offers legal conclusions, as opposed to factual assertions.  *See McGrath v. City of Somerville*, 2019 WL 4764928, at *3 (D. Mass. Sept. 30, 2019) (striking inadmissible conclusions of law).

In opposition to defendant's motion to strike, plaintiffs have submitted an affidavit from their counsel, who testifies to the origins of Exhibits 5 and 6:

> With respect to the documents which were filed with the U.S. District Court for the District of Massachusetts in the above-captioned matter and assigned the document numbers #81-5 and #81-6, and also #153-5 and #153-6, I attest that these documents were produced to my office in response to a Freedom of Information Request directed to the Wage and Hour Division of the U.S. Department of Labor. At the time of receipt the documents bore the current redaction markings[.]

(Dkt. No. 154-1 ¶ 2). He attaches "true and accurate copies" of Exhibits 5 and 6 "as received by [his] office." (*Id.* ¶ 3). The attachments appear to match Exhibits 5 and 6 as originally submitted.

That affidavit is sufficient to satisfy the minimal burden on plaintiffs to authenticate Exhibits 5 and 6. Plaintiffs contend that the exhibits are documents created by the Wage and Hour Division, and their counsel attests, based on his personal knowledge, that they were produced to his office as a result of a FOIA request to that division. The affidavit therefore represents "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).[20]

Accordingly, the Court will deny defendant's motion to strike to the extent that it seeks to strike Exhibits 5 and 6 to plaintiffs' Statement of Material Facts.

## B. FLSA Exemption of Defendant's Job Positions

The Court will next consider whether defendant's job positions are properly classified as

---

[20] Defendant nonetheless contends that the affidavit, even if accurate, is insufficient to authenticate Exhibits 5 and 6. It reasons that "[p]laintiffs are attempting to use these documents to make sweeping statements regarding positions *the DOL itself* has taken regarding the exemption status of full-time Tournament Directors," but the affidavit does not establish "the requisite foundation to conclude that these documents represent the [Department of Labor's] official opinion regarding the exemption status of full-time Tournament Directors." (Dkt. No. 163, at 2). That argument, however, goes to plaintiffs' characterization (or mischaracterization) of the contents of the documents; it does not go to whether the documents themselves have been authenticated.

exempt under the FLSA.

### 1.    Overtime Generally

The FLSA requires an employer to compensate its employees "not less than one and one-half times the regular rate at which [the employee] is employed" for each hour worked in excess of 40 hours per workweek.  29 U.S.C. § 207(a)(1).  That general rule, however, is subject to several exemptions.  *See id.* § 213.  The FLSA places the burden on the employer to show that an exemption applies.  *See Marzuq v. Cadete Enters., Inc.*, 807 F.3d 431, 438 (1st Cir. 2015) (citing *Cash v. Cycle Craft Co.*, 508 F.3d 680, 683 (1st Cir. 2007)).

Historically, exemptions were "narrowly construed" and "limited to those [cases] plainly and unmistakably within their terms and spirit."  *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  The Supreme Court, however, has recently rejected that principle.  *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).  "Because the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give them anything other than a fair (rather than a narrow) interpretation."  *Id.* (internal quotation marks and citations omitted).

Two FLSA exemptions are relevant to the present dispute:  the administrative exemption and the executive exemption.  *See* 29 U.S.C. § 213(a)(1).  Defendant contends that all plaintiffs, regardless of the positions they held, were properly classified as exempt under the administrative exemption.  It further contends that plaintiffs who held Field Supervisor, Area Manager, or Mentor positions were also properly classified as exempt under the executive exemption.

For the reasons set forth below, the Court concludes that Tournament Directors are not subject to the administrative exemption, but that National Tournament Directors, Associate National Tournament Directors, Field Supervisors, Area Managers, and Mentors are subject to that exemption.  Because the Court concludes that Field Supervisors, Area Managers, and

28

Mentors are subject to the administrative exemption, it need not consider whether they are also subject to the executive exemption. The Court will further not reach the issue of whether the STaC Coordinator is subject to an exemption.

### 2. The Administrative Exemption

The FLSA's overtime provision does not apply to any employee employed in a *bona fide* administrative capacity. *See* 29 U.S.C. § 213(a)(1). According to Department of Labor regulations, that exemption includes any employee:

> (1) Compensated on a salary or fee basis . . . at a rate of not less than $684 per week . . . ;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). Here, the parties agree that plaintiffs satisfy the salary criterion. (Pl. Mem. at 11; Def. Reply at 6). Their dispute centers on the nature of plaintiffs' primary duties.

The regulations provide that the term "primary duty" means "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Determining an employee's primary duty is a fact-intensive inquiry, "with a major emphasis on the character of the employee's job as a whole." *Id.* "Briefly stated, the regulation explains that an employee's 'primary' duty is not determined solely by the amount of time he or she devotes to the different categories of tasks—*i.e.*, exempt vs. nonexempt—but on the overall character of his or her position." *Marzuq*, 807 F.3d at 436.

The regulations identify several factors to consider when determining the primary duty of an employee:

the relative importance of the exempt duties as compared with other types of

duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a).

Time spent performing exempt work offers a "useful guide" when determining whether that work is the primary duty of an employee, but it is "not the sole test." *Id.* § 541.700(b). As a result, employees who spend more than 50 percent of their time performing exempt work will "generally" satisfy the primary duty requirement. *Id.* But "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.*

As noted, to qualify for the administrative exemption, an employee's primary duty must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." *Id.* § 541.200(a)(2). The regulations provide that an employee's work must "directly relate[] to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* § 541.201(a). They identify several examples of work that would qualify for the exemption, including work in functional areas such as accounting, marketing, human resources, public relations, and regulatory compliance. *See id.* § 541.201(b).

An employee's primary duty must also "include[] the exercise of discretion and independent judgment with respect to matters of significance." *Id.* § 541.200(a)(3). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or

consequence of the work performed." *Id.* § 541.202(a).  The regulations again identify several

factors to consider when making that fact-intensive determination:

> whether the employee has authority to formulate, affect, interpret, or implement
> management policies or operating practices; whether the employee carries out
> major assignments in conducting the operations of the business; . . . whether the
> employee has authority to waive or deviate from established policies and
> procedures without prior approval; . . . whether the employee is involved in
> planning long- or short-term business objectives; whether the employee
> investigates and resolves matters of significance on behalf of management; and
> whether the employee represents the company in handling complaints, arbitrating
> disputes or resolving grievances.

*Id.* § 541.202(b).  The regulations make clear that "employees can exercise discretion and

independent judgment even if their decisions or recommendations are reviewed at a higher

level."  *Id.* § 541.202(c).

### 3.   Analysis

#### a.   Tournament Directors

Based on the undisputed evidence in the record, Tournament Directors are not subject to

the administrative exemption.  First, their primary duty—officiating bridge contests—does not

relate to defendant's management or general business operations.  (Def. SMF ¶ 17).  The case

law and regulations draw a line between "administrative" work and "production" work.  *See*

*Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir. 1997) (describing the "administrative-

production dichotomy"); 29 C.F.R. § 541.201(a).  Here, the duties of Tournament Directors fall

into the latter category.  Tournament Directors "produce" officiated contests at ACBL-

sanctioned tournaments.  They do not "assist[] with the running or servicing" of ACBL.  29

C.F.R. § 541.201(a).  Instead, they themselves provide ACBL's key product.  Indeed, for 2017

and 2018, tournament-director fees represented the largest source of income for ACBL other

than membership dues.  (Pl. SMF Ex. 10, at 3-4).  Even though Tournament Directors are not

"manufacturing" employees in the traditional sense, they "can still be considered 'production'

31

employees" because "their job is to generate (i.e., 'produce') the very product or service that the employer's business offers to the public." *Reich*, 126 F.3d at 9 (citing *Reich v. New York*, 3 F.3d 581, 587-89 (2d Cir. 1993); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230-31 (5th Cir. 1990)).

Second, even if their primary duty related to defendant's management or general business operations, it does not "include[] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Tournament Directors, like all game officials, make rulings on disputes during bridge contests. (Def. SMF ¶¶ 18, 20). Most rulings, however, are "book rulings," which resolve procedural violations according to the Laws of Contract Bridge. (Pl. SMF ¶ 33).[21] Such rulings do not constitute the exercise of discretion and independent judgment necessary for application of the administrative exemption. *See* 29 C.F.R. § 541.202(e) ("The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."); *see also Reich*, 126 F.3d at 14 (concluding that marketing representatives were subject to the administrative exemption because they were "not merely 'skilled' workers who operate[d] within a strict set of rules" (quoting *Reich v. John Alden Life Ins. Co*, 940 F. Supp. 418, 423 (D. Mass. 1996))).

The other type of rulings that Tournament Directors make—"judgment rulings"—involve issues of judgment concerning the game of bridge. (Pl. SMF ¶ 33). Directors typically consult with other directors before making such rulings, and any appeals are resolved based on input from other players who are not at the table. (*Id.*). As a result, Tournament Directors do not

---

[21] Defendant "disputes the statements in Paragraph 33 to the extent that they describe events or circumstances after Marcus resigned in August 2016, as he lacks personal knowledge to testify about such matters." (Def. Resp. to Pl. SMF ¶ 33). It does not, however, dispute "that individuals holding the job title [of] Tournament Director may perform the responsibilities set forth in Paragraph 33." (*Id.*).

exercise discretion and independent judgment in making those rulings because they are subject to input from other directors and to reversal by other players.  And, in any event, while those rulings may be of significance to the particular contest or even the tournament, they are of little significance to defendant as a company.  *See Hines v. State Room, Inc.*, 665 F.3d 235, 246 (1st Cir. 2011) ("[T]he matters about which the sales managers exercised discretion are matters of significance *to the employer*." (emphasis added)).

The additional duties of Tournament Directors outside of officiating bridge contests likewise do not include exercising discretion and independent judgment with respect to matters of significance.  (Def. SMF ¶¶ 17-18, 24, 27; Pl. SMF ¶¶ 33-34).[22]  Tasks such as setting up tournament sites, selling entries, and keeping score represent "clerical and secretarial work" with relatively little significance.  *See* 29 C.F.R. § 541.202(e).

In *Hines*, the First Circuit held that sales managers at a banquet facility were subject to the administrative exemption.  *See* 665 F.3d at 241-47.  The court reasoned that the plaintiffs' sales-manager positions were administrative because "[t]he sales aspect of the defendants' businesses, although necessary to their success, is clearly ancillary to the principal function of actually providing the banquet services themselves."  *Id.* at 242.  The court pointed out that the plaintiffs "were focused on more than simple individual sales transactions" and "worked with each client to create a custom event in all of the particulars."  *Id.* at 242-43.  In doing so, they exercised "creative freedom" bounded only by "guidelines" rather than "iron rules."  *Id.* at 245.  Their primary duties therefore included sufficient discretion and independent judgment to meet the exemption's requirements.  *See id.* at 247.

---

[22] Defendant makes the same objection to paragraph 34 of plaintiffs' Statement of Material Facts as it makes to paragraph 33.

By contrast, the duties of Tournament Directors are not "ancillary to the principal function" of ACBL. They provide ACBL's principal service: officiating bridge contests at ACBL-sanctioned tournaments. And in providing that service, to the extent that Tournament Directors exercise any discretion, they do so within a narrowly cabined set of boundaries, principally involving the rules of bridge. *See id.* at 243-44 ("The plaintiffs' own descriptions of their duties further make clear that they were focused on more than simple individual sales transactions. . . . [T]hey worked with each client to create a custom event in all of the particulars."); *Cash v. Cycle Craft Co.*, 508 F.3d 680, 686 (1st Cir. 2007) (concluding that customer-relations manager was subject to the administrative exemption in part because he "focused on improving customer service generally"). Unlike the sales managers in *Hines*, whose duties required "creative freedom" and "a significant degree of invention, imagination and talent," and whose decisions were cabined mostly by "guidelines" rather than "iron rules," *Hines*, 665 F.3d at 245 (internal quotation marks omitted), Tournament Directors make most rulings according to a rulebook. (Pl. SMF ¶ 33; Def. SMF ¶¶ 17, 20-21).

Defendant contends that its mission is "to promote, grow and sustain the game of bridge and serve the bridge-related interests of its members," and that it accomplishes that mission not only by officiating bridge tournaments but also supporting local bridge clubs, offering bridge education, publishing bridge materials, supporting competitive bridge play, and marketing the game of bridge. (Def. Reply at 8). It reasons that because "Tournament Directors are directly involved in serving those missions by ensuring that the subset of ACBL members who play in competitive bridge tournaments enjoy and benefit from an experience where the rules for contract bridge are applied with integrity," they are not comparable to retail sales employees or workers on a manufacturing line. (*Id.*).

But even if defendant's services in pursuit of its larger mission go beyond officiating bridge contests, there is no evidence in the record that the primary duties of Tournament Directors likewise extend beyond officiating those contests. To the extent that Tournament Directors are involved in "servicing" defendant's larger mission of growing the game of bridge by officiating contests, that is distinct from "servicing" defendant itself, such as by providing support in a functional area. And it is that type of work that is required for the administrative exemption to apply. *See* 29 C.F.R. § 541.201(a) (explaining that administratively exempt work must "directly relate[] to assisting with the running or servicing of the business"); *id.* § 541.201(b) (identifying exemplar work that qualifies for the administrative exemption, including work in functional areas such as accounting, marketing, human resources, public relations, and regulatory compliance).

Defendant relies on three decisions from courts outside of this circuit in support of its argument that Tournament Directors are subject to the exemption. In two of those decisions, courts granted the defendants summary judgment after concluding that table game supervisors at casinos were subject to the administrative exemption. *See Fetrow-Fix v. Harrah's Entertainment, Inc.*, 2011 WL 5827199, at *9 (D. Nev. Nov. 18, 2011); *Allen v. Harrah's Entertainment, Inc.*, 2006 WL 3513857, at *13 (N.D. Ind. Dec. 4, 2006). But the primary duties of those supervisors—such as assigning dealers to tables, approving large customer purchases, overseeing the day-to-day performance of dealers, and conducting semi-annual appraisals of dealers—were directly related to running the casino. *See Fetrow-Fix*, 2011 WL 5827199, at *8; *Allen*, 2006 WL 3513857, at *10-11. And the matters about which they exercised discretion and independent judgment—such as coaching, disciplining, and commending dealers; suggesting hiring and firing decisions; and drafting performance appraisals of dealers—were significant to

35

the casino's operations.  *See Fetrow-Fix*, 2011 WL 5827199, at *8; *Allen*, 2006 WL 3513857, at

*12.  Notably, their duties did not include making in-game rulings.  Instead, the appropriate

analogues to Tournament Directors in the casino context are the dealers, who are overseen by the

table game supervisors and who are not exempt.  *See Allen*, 2006 WL 3513857, at *12.[23]

The third decision concerns rules officials on the PGA Tour.  *See Mutch v. PGA Tour,

Inc.*, 2007 WL 9718940, at *1 (M.D. Fl. Mar. 30, 2007).  In *Mutch*, after a jury rendered a

verdict in favor of the defendant, plaintiffs moved for judgment as a matter of law, contending

that there was insufficient evidence for the jury to find that the plaintiffs' primary duty consisted

of work directly related to the defendant's management policies or general business operations.

*See id.* at *2.  The court denied that motion.  *Id.*

It is true that the duties of the PGA officials, including making on-the-spot rulings during

tournament play and writing up players for misconduct, are to a certain extent analogous to those

of Tournament Directors.  *See id.*  But the decision is of little persuasive value.  The entire

analysis consisted of a single paragraph—based on the court's recollection of the trial rather than

a trial transcript—in which the court recited the officials' duties, considered the evidence in the

light most favorable to the defendant, and concluded that a sufficient basis existed for a

reasonable jury to find for the defendant.  More significantly, the plaintiffs did not raise, and thus

the court did not consider, whether the officials' primary duties included the exercise of

discretion and independent judgment with respect to matters of significance.  *See id.*

Accordingly, notwithstanding any similarities between the rules officials' duties and those of

---

[23] Tournament Directors may have some duties similar to casino table game supervisors when acting as a DIC.  (Def. SMF ¶¶ 36-37 (explaining that a DIC determines which Tournament Directors will work at the tournament and the shifts that each Tournament Director will work)).  But there is no indication in the record that any Tournament Director operated as a DIC with sufficiently regularity to make the DIC duties their primary duty.

Tournament Directors, the decision provides little support to defendant here.

In short, the primary duty of Tournament Directors, which is officiating bridge contests, does not relate to the management or general business operations of ACBL, and those employees do not exercise discretion or independent judgment with respect to matters of significance. Accordingly, Tournament Directors are not subject to the administrative exemption under the FLSA.

### b. National Tournament Directors, Associate National Tournament Directors, Field Supervisors, Area Managers, and Mentors

National Tournament Directors and Associate National Tournament Directors, however, are subject to the administrative exemption. They have duties that are similar to one another. They manage large tournaments and the associated staff; train and mentor other directors in making rulings, movement selection, game setup, and tournament scheduling; guide disputes concerning gameplay and poor behavior through appeals committees; and draft and update tournament regulations. (Def. SMF ¶¶ 42-43). It is clear that those duties constitute "administrative" rather than "production" work. The duties, "although necessary to [ACBL's] success," are "ancillary" to its "principal function" of providing officiated contests at ACBL-sanctioned tournaments. *See Hines*, 665 F.3d at 242. National Tournament Directors and Associate National Tournament Directors "assist with the running" of ACBL by managing larger tournaments and associated staff and "servic[e]" ACBL by mentoring other directors and drafting and updating ACBL regulations. *See* 29 C.F.R. § 541.201(a). Those tasks go beyond officiating individual contests and directly relate to ACBL's management and general business operations. *See Hines*, 665 F.3d at 242 (noting that sales managers "were focused on more than simple individual sales transactions").

In carrying out their duties, National Tournament Directors and Associate National

Tournament Directors exercise discretion and independent judgment with respect to significant matters.  Their decisions, unlike those of Tournament Directors, are not cabined by bridge rules and are not limited to matters concerning individual games; rather, they concern large tournaments, mentoring, appeals resolution, and regulation drafting, which allow for the "creative freedom" necessary to satisfy the administrative exemption.  *See Hines*, 665 F.3d at 245; *Reich*, 126 F.3d at 14 ("[T]he marketing representatives 'are not merely "skilled" workers who operate within a strict set of rules.  Rather, they exercise significant discretion in their daily contacts with various insurance agents.'" (quoting *Reich*, 940 F. Supp. at 423)).

Likewise, Field Supervisors, Area Managers, and Mentors are also subject to the administrative exemption.  Here, the comparison to the casino table game supervisors is apt.  The casino supervisors assigned dealers to tables, oversaw the day-to-day performance of dealers, trained dealers, conducted formal semi-annual performance reviews, and made recommendations as to hiring and firing decisions.  *See Fetrow-Fix*, 2011 WL 5827199, at *8; *Allen*, 2006 WL 3513857, at *10-12.  Field Supervisors, Area Managers, and Mentors carry out comparable duties.  Field Supervisors and Area Managers assign DICs for sectional and regional tournaments, and recruit, hire, train, supervise, review, and fire Tournament Directors.  (Def. SMF ¶¶ 50-53, 61).  Mentors acted as "buffers" between Area Managers and Tournament Directors by answering Tournament Directors' questions, checking their hours, and giving performance reviews.  (*Id.* ¶ 66).  They did not have the authority to fire employees, but ACBL generally deferred to their recommendations.  (*Id.* ¶¶ 68-69).  Field Supervisors, Area Managers, and Mentors also work as tournament directors, where they officiate games and supervise and provide feedback to their direct reports.  (*Id.* ¶¶ 54, 70).  Those duties directly relate to the management and general business operations of ACBL, and there is no evidence in the record

that employees in those positions are materially constrained when carrying out these duties. Accordingly, they qualify under the administrative exemption.

Plaintiffs contend that the administrative duties of the employees in these "leadership" positions—the National Tournament Director, Associate National Tournament Director, Field Supervisor, Area Manager, and Mentor—are not the "primary" duties of those employees, and therefore the exemption does not apply.  (Pl. Opp. at 10; *see also id.* at 6-9 (making analogous argument as to the executive exemption)).  They point to deposition testimony and job descriptions that indicate that all ACBL employees who direct tournaments, including those in leadership positions, spend approximately 75% of their time directing tournaments.  (Pl. SMF ¶ 52; Pl. SMF Ex. 7, at 1; Weinstein Dep. at 54).[24]

But even if employees in leadership positions spend approximately 75% of their time directing tournaments, the record indicates that some portion of that time is dedicated to administratively exempt work.  For example, Nancy Boyd, an Area Manager at ACBL, when discussing the job duties of a Field Supervisor, testified that "even though you are there fulfilling your duties as a [tournament director] and doing the assignments that you have, you are also able to see the people that report to you in the environment that you are helping them grow in."

---

[24] Plaintiffs contend that Weinstein testified that "no Tournament Directors—not even Area Managers—spend more than 25% of their time performing duties other than directing at tournaments" and that "25% was actually a 'high' estimate of time spent on duties other than tournament directing."  (Pl. Opp. at 7; *see also id.* at 10). But in the quoted portion of the deposition, Weinstein appears to have been discussing Area Managers specifically, not tournament directors generally:

> Q: What would you say is, again based on your observations, what would you say is the greatest percentage of time spent by an Area Manager doing work that's not tournament directing?

> A. Doing work that's not tournament directing?  I don't think anybody does as much as 25 percent of their work that's not tournament directing.  I think that would be a high number.

(Weinstein Dep. at 54).  In any event, the Court will assume in plaintiffs' favor that the testimony concerns all employees who direct tournaments, including those in leadership positions, and not only Area Managers.

(Boyd Dep. at 118-19).  Likewise, the job description for Mentors includes as a responsibility "continuously manag[ing] the performance of direct reports through on-site coaching at tournaments and one-on-one coaching sessions."  (Carmichael Dep. Ex. 5, at 1).  Tournament directing for employees in leadership roles therefore includes administratively exempt duties—specifically, supervising, observing, and providing feedback to their direct reports.  Accordingly, even if employees in leadership positions spend approximately 75% of their time directing tournaments, they spend less than 75% of their time carrying out non-exempt duties.

In any event, as the First Circuit has explained, "an employee's 'primary' duty is not determined solely by the amount of time he or she devotes to different categories of tasks—*i.e.*, exempt vs. nonexempt—but on the overall character of his or her position."  *Marzuq*, 807 F.3d at 436.  Indeed, the regulations note that time spent performing exempt work represents a "useful guide," but it is "not the sole test."  29 C.F.R. § 541.700(b).  "Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion."  *Id.*

Here, those other factors indicate that employees in leadership positions meet the "primary duty" requirement.  First, the importance to ACBL of the exempt duties (managing large tournaments; drafting new ACBL regulations; participating in appeals committees; and recruiting, hiring, coaching, supervising, reviewing, and firing Tournament Directors) dwarfs that of the non-exempt duties (officiating individual bridge contests).  Indeed, the "Key Role and Responsibilities" identified in the Field Supervisor and Area Manager job descriptions do not even include officiating bridge contests.  (Pl. SMF Ex. 7; Second Rosenbury Dec. Ex. 13).  Similarly, for the Mentor position, "[serving] as [DIC] or Tournament Director at sanctioned tournaments" represents only one of nine key responsibilities.  (Carmichael Dep. Ex. 5).  Those

40

job descriptions indicate that their exempt duties are more important to defendant than their non-exempt duties.

Plaintiffs further contend that "ACBL gave greater importance to the non-managerial duty of directing tournaments" because ACBL set a minimum number of sessions that all tournament directors, regardless of position, were required to work each year.  (Pl. Opp. at 8 (emphasis omitted)).  But that says little about the relative importance of the duties of an employee in a leadership position; rather, it reflects the fact that tournament directing is ACBL's primary revenue-producing activity, other than membership dues.  (Pl. SMF Ex. 10, at 3-4).

Second, there is no evidence in the record that employees in leadership positions were subject to any direct supervision when carrying out their exempt duties, unlike the supervision they provided over their direct reports when directing tournaments.

Third, promotions to leadership positions or to more senior leadership positions are normally associated with material pay increases.  For example, Jeffery Jacob earned $34,541 per year as a Tournament Director and $43,200 per year as a Mentor.  (Def. SMF ¶¶ 205, 207). Similarly, Karl Miller earned $39,655 per year as a Tournament Director and $50,000 per year as a Mentor.  (*Id.* ¶¶ 217-20).  And McKenzie Myers earned $52,000 per year as a Mentor and $60,091 per year as an Area Manager.  (*Id.* ¶¶ 236-37).

Plaintiffs point to Arleen Harvey's pay increase when transitioning from Field Supervisor to Area Manager—from $48,900 per year to $53,999 per year—as evidence that no relationship exists "between the manner in which the ACBL compensates those who perform 'managerial' duties and those who do not."  (Pl. Opp. at 8).  But that transition—which came as part of ACBL's reorganization of its Field Operations Department—was not between a non-managerial role and a managerial role.  It is undisputed that the job duties of Field Supervisors and Area

Managers were similar, except for the fact that "Field Supervisors who accepted new positions as Area Managers gained responsibility over more districts and performed more work, including special projects on behalf of ACBL." (Def. SMF ¶ 59). It is therefore unsurprising that Harvey's new position came with a salary increase, and in fact supports the conclusion that greater managerial responsibilities were associated with increased pay.

Plaintiffs also note that Eric Bell earned an annual salary of $44,150 as a Mentor and now earns $47,293 as a Tournament Director. (Pl. Opp. at 8; Def. SMF ¶¶ 122, 129). But plaintiffs ignore the much larger pay increase Bell received when he moved from Tournament Director to Mentor. When he initially worked as a salaried Tournament Director, he earned $35,619. (Def. SMF ¶ 118). His move to Mentor was accompanied by a more than 20% increase in pay. The fact that his transition back to Tournament Director—made only after defendant eliminated the Mentor position in 2019—was not associated with a decrease in pay is scant evidence that defendant does not compensate employees with managerial duties better than those without managerial duties.

Accordingly, based on the undisputed evidence in the record, the primary duty of employees in the positions of National Tournament Director, Associate National Tournament Director, Field Supervisor, Area Manager, and Mentor directly relates to defendant's management or general business operations and includes the exercise of discretion and independent judgment with respect to matters of significance. Those positions are therefore exempt from FLSA's overtime provision under the administrative exemption.

### c.   STaC Coordinator

For the reasons set forth below, all plaintiffs' claims are subject to a two-year limitations period. Marcus is the only plaintiff who held the position of STaC Coordinator. Because he resigned from ACBL in August 2016, his claim under Count 1 is untimely in light of the two-

year limitations period.  It is therefore not necessary to decide whether the STaC Coordinator position is administratively exempt.

### C.    Cross-Motions for Summary Judgment as to the Limitations Period Under Count 1

The parties have cross-moved for summary judgment as to the limitations period applicable to plaintiffs' misclassification claims.  Actions under the FLSA are subject to a two-year limitations period, unless violations are shown to be willful, in which case a three-year limitations period applies.  *See* 29 U.S.C. § 255(a).  A violation is willful if "the employer either knew or showed reckless disregard as to whether its conduct was prohibited by the FLSA." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  Whether an FLSA violation is willful "is a mixed question of law and fact."  *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1080 (1st Cir. 1995).

Courts have found willfulness in FLSA cases most often when an employer "deliberately chose to avoid researching the law's terms or affirmatively evaded them."  *Hoffman v. Professional Med Team*, 394 F.3d 414, 419-20 (6th Cir. 2005) (citing *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003)).  For example, an employer's "failure to keep adequate payroll records," "intentional manipulation of [its] records," and practice of paying employees "off the books" could be "sufficient grounds for concluding that [the employer] did not act in good faith or with a reasonable belief that it was in compliance with the FLSA."  *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 35 (1st Cir. 2007) (concluding that district court's finding of willfulness was not clearly erroneous); *see also Lopez v. Corporación Azucarera de Puerto Rico*, 938 F.2d 1510, 1515 (1st Cir. 1991) (stating hypothetically that a genuine issue of material fact would be raised, sufficient for a claim of willfulness to survive summary judgment, if employees had attested that employer forbade them from accurately recording their hours); *Gonpo v. Sonam's Stonewalls &*

*Art LLC*, 2018 WL 1725695, at *9 (D. Mass. Apr. 9, 2018) (finding plaintiff's allegations concerning willfulness sufficient to survive a motion to dismiss because they allege that defendants "failed to keep full and accurate records of hours worked, underreported his hours on pay slips, sometimes paid wages in cash, and consistently failed to pay overtime wages"); *Lagasse v. Flextronics Am., LLC*, 2012 WL 2357442, at *2 (D.R.I. June 1, 2012) (same where plaintiff alleged defendants failed to keep accurate records of hours worked and manipulated time-keeping software records).

Other indicia of willfulness include lack of diligence in researching FLSA requirements and ignoring repeated employee complaints about violations. *See, e.g.*, *Collinge v. IntelliQuick Delivery, Inc.*, 2018 WL 1088811, at *19 (D. Ariz. Jan. 9, 2018) (granting partial summary judgment to plaintiffs on willfulness in part because defendants never consulted with an attorney or made reasonable efforts to determine lawfulness of their actions); *Ketchum v. City of Vallejo*, 523 F. Supp. 2d 1150, 1157 (E.D. Cal. 2007) (denying defendant's motion for summary judgment where plaintiffs repeatedly complained of uncompensated work hours); *Cheng v. IDEAssociates, Inc.*, 2000 WL 1029219, at *8 (D. Mass. July 6, 2000) (concluding that plaintiff sufficiently alleged willfulness in Equal Pay Act case where defendants ignored plaintiff's repeated complaints that she was being underpaid).

Here, the undisputed evidence indicates that defendant's misclassification of Tournament Directors was not willful.[25]   There is no evidence of falsified or missing records, cash payments

---

[25]  The Court has concluded that defendant properly classified as exempt National Tournament Directors, Associate National Tournament Directors, Field Supervisors, Area Managers, and Mentors.  As a result, the inquiry here is limited to whether defendant's misclassification of Tournament Directors and the STaC Coordinator was willful.  Plaintiffs have identified no evidence in the record that would permit a rational factfinder to conclude that defendant's alleged misclassification of the STaC Coordinator was willful.  Their arguments focus only on defendant's classification of Tournament Directors.  Summary judgment will therefore be granted in defendant's favor as to the limitations period of misclassification claims related to the STaC Coordinator position.

to avoid a paper trail, or anything similar.  Nor is there any evidence of high-level officers making statements indicating an awareness of their obligations and an unwillingness to follow the law.  Instead, plaintiffs rely heavily on two facts:  defendant's historical classification of Tournament Directors and the conclusions of a single Department of Labor investigator.

Much of the history cited by plaintiffs, however, has little bearing on whether defendant's misclassification of full-time Tournament Directors after 2016 was willful.  For example, the fact that defendant incorrectly classified Tournament Directors as independent contractors from 1980 to 1993 is weak evidence that its misclassification of Tournament Directors more than two decades later was willful.  Plaintiffs also point to 2009, when defendant settled a lawsuit brought by Marcus concerning overtime wages for part-time Tournament Directors.  But the record indicates that "[r]eportedly, the decision to settle was premised on business considerations rather than the perceived merits of Marcus' claims."  (Littler Memo at 4 n.3).  Defendant "disclaimed any liability and never conceded that Tournament Directors were misclassified."  (*Id.*).[26]  That settlement, without more, is not sufficient to support a finding that defendant's subsequent misclassification was willful.

Following that settlement, defendant consulted with counsel at Littler Mendelson concerning the exemption status of Tournament Directors.  In 2014, counsel provided defendant with a memorandum that analyzed whether Tournament Directors should be classified as exempt.  It concluded that defendant had "a strong argument that both full-time and part-time Tournament Directors may be classified as administratively exempt."  (Littler Memo at 5).  The

---

[26] The Littler memorandum provides some background to that settlement.  In 2007, according to the memorandum, defendant requested from the Department of Labor "an advisory opinion on whether Tournament Directors [were] properly classified as exempt under the FLSA."  (Littler Memo at 4 n.3).  The Department, however, apparently never provided the requested opinion.  (*See id.*).

fact that defendant not only consulted counsel but also followed counsel's advice is strong evidence that defendant's violation of the FLSA was not willful. *See Dacar v. Saybolt, L.P.*, 914 F.3d 917, 926-27 (5th Cir. 2018) (concluding that plaintiffs failed to present an issue of disputed fact concerning defendant's willfulness where, among other factors, defendant relied on counsel).[27]

Plaintiffs also rely heavily on the fact that two years later, a single Department of Labor investigator came to the opposite conclusion after he investigated whether Tournament Directors, and specifically Marcus, were properly classified as exempt. (*See* Pl. SMF Ex. 5). He concluded that they were not and informed defendant's counsel of that conclusion. (*See id.* at 3, 7). In response, counsel told the investigator that defendant "disagreed that overtime was due to" Marcus and "[was] not agreeing to pay any back wages." (*Id.* at 7).[28]

It is true that an investigation by the Department of Labor that results in warnings concerning possible overtime violations, without a change in compliance, might be evidence of willfulness. *See Newspapers of New England*, 44 F.3d at 1080 (noting that the Department of

---

[27] Plaintiffs contend that "the analysis in the [Littler] memo is so at odds with the analysis that the defendant makes now with respect to many of the plaintiffs, that a jury could reasonably conclude that the defendant is not, in fact, relying on advice of counsel." (Pl. Opp. at 19; *see also id.* at 21-23). But that analysis does not appear to be materially inconsistent. To be sure, the memorandum does not discuss leadership positions, and defendant offers new arguments as to those positions. But the memorandum was expressly limited to the exemption status of Tournament Directors; it was not intended to analyze the exemption status of leadership positions. (*See* Littler Memo at 1). In fact, some of those positions, such as Area Managers and Mentors, did not even exist at the time of the memorandum. And the analysis concerning Tournament Directors is not "entirely at odds" with defendant's arguments in this litigation. In fact, the memorandum relies exclusively on *Fetrow-Fix v. Harrah's Entertainment*, *Allen v. Harrah's Entertainment*, and *Mutch v. PGA Tour*—three cases on which defendant principally relies here. (*See, e.g.*, Dkt. No. 85, at 11-13).

[28] Plaintiffs state that defendant further informed the Department of Labor that "effective January 1, 2016, it would begin treating full time Tournament Directors as hourly employees, including for purposes of overtime pay." (Pl. SMF ¶ 20). In support, they cite the related WHISARD Compliance Action Report. (*See* Pl. SMF Ex. 6). But that report does not include any statement to that effect. It states that counsel for defendant "disageed [sic] that [redacted] was non exempt. Said firm was moving away from having Tourn Directors for future. Assured FC but said firm would not pay BWS." (*Id.* at 3). It does not state that defendant would begin to treat Tournament Directors as hourly employees effective January 1, 2016.

Labor presented "plausible" and "tenable" arguments in support of willfulness, including the Department's prior investigation of the employer, but finding no clear error in district court's conclusion that employer did not willfully violate the FLSA).  But a single investigator's conclusion is insufficient, by itself, to permit a reasonable factfinder to find that defendant's violation was willful.  As the First Circuit has noted, if an employer's conduct was always "knowing" when a single investigator informed it that its conduct was unlawful, it would "preclude[] legitimate disagreement between a party and the Wage and Hour Division . . . , leaving [the] employer in an untenable position:  either accept the Wage and Hour Division's position and comply with its advice, or risk a finding of a willful violation of the Act."  *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 680 (1st Cir. 1998) (considering whether a party is an "employer" under the FLSA).[29]

The problem with such an approach is evident here, particularly when the legal analysis in the FLSA Narrative is compared to that in the Littler memorandum.  The FLSA Narrative's analysis of the exemption status of Tournament Directors is limited.  In the span of four sentences—and without considering any case law—it recites the basic duties of Tournament Directors and concludes that neither the executive exemption nor the administrative exemption

---

[29] The Department of Labor has promulgated regulations concerning the assessment of civil penalties for willful violations of FLSA's overtime provisions.  Until recently, the regulations provided that "an employer's conduct shall be deemed knowing, among other situations, if the employer received advice from a responsible official of the Wage and Hour Division to the effect that the conduct in question is not lawful."  29 C.F.R. § 578.3(c)(2) (2020).  The First Circuit has criticized that provision as "incongru[ous] with the *Richland Shoe* standard on which the regulation is based."  *Baystate Alternative Staffing*, 163 F.3d at 680 ("Because legitimate disagreement may exist about the Act's coverage, we have significant reservations about 29 C.F.R. § 578.3(c)(2)'s blanket assertion that a party's decision not to comply with the Wage and Hour Division's advice constitutes a 'knowing' violation of the Act under the *Richland Shoe* standard.").

The Labor Department, however, recently finalized a rule that modifies those regulations.  *See* Tip Regulations Under the Fair Labor Standards Act (FLSA), 85 Fed. Reg. 86756, 2020 WL 7753223 (Dec. 30, 2020).  The modified regulations provide that "an employer's receipt of advice from [the Wage and Hour Division] that its conduct was unlawful can be sufficient to show that the violation is willful but is not automatically dispositive."  *Id.* at 86774.

applies.  (*See* Pl. SMF Ex. 5, at 3).  The Littler memorandum, by contrast, presents a detailed

analysis of the exemption status of Tournament Directors, including considering relevant judicial

decisions.  (*See* Littler Memo at 5-7).  Defendant could have reasonably concluded that its

counsel's thorough analysis more accurately assessed whether Tournament Directors were

properly exempt.  That conclusion, of course, might well prove to be wrong.  Indeed, this court

has concluded to the contrary.  But for a company to follow what appears to be a reasonable and

well-supported opinion of counsel—rather than the conflicting opinion of a single investigator,

set out in a cursory conclusion—cannot constitute a willful violation of the FLSA.

Events subsequent to the investigation further undermine a finding of willfulness.  In

2016, defendant consulted counsel again concerning the exemption status of Tournament

Directors.  As noted, during that year, the Department of Labor released new regulations that

would have forced defendant to increase the minimum salaries of Tournament Directors.  (Def.

SMF ¶ 78).  According to defendant, because of the new regulations, it reclassified its full-time

Tournament Directors as non-exempt in January 2017.  (*Id.* ¶ 79).[30]   Hartman testified that the

decision was made in consultation with legal counsel:

> [T]he Obama Administration came down with this minimum salary requirement
> for exempt employees and we talked internally about how we were going to
> handle it.  I'm sure we had discussions with -- with counsel, as well, and we made
> the business decision to pay full time tournament directors hourly.

(Hartman Dep. at 26).[31]   In other words, defendant not only sought out advice from legal counsel

---

[30] As noted, the positions of the parties as to the years in which these events occurred are contradictory and inconsistent.  For present purposes, the critical issue is the sequence of events, not the years in which they occurred.

[31] Plaintiff contends that the testimony of Hartman and Hardin concerning exemptions is "strained and contradictory" and therefore supports a finding of willfulness.  (Pl. Mem. at 16).  According to plaintiffs, Hardin "claimed not to understand questions about the exemption she believed applied to full time Tournament Directors" even though she had prior experience making classification decisions.  (*Id.* at 16-17).  The implication appears to be that Hardin was being evasive in her answers or could not answer the questions because defendant knowingly misclassified Tournament Directors.  In fact, however, it appears from the transcript that she did not understand the questions.  They were poorly worded, and individual questions sought information concerning multiple positions or

after the Department of Labor's investigation but also made changes to its compensation

structure based on that advice specifically to comply with FLSA regulations.  Again, even if

defendant ultimately misclassified the Tournament Directors, that evidence falls far short of

supporting a finding of willfulness.[32]

In short, even viewing the record in the light most favorable to plaintiffs, there is no

evidence that would permit a rational factfinder to resolve the issue of willfulness in plaintiffs'

favor.  Accordingly, the Court will grant defendant's motions for summary judgment to the

extent that they seek judgment as to the applicable limitations period for plaintiffs'

misclassification claims.  It will also deny plaintiffs' motion for summary judgment to the same

extent.

Because there are no valid claims of willful violation, plaintiffs' claims are subject to a

two-year limitations period.  *See* 29 U.S.C. § 255(a).  Section 256 of the FLSA defines when an

action under the statute is commenced:

> [A]n action . . . shall be considered to be commenced on the date when the
> complaint is filed; except that in the case of a collective or class action . . . it shall
> be considered to be commenced in the case of any individual claimant—
>
> (a) on the date when the complaint is filed, if he is specifically named as a party
> plaintiff in the complaint and his written consent to become a party plaintiff is
> filed on such date in the court in which the action is brought; or
>
> (b) if such written consent was not so filed or if his name did not so appear—on
> the subsequent date on which such written consent is filed in the court in which

---

multiple exemptions.  (*See, e.g.*, Hardin Dep. at 16-19).  That prompted several objections, and some questions were simply withdrawn.  (*See, e.g.*, *id.* at 16-17).

Hartman's testimony offers even less support.  As plaintiffs point out, Hartman testified that he did not understand defendant's Tournament Director ranking system and could not recall what information was provided to Littler Mendelson when it reviewed the exemption status of Tournament Directors.  (Pl. Mem. at 17).  It is unclear what relevance, let alone significance, those facts have to plaintiffs' claim of willfulness.  (The Littler memorandum itself identifies what information defendant provided counsel.  (*See* Littler Memo at 4 n.3).)

[32] Defendant states that it switched Tournament Directors back to exempt on June 1, 2019.  (Def. Resp. to Pl. SMF ¶ 22).  It is unclear if that change was based, in whole or in part, on advice from counsel.

the action was commenced.

*Id.* § 256.  Thus, for a plaintiff asserting an individual FLSA claim, the action commences on the date that the complaint is filed.  *Id.*  For a named plaintiff asserting a collective FLSA claim, however, the action commences after (1) the complaint is filed naming him as a party plaintiff and (2) written consent to serve as party plaintiff is filed with the court.  *See McLaughlin v. Boston Harbor Cruises, Inc.*, 2006 WL 1998629, at *2 (D. Mass. July 17, 2006).  And for an opt-in plaintiff joining a collective action under the FLSA, the action commences when he files a written consent to op-in with the court.  29 U.S.C. § 256(b).

Here, named and opt-in plaintiffs filed their written opt-in consent forms on April 24, 2019.  (*See* Dkt. No. 49-1; Dkt. No. 49-2).  Any claims that have accrued since April 24, 2017, are thus not barred by the statute of limitations.

### D.   Cross-Motions for Summary Judgment as to Liability Under Count 1

As noted, plaintiffs have filed an omnibus motion for summary judgment under Count 1. Defendant has filed 18 separate motions for summary judgment.  With one exception, each of defendant's motions is directed to the claim of a specific plaintiff.

For the reasons set forth above, the Court has concluded that (1) Tournament Directors are not exempt, and (2) National Tournament Directors, Associate National Tournament Directors, Field Supervisors, Area Managers, and Mentors are exempt.  It has further concluded that plaintiffs' claims, to the extent that plaintiffs worked in a non-exempt position and were wrongly denied overtime pay, are subject to a two-year limitations period.

In light of those conclusions, the Court will next consider the parties' cross-motions for

summary judgment as to each plaintiff.[33]

### 1.   Dianne Barton-Paine

Dianne Barton-Paine is a Tournament Director.  (Barton-Paine Dep. at 13).  From April 2016 until January 2017, she was paid an annual salary.  (Second Rosenbury Dec. ¶ 49).  Starting in January 2017, she has been paid hourly and eligible for overtime when she works more than 40 hours in a week.  (*Id.*).

She filed her written consent to opt-in on April 24, 2019.  She is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  But since that date, she has been paid hourly and eligible for overtime when she works more than 40 hours in a week.  (Second Rosenbury Dec. ¶ 49).

Accordingly, the Court will grant defendant's motion for summary judgment as to Barton-Paine.  It will also deny plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to her claim.

### 2.   Eric Bell

From April 2016 until January 2018, Eric Bell was a Tournament Director.  (Second Rosenbury Dec. ¶ 19).  From April 2016 until January 2017, he was paid an annual salary.  (*Id.*).  From January 2017 until January 2018, he was paid hourly.  (*Id.*).  When he was paid hourly, he was eligible for overtime for any hours worked in excess of 40 in a workweek.  (*Id.*).  In January 2018, he returned to being a salaried employee when he was promoted to Mentor.  (*Id.*).  In June 2019, after that position was eliminated, Bell became a full-time Tournament Director and remained a salaried employee.  (*Id.* ¶ 20).

---

[33] Because defendant's motion for summary judgment as to Van Cleve raises unique issues, it is considered separately below.

Bell filed his written consent to opt-in on April 24, 2019.  He is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  From that date until June 2019, he either was eligible for overtime when he worked more than 40 hours in a week or worked as a Mentor, which is an exempt position.  (Second Rosenbury Dec. ¶ 19).  But from June 2019 to present, he has been a Tournament Director and not eligible for overtime, even though it is a non-exempt position.  (*Id.* ¶ 20).

Accordingly, the Court will deny defendant's motion for summary judgment as to Bell to the extent that it seeks to dismiss Bell's claim.  It will also grant plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to Bell's claim.

### 3.     Jennifer Carmichael

From April 2016 until January 2018, Jennifer Carmichael was a Tournament Director. (Second Rosenbury Dec. ¶ 23).  From April 2016 until January 2017, she was paid an annual salary.  (*Id.*).  From January 2017 until January 2018, she was paid hourly.  (*Id.*).  When she was paid hourly, she was eligible for overtime for any hours worked in excess of 40 in a workweek. (*Id.*).  In January 2018, she returned to being a salaried employee when she was promoted to Mentor.  (*Id.*).  In June 2019, after that position was eliminated, she became a full-time Tournament Director and remained a salaried employee.  (*Id.*).

Carmichael filed her written consent to opt-in on April 24, 2019.  She is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  From that date until June 2019, she either was eligible for overtime when she worked more than 40 hours in a week or worked as a Mentor, which is an exempt position.  (Second Rosenbury Dec. ¶ 23).  But from June 2019 to present, she has been a Tournament Director and not eligible for overtime, even though it is a non-exempt position.  (*Id.*).

Accordingly, the Court will deny defendant's motion for summary judgment as to

Carmichael to the extent that it seeks to dismiss Carmichael's claim.  It will also grant plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to Carmichael's claim.

### 4.  Susan Doe and Terry Lavender

Defendant hired Susan Doe as a Tournament Director in 1993.  (Second Rosenbury Dec. ¶ 18).  She began working as a full-time employee in 1997.  (*Id.*).  She returned to working as a part-time employee in May 2015.  (*Id.*).  One year later, in May 2016, she retired.

Defendant also hired Terry Lavender as a Tournament Director in 1993.  (Lavender Dep. at 10).  She was promoted to Associate National Tournament Director in 2009.  (*Id.* at 13).  She then went from being a full-time employee to a part-time employee "at the beginning of 2016." (*Id.* at 21).  As a part-time employee, she was paid hourly and eligible for overtime when she worked more than 40 hours in a week.  (*Id.*; Second Rosenbury Dec. ¶ 17).

Lavender and Doe filed their written consents to opt-in on April 24, 2019.  They are therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017. *See* 29 U.S.C. 255(a).  But since that date, Lavender has been paid hourly and received overtime when she worked more than 40 hours in a week.  (Second Rosenbury Dec. ¶ 17).  And Doe retired in May 2016.  (*Id.* ¶ 18).  Summary judgment for defendant as to their claims for unpaid overtime is therefore appropriate.

Because Lavender was paid overtime and Doe was retired during the time period relevant to this lawsuit, defendant requests that the Court award attorneys' fees and costs associated with filing the motion as to Lavender and Doe and related discovery pursuant to 28 U.S.C. § 1927. Section 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.

Even though Lavender and Doe's claims must be dismissed, the Court cannot conclude that plaintiffs' counsel "multiplie[d] the proceedings . . . unreasonably and vexatiously" such that attorneys' fees and related costs are appropriate. Notably, the Notice of Collective Action, which the parties jointly proposed to the Court, was directed to "[a]ll persons who work or have worked for The American Contract Bridge League, Inc. as a full time Tournament Director *in the period from June 23, 2014 to the present* and who at any time during that period was not paid overtime at one and one-half their regular hourly rate for all hours worked in excess of forty (40) hours in any one week period." (Dkt. No. 40-1, at 1 (emphasis added)). The record indicates that Lavender and Doe did in fact work as full-time Tournament Directors in the period from June 23, 2014, to the present. (Def. SMF ¶¶ 354-55 ("In 2009, Lavender was promoted to Associate National Tournament Director. On January 1, 2016, Lavender went from full-time to part-time."); Second Rosenbury Dec. ¶ 18 ("ACBL hired Susan Doe as a Tournament Director on a part-time basis in 1993. In 1997, Doe began working for ACBL on a full-time basis. On May 8, 2015, Doe transitioned back to part-time work and ACBL paid her by the hour.")). Because Lavender and Doe satisfied the criteria identified in the Notice of Collective Action, their inclusion in the lawsuit by plaintiffs' counsel did not "unreasonably and vexatiously" multiply the proceedings. An award of attorneys' fees and costs is therefore not appropriate.

Accordingly, the Court will grant defendant's motion for summary judgment as to Lavender and Doe, except to the extent that it seeks attorneys' fees and costs. It will also deny plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to both claims.

### 5.   **Harry Falk**

Defendant hired Harry Falk as a Tournament Director in 1997. (Second Rosenbury Dec. ¶ 24). He was promoted to Field Supervisor in 2015. (*Id.*). When that position was eliminated

in January 2018, he became an Area Manager.  (*Id.*).  He remained in that position until May 2019.  (*Id.*).  That month, he became a part-time Tournament Director and eligible for overtime. (*Id.*).

Falk filed his written consent to opt-in on April 24, 2019.  He is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  But since that date, he has either worked as a Field Supervisor or Area Manager, which are exempt positions, or been eligible for overtime when he worked more than 40 hours in a week.  (Second Rosenbury Dec. ¶ 24).

Accordingly, the Court will grant defendant's motion for summary judgment as to Falk. It will also deny plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to his claim.

### 6.   John Gram

Since at least April 2016, John Gram has worked as a Tournament Director.  (Second Rosenbury Dec. ¶ 27).  From April 2016 until January 2017, he was paid an annual salary.  (*Id.*). From January 2017 until June 2019, he was paid hourly.  (*Id.*).  When he was paid hourly, he was eligible for overtime for any hours worked in excess of 40 in a workweek.  (*Id.*).  In June 2019, he returned to being a salaried employee and not eligible for overtime.  (*Id.*).

Gram filed his written consent to opt-in on April 24, 2019.  He is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  From that date until June 2019, he was eligible for overtime when he worked more than 40 hours in a week.  (Second Rosenbury Dec. ¶ 27).  But from June 2019 to present, he has been a Tournament Director and not eligible for overtime, even though it is a non-exempt position. (*Id.*).

Accordingly, the Court will deny defendant's motion for summary judgment as to Gram

to the extent that it seeks to dismiss Gram's claim.  It will also grant plaintiffs' motion for

summary judgment to the extent that it seeks summary judgment as to Gram's claim.

### 7.    Arleen Harvey

Defendant initially hired Arleen Harvey as a Tournament Director.  (Harvey Dep. at

12).[34]  Sometime before January 2018, she was promoted to Field Supervisor.  (Second

Rosenbury Dec. ¶ 51).[35]  When that position was eliminated in January 2018, she became an

Area Manager.  (Second Rosenbury Dec. ¶ 51).  She remained in that position until December

2018.  (*Id.*).  That month, she became a part-time Tournament Director and eligible for overtime.

(*Id.*).

Harvey filed her written consent to opt-in on April 24, 2019.  She is therefore limited to

bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C.

255(a).  The record does not show when Harvey was promoted from Tournament Director to

Field Supervisor, other than indicating that it was before January 2018.  To the extent that she

was a Tournament Director after April 24, 2017, it also does not show whether she was eligible

---

[34] Defendant states that Harvey was hired in 2007.  (Def. SMF ¶ 163).  That date matches Harvey's testimony.  (Harvey Dep. at 12).  But according to the declaration of Nancy Rosenbury, Harvey has worked for defendant since 1997.  (Second Rosenbury Dec. ¶ 51).  In any event, the exact date of her hiring is not material to the pending motions.

[35] Defendant states that Harvey was promoted to Field Supervisor in May 2016.  (Def. SMF ¶ 164).  In support, it cites a portion of her deposition transcript.  (Harvey Dep. at 38-39).  But the cited material does not indicate when Harvey was promoted to Field Supervisor.  She simply discusses the qualifications for the position and why she believed she met those qualifications.  Defendant also submitted two exhibits, performance evaluations of Harvey, from her deposition.  Exhibit 5 indicates that it is her "2017 Field Supervisor" review, but it is unclear whether that means she was a Field Supervisor for all of 2017.  (Dkt. No. 124-10, at 1).  Exhibit 6 appears to be a 2018 performance review when she was an Area Manager.  (*Id.* at 5).  The declaration from Nancy Rosenbury likewise does not indicate the date of Harvey's promotion to Field Supervisor.  Instead, it indicates only that she was a Field Supervisor when she was promoted to Area Manager on January 1, 2018.  (Second Rosenbury Dec. ¶ 51).

Plaintiffs did not object to defendant's statement that Harvey was promoted to Field Supervisor in May 2016.  Arguably, it may be deemed admitted under Local Rule 56.1.  But her promotion date from Tournament Director to Field Supervisor is crucial to the viability of her claim.  The Court will therefore treat the issue as one of disputed fact.

for overtime.[36]  It is therefore unclear whether Harvey has a claim for unpaid overtime within the limitations period.

Accordingly, the Court will deny defendant's motion for summary judgment as to Harvey to the extent that it seeks to dismiss Harvey's claim.  It will also deny plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to Harvey's claim.

### 8.    Jeffery Jacob

From April 2016 until January 2018, Jeffery Jacob was a Tournament Director.  (Second Rosenbury Dec. ¶ 30).  From April 2016 until January 2017, he was paid an annual salary.  (*Id.*).  From January 2017 until December 2017, he was paid hourly.  (*Id.*).  When he was paid hourly, he was eligible for overtime for any hours worked in excess of 40 in a workweek.  (*Id.*).  In December 2017, he returned to being a salaried employee when he was promoted to Mentor.  (*Id.*).  In June 2019, after that position was eliminated, he became a full-time Tournament Director and remained a salaried employee.  (*Id.* ¶ 32).

Jacob filed his written consent to opt-in on April 24, 2019.  He is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  From that date until June 2019, he either was eligible for overtime when he worked more than 40 hours in a week or worked as a Mentor, which is an exempt position.  (Second Rosenbury Dec. ¶ 30).  But from June 2019 to present, he has been a Tournament Director and not eligible for overtime, even though it is a non-exempt position.  (*Id.* ¶ 32).

Accordingly, the Court will deny defendant's motion for summary judgment as to Jacob to the extent that it seeks to dismiss Jacob's claim.  It will also grant plaintiffs' motion for

---

[36] The record indicates that Harvey received a salary raise when she moved from Field Supervisor to Area Manager in January 2018.  (Second Rosenbury Dec. ¶ 51).  It is therefore clear that Harvey was salaried rather than hourly for at least some (if not all) of 2017.  That leaves open the possibility that Harvey was a salaried Tournament Director for some portion of that year within the limitations period and wrongly denied overtime.

summary judgment to the extent that it seeks summary judgment as to Jacob's claim.

### 9.   Matt Koltnow

Defendant hired Matt Koltnow as a Tournament Director in 2001.  (Koltnow Dep. at 18, 24).  He was promoted to Field Supervisor in 2015.  (*Id.* at 41).  When that position was eliminated in January 2018, he became a National Tournament Director.  (First Rosenbury Dec. ¶ 24).  He remained in that position until September 2019.  (Second Rosenbury Dec. ¶ 10).  That month, he became an Area Manager.  (*Id.*).

Koltnow filed his written consent to opt-in on April 24, 2019.  He is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  But since that date, he has worked as a Field Supervisor, National Tournament Director, or Area Manager, which are exempt positions.  (Koltnow Dep. at 41; First Rosenbury Dec. ¶ 24; Second Rosenbury Dec. ¶ 10).

Accordingly, the Court will grant defendant's motion for summary judgment as to Koltnow.  It will also deny plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to his claim.

### 10.   Candace Kuschner

From April 2016 until January 2017, Candace Kuschner was a full-time salaried Tournament Director.  (Second Rosenbury Dec. ¶ 34).  Beginning in January 2017 and through the end of her employment, she was paid hourly.  (*Id.*).  She was also eligible for overtime for any hours worked in excess of 40 in a workweek.  (*Id.*).

Kuschner filed her written consent to opt-in on April 24, 2019.  She is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  But since that date, she has been eligible for overtime when she worked more than 40 hours in a week.  (Second Rosenbury Dec. ¶ 34).

Accordingly, the Court will grant defendant's motion for summary judgment as to Kuschner.  It will also deny plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to her claim.

### 11.   Peter Marcus

In April 2015, Peter Marcus began performing the STaC Coordinator job duties, and defendant officially promoted him to that position in June 2015.  (Marcus Dep. at 86; First Rosenbury Dec. ¶ 17).  In August 2016, Marcus resigned his employment.  (Marcus Dep. at 128).

Marcus filed his written consent to opt-in on April 24, 2019.  He is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  But Marcus's employment with defendant ended prior to that date.  (Marcus Dep. at 128).

Accordingly, the Court will grant defendant's motion for summary judgment as to Marcus's claim under Count 1.  It will also deny plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to his claim under Count 1.

### 12.   Karl Miller

From April 2016 until January 2018, Karl Miller was a Tournament Director.  (Second Rosenbury Dec. ¶ 45).  From April 2016 until January 2017, he was paid an annual salary.  (*Id.*).  From January 2017 until January 2018, he was paid hourly.  (*Id.*).  During that period, he was eligible for overtime for any hours worked in excess of 40 in a workweek.  (*Id.*).  In January 2018, he returned to being a salaried employee when he was promoted to Mentor.  (*Id.*).  In June 2019, after that position was eliminated, Miller became a full-time Tournament Director and remained a salaried employee.  (*Id.*).

Miller filed his written consent to opt-in on April 24, 2019.  He is therefore limited to

bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  From that date until June 2019, he either was eligible for overtime when he worked more than 40 hours in a week or worked as a Mentor, which is an exempt position.  (Second Rosenbury Dec. ¶ 45).  But from June 2019 to present, he has been a Tournament Director and not eligible for overtime, even though it is a non-exempt position.  (*Id.*).

Accordingly, the Court will deny defendant's motion for summary judgment as to Miller to the extent that it seeks to dismiss Miller's claim.  It will also grant plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to Miller's claim.

### 13.   **McKenzie Myers**

From April 2016 until January 2018, McKenzie Myers was a Tournament Director. (Second Rosenbury Dec. ¶ 35).  From April 2016 until January 2017, he was paid an annual salary.  (*Id.*).  From January 2017 until January 2018, he was paid hourly.  (*Id.*).  When he was paid hourly, he was eligible for overtime for any hours worked in excess of 40 in a workweek. (*Id.*).  In January 2018, he returned to being a salaried employee when he was promoted to Mentor.  (*Id.*).  In December 2018, he was further promoted to Area Manager and remained a salaried employee.  (*Id.*).

Myers filed his written consent to opt-in on April 24, 2019.  He is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  But since that date, he has either worked as a Mentor or Area Manager, which are exempt positions, or been eligible for overtime when he worked more than 40 hours in a week. (Second Rosenbury Dec. ¶ 35).

Accordingly, the Court will grant defendant's motion for summary judgment as to Myers. It will also deny plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to his claim.

### 14.   Joan Paradeis

From April 2016 until August 2018, Joan Paradeis was a part-time Tournament Director. (Second Rosenbury Dec. ¶ 38).  During that period, she was paid hourly and eligible for overtime for any hours worked in excess of 40 in a workweek.  (*Id.*).  In August 2018, she was promoted to Mentor and started earning an annual salary.  (*Id.*).  In June 2019, after that position was eliminated, she became a full-time Tournament Director and remained a salaried employee. (*Id.*).

Paradeis filed her written consent to opt-in on April 24, 2019.  She is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  From that date until June 2019, she either was eligible for overtime when she worked more than 40 hours in a week or worked as a Mentor, which is an exempt position.  (Second Rosenbury Dec. ¶ 38).  But from June 2019 to present, she has been a Tournament Director and not eligible for overtime, even though it is a non-exempt position.  (*Id.*).

Accordingly, the Court will deny defendant's motion for summary judgment as to Paradeis to the extent that it seeks to dismiss Paradeis's claim.  It will also grant plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to Paradeis's claim.

### 15.   Nancy Watkins

From April 2016 until August 2018, Nancy Watkins was a Tournament Director. (Second Rosenbury Dec. ¶ 43).  From April 2016 through November 2016, she was paid an annual salary.  (*Id.*).  From December 2016 until August 2018, she was paid hourly and eligible for overtime for any hours worked in excess of 40 in a workweek.  (*Id.*).  In August 2018, she was promoted to Mentor and returned to being a salaried employee.  (*Id.*).  She remained in that position until June 2019, when the Mentor position was eliminated.  (*Id.*).  That month, she

became a full-time Tournament Director and remained a salaried employee. (*Id.*).

Watkins filed her written consent to opt-in on April 24, 2019. She is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017. *See* 29 U.S.C. 255(a). From that date until June 2019, she either was eligible for overtime when she worked more than 40 hours in a week or worked as a Mentor, which is an exempt position. (Second Rosenbury Dec. ¶ 43). But from June 2019 to present, she has been a Tournament Director and not eligible for overtime, even though it is a non-exempt position. (*Id.*).

Accordingly, the Court will deny defendant's motion for summary judgment as to Watkins to the extent that it seeks to dismiss Watkins's claim. It will also grant plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to Watkins's claim.

### 16. **Marilyn Wells**

In 2003, defendant hired Marilyn Wells as a Tournament Director. (Wells Dep. at 10-11). In 2015, she was promoted to Field Supervisor. (*Id.* at 23). In January 2018, after that position was eliminated, she became an Area Manager. (*Id.* at 84; Second Rosenbury Dec. ¶ 50). She remains an Area Manager today. (Second Rosenbury Dec. ¶ 50).

Wells filed her written consent to opt-in on April 24, 2019. She is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017. *See* 29 U.S.C. 255(a). But since that date, she has worked as Field Supervisor or Area Manager, which are exempt positions. (Wells Dep. at 23, 84; Second Rosenbury Dec. ¶ 50).

Accordingly, the Court will grant defendant's motion for summary judgment as to Wells. It will also deny plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to her claim.

17.     **Lynn Yokel**

From April 2016 until January 2018, Lynn Yokel was a Tournament Director.  (Second Rosenbury Dec. ¶ 48).  During that period, she was eligible for overtime for any hours worked in excess of 40 in a workweek.  (*Id.*).  In January 2018, she was promoted to Mentor and became a salaried employee.  (*Id.*).  She remained in that position until June 2019, when the Mentor position was eliminated.  (*Id.*).  That month, she became a Tournament Director and remained a salaried employee.  (*Id.*).

Yokel filed her written consent to opt-in on April 24, 2019.  She is therefore limited to bringing claims for unpaid overtime that accrued on or after April 24, 2017.  *See* 29 U.S.C. 255(a).  From that date until June 2019, she either was eligible for overtime when she worked more than 40 hours in a week or worked as a Mentor, which is an exempt position.  (Second Rosenbury Dec. ¶ 48).  But from June 2019 to present, she has been a Tournament Director and not eligible for overtime, even though it is a non-exempt position.  (*Id.*).

Accordingly, the Court will deny defendant's motion for summary judgment as to Yokel to the extent that it seeks to dismiss Yokel's claim.  It will also grant plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to Yokel's claim.

E.     **Defendant's Motion to Dismiss and Motion for Summary Judgment as to Plaintiff Kenneth Van Cleve**

Defendant has moved both to dismiss the claim of plaintiff Kenneth Van Cleve and for summary judgment as to his claim.

On May 11, 2020, defendant filed and served a notice stating that Van Cleve died on July 9, 2019.  On October 13, 2020, plaintiffs moved to substitute a representative of the estate of Van Cleve pursuant to Fed. R. Civ. P. 25(a).  The Court denied that motion because it was made beyond the 90-day time limit provided by Fed. R. Civ. P. 25(a):

63

> Plaintiff did not file a motion to substitute until October 13, 2020, 155 days after service of the statement noting the death.  Plaintiff did not seek additional time under Fed. R. Civ. P. 6(b)(1), or show excusable neglect for the failure to file a timely motion.  Plaintiff's argument that defendant was required to serve the statement noting death on the representative of the estate is without merit; the rule contains no such requirement, and, indeed, defense counsel has an ethical obligation not to have contact with a party represented by counsel.  Nor is there merit to the argument that the 90-day clock does not run until the representative has been identified, as the language of the rule clearly indicates that it begins to run upon "service" of the statement.

(Dkt. No. 168).

Defendant now contends that the Court must dismiss the claim of Van Cleve to give effect to that order.  In response, plaintiffs make largely the same argument they made in support of their motion to substitute: "[T]he limitations period in Fed. R. Civ. P. 25(a)(1) does not begin until the decedent's representative or successor is properly served with the statement noting death."  (Dkt. No. 170, at 2 (quoting *In re C.R. Stone Concrete Contractors, Inc.*, 462 B.R. 6, 19 (Bankr. D. Mass. 2011))).  The Court previously considered and rejected that argument.  The additional cases that plaintiffs identify in their opposition do not change that conclusion.

The Court will therefore grant defendant's motion to dismiss the claim of Van Cleve for failure to state a claim.  Because the Court will grant that motion, defendant's motion for summary judgment as to Van Cleve will be denied as moot.  It will also deny plaintiffs' motion for summary judgment to the extent that it seeks summary judgment as to his claim.

### F.  <u>Motions for Summary Judgment as to Damages</u>

The parties have moved for summary judgment as to two issues related to damages. Defendant has moved for summary judgment as to the proper calculation of plaintiffs' overtime compensation.  Plaintiffs have moved for summary judgment as to whether they are entitled to liquidated damages.

1.      **Fluctuating Workweek**

The FLSA requires employers to compensate employees for each hour worked in excess of 40 hours during a workweek "at a rate not less than one and one-half times the regular rate at which [they are] employed."  29 U.S.C. § 207(a)(1).  An employee's "regular rate" refers to "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed."  *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945).

There are two methods to calculate an employee's regular rate.  *See Bucceri v. Cumberland Farms, Inc.*, 2019 WL 3755442, at *14 (D. Mass. July 18, 2019).  The first method applies when an employee is paid "a fixed weekly salary for a specific number of hours to be worked each [week]."  *Id.* (citing 29 C.F.R. § 778.113).  In that case, the employee's regular rate is calculated "by dividing the salary by the number of hours which the salary is intended to compensate."  29 C.F.R. § 778.113(a).  When the employee works more than 40 hours in a week, he or she is paid one-and-one-half times that rate for each hour worked in excess of 40.  *See id.*

The second method—known as the "fluctuating workweek" method—applies when an employee is paid "a fixed weekly salary regardless of how many hours the employee may [work] in a given week."  *Bucceri*, 2019 WL 3755442, at *14 (citing 29 C.F.R. § 778.114).  Under the fluctuating workweek method, the employee's regular rate is calculated "by dividing the weekly wages by the hours worked that particular week."  *Lalli v. General Nutrition Ctrs.*, 814 F.3d 1, 2-3 (1st Cir. 2016) (citing *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 580 n.16 (1942)).  The employee's regular rate therefore varies with the number of hours worked each week.  *See id.* at 3.  When the employee works more than 40 hours in a week, he or she is paid half—rather than one-and-one-half times—that week's regular rate for each hour worked in excess of 40.  *See id.*  "Only an additional 'half' is required to satisfy the [FLSA] because the 'time' in 'time-and-a-half' has already been compensated under the salary arrangement."  *Id.* (citing *O'Brien v. Town*

65

*of Agawam*, 350 F.3d 279, 288 (1st Cir. 2003)); *see also* 29 C.F.R. § 778.114(a)(5) ("Payment for overtime hours at not less than one-half such rate satisfies the overtime pay requirement because such hours have already been compensated at the straight time rate by payment of the fixed salary and non-excludable additional pay.").

The First Circuit, relying on 29 C.F.R. § 778.114, has explained that an employer may use the fluctuating workweek method when the following criteria are met:

(1) [T]he employee's hours must fluctuate from week to week;

(2) the employee must receive a fixed salary that does not vary with the number of hours worked during the week (excluding overtime premiums);

(3) the fixed amount must be sufficient to provide compensation every week at a regular rate that is at least equal to the minimum wage; and

(4) the employer and employee must share a "clear mutual understanding" that the employer will pay that fixed salary regardless of the number of hours worked.

*Lalli*, 814 F.3d at 4 (quoting *O'Brien*, 350 F.3d at 288). Under such circumstances, an employer complies with the FLSA by paying the employee "a fifty percent (50%) overtime premium in addition to the fixed weekly salary for all hours worked in excess of 40 during the week." *Id.* (quoting *Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 255 (S.D.N.Y. 2013)) (emphases and alterations omitted); *see also* 29 C.F.R. § 778.114(a)(5) (requiring that "[t]he employee receive[] overtime compensation . . . for all overtime hours worked at a rate of not less than one-half the employee's regular rate of pay for that workweek" for an employer to use the fluctuating workweek method to compute overtime compensation). Defendant contends that the fluctuating workweek method applies to plaintiffs and that therefore, to the extent that any plaintiffs prevail, their recovery is limited to a 50% increase in pay for all hours worked in excess of 40 for each week within the limitations period.

The Court has concluded that plaintiffs Bell, Carmichael, Gram, Harvey, Jacob, Miller,

Paradeis, Watkins, and Yokel have viable claims for unpaid overtime.  For all but Harvey, those claims are based on working as a full-time salaried Tournament Director from June 2019 to the present.  According to Nancy Rosenbury, since those plaintiffs have been salaried, they have earned a fixed amount per week regardless of the number of hours they work.  (*See* Second Rosenbury Dec. ¶ 20 (Bell); *id.* ¶ 23 (Carmichael); *id.* ¶ 27 (Gram); *id.* ¶ 32 (Jacob); *id.* ¶ 45 (Miller); *id.* ¶ 38 (Paradeis); *id.* ¶ 43 (Watkins); *id.* ¶ 48 (Yokel)).  Likewise, Harvey testified that "in the weeks when [she was] at a tournament, [she] got paid the salary; and in the weeks when [she wasn't] at the tournament [she] got paid the salary."  (Harvey Dep. at 78).  She further testified that she understood that "whether [she] worked no hours in a week or a whole bunch of hours in a tournament, the salary was going to be the same."  (*Id.*).

Plaintiffs do not identify any evidence to the contrary.[37]  Instead, they argue that the fluctuating workweek method is used only to calculate wages, not to calculate damages.  (*See* Pl. Opp. at 24-25).  They contend that "[t]he practical import of applying the [fluctuating workweek] method to the calculation of damages is that the employer pays overtime compensation only if they are caught violating the law, and only in the amount they would have had to pay if they obeyed the law."  (*Id.* at 25).  They imply that, if the fluctuating workweek method is used to calculate damages, employers will withhold overtime unless employees bring suit because the most that an employer would risk paying in litigation is the unpaid overtime.  When employees bring suit, however, employers risk paying more than unpaid overtime; they risk paying

---

[37] Plaintiffs concede that "the ACBL has proffered evidence that several of the plaintiffs understood that their salary was payment for a fluctuating number of hours."  (Pl. Opp. at 25).  However, they contend that "ACBL has not shown that other plaintiffs," including Bell, Gram, Jacob, Miller, and Watkins, "had such an understanding or entered into such an agreement[.]"  (*Id.*).  But Rosenbury's declaration shows that those plaintiffs did in fact operate pursuant to such an understanding.  (*See* Second Rosenbury Dec. ¶¶ 20, 27, 32, 43, 45 (stating that Bell, Gram, Jacob, Miller, and Watkins "earned a fixed amount per week regardless of the number of hours [he or she] worked or the quality of [his or her] work")).

liquidated damages as well.  *See* 29 U.S.C. § 216(b) ("Any employer who violates . . . section 207 of this title shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages.").[38] That risk likely discourages the gamesmanship that plaintiffs suggest.

Plaintiffs also point to decisions from courts outside this circuit that have concluded that "the [fluctuating workweek] method simply cannot logically apply in misclassification cases because an agreement between the parties to calculate overtime premiums in such a manner would not have existed."  (Pl. Opp. at 25 (quoting *Boyce v. Independent Brewers United Corp.*, 223 F. Supp. 3d 942, 948 (N.D. Cal. 2016) (collecting cases))).[39]  FLSA regulations, however, expressly state that the parties' "clear and mutual understanding does not need to extend to the specific method used to calculate overtime pay[.]"  29 C.F.R. § 778.114(a)(4); *see also Valerio v. Putnam Assocs. Inc.*, 173 F.3d 35, 40 (1st Cir. 1999) ("Valerio argues that section 114 requires that the 'clear mutual understanding' must extend to how her overtime premiums should be calculated. . . .  But the regulation calls for no such enlarged understanding.  The parties must only have reached a 'clear mutual understanding' that while the employee's hours may vary, his or her base salary will not." (internal citation omitted)).  Indeed, the First Circuit has affirmed a grant of summary judgment in an employer's favor after it concluded that, even though the employee was misclassified as exempt, the employer's severance payment—including overtime calculated using the fluctuating workweek method—extinguished its obligation to that employee. *See id.* at 38-40.  And at least one court in this District has specifically directed parties to

---

[38] An employer might also, of course, be subject to additional liability for a willful violation under appropriate circumstances.  *See* 29 U.S.C. § 255(a).

[39] Defendant "acknowledges that a minority of federal district courts have rejected the [fluctuating workweek] method as a measure of calculating overtime damages (versus a method of paying overtime to non-exempt employees paid by salary)."  (Def. Reply at 13).

calculate damages using the fluctuating workweek method.  *See Martin v. David T. Saunders Const. Co.*, 813 F. Supp. 893, 900-01 (D. Mass. 1992) (concluding that the fluctuating workweek method was the appropriate measure of damages for a failed *Belo* contract).

In light of that precedent and the undisputed record evidence, it is clear that any unpaid overtime due to plaintiffs in this matter may be calculated using the fluctuating workweek method.  Accordingly, the Court will grant defendant's motion for summary judgment as to the method of calculating plaintiffs' overtime damages.

## 2. <u>Liquidated Damages</u>

Plaintiffs have moved for summary judgment as to whether they are entitled to liquidated damages.  An employer who violates the overtime provisions of the FLSA is liable to the affected employees "in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."  29 U.S.C § 216(b).  A court may decline to award liquidated damages if an employer shows that the conduct resulting in an FLSA violation was in "good faith" and that it had "reasonable grounds for believing" that it complied with the statute.  *Id.* § 260.

The burden is on the employer to show good faith and objective reasonableness.  *See Chao*, 493 F.3d at 36 (citing 29 U.S.C. § 260).  That burden "is a surprisingly heavy one, as 'case law construing 29 U.S.C. § 260 strongly suggests that liquidated damages must be awarded unless the employer can show that it solicited an opinion from the Department of Labor regarding the employment practice at issue, or relied on the advice of informed counsel.'"  *Murphy v. Town of Natick*, 516 F. Supp. 2d 153, 161 (D. Mass. 2007) (quoting *O'Brien v. Town of Agawam*, 482 F. Supp. 2d 115, 120 (D. Mass. 2007)).

The parties rely on the same evidence and arguments concerning good faith as they do concerning willfulness.  That reflects the approach used by many courts, which often look at the

same evidence when considering good faith as they do when considering willfulness.  *See, e.g.*, *Chao*, 493 F.3d at 35 ("[T]he district court found that Defendants failed to show good faith or objective reasonableness, referring back to its findings on willfulness with respect to the applicable statute of limitations. . . .  The district court's willfulness findings are not clearly erroneous, and they adequately support the court's decision to award liquidated damages." (internal citation omitted)); *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 375 (4th Cir. 2011) ("[W]e credit the district court's finding that Mountaire's acts were not 'willful' as evidence of Mountaire's good faith.").[40]  That evidence includes, among other things, whether the employer relied on the advice of counsel, as defendant did here on more than one occasion, when determining its obligations under the FLSA.  *See Murphy*, 516 F. Supp. 2d at 161.  As a result, and for the reasons set forth above as to willfulness, a rational factfinder could resolve the issue of good faith in defendant's favor.

Accordingly, the Court will deny plaintiff's motion for summary judgment as to liquidated damages.

### G.      Defendant's Motion to Decertify the Collective Action

Defendant has also moved to decertify the collective action under Count 1.  The Court has granted summary judgment in plaintiffs' favor to the extent that they worked as salaried Tournament Directors since April 24, 2017.  It has denied the parties' motions for summary judgment as to Harvey because there remains a dispute concerning when she was promoted from

---

[40] Even though the same evidence may be relevant to willfulness and good faith, the burdens of proof differ:  the burden is on the employee to prove willfulness, but the burden is on the employer to prove good faith.  *Compare Cruz v. Boston Litig. Solutions*, 2016 WL 3568254, at *10 (D. Mass. May 24, 2016) ("The employee bears the burden of showing that the defendant's conduct was willful."), *with Chao*, 493 F.3d at 36 ("[I]t is the employer's burden to show good faith and objective reasonableness . . . ." (emphasis omitted)).

Tournament Director to Field Supervisor.  It has otherwise granted summary judgment in defendant's favor.

As a result, the case has been substantially narrowed.  The outstanding issues are Harvey's misclassification claim and the amount of damages, if any, to which certain plaintiffs are entitled.  Accordingly, the Court will deny as moot defendant's motion to decertify the collective action.

### H.      **Defendant's Motion for Summary Judgment as to Count 2**

Count 2 alleges that defendant unlawfully retaliated against Peter Marcus in violation of the FLSA.  Defendant contends that summary judgment should be granted as to that count.

The FLSA's anti-retaliation provision prohibits an employer from penalizing an employee who has filed a complaint seeking compensation for overtime hours.  *See* 29 U.S.C. § 215(a)(3).  Where there is no direct evidence of the defendant's retaliatory animus, employment retaliation claims are subject to a burden-shifting framework.  *See Wilson v. Entergy Nuclear Operations, Inc.*, 2019 WL 4417771, at *3 (D. Mass. Sept. 16, 2019).  The plaintiff must first establish a *prima facie* case of retaliation.  *See id.*  To do so, he must show (1) that he engaged in a statutorily protected activity, (2) that he experienced an adverse employment action, and (3) that a causal link exists between that employment action and his protected activity.  *See Blackie v. Maine*, 75 F.3d 716, 722 (1st Cir. 1996).  After he establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision.  *See Wilson*, 2019 WL 4417771, at *3.  If the defendant makes that showing, "the ultimate burden falls on the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus."  *Id.* (quoting *Mogilevsky v. Wellbridge Club Mgmt., Inc.*, 905 F. Supp. 2d 405, 411 (D. Mass. 2012)).

Here, Marcus has failed to establish a *prima facie* case of retaliation.  The parties agree

that he engaged in statutorily protected activity by filing a complaint with the Department of Labor in November 2014.  And the Court will assume that defendant's decision to not promote Marcus to Director of Field Operations constitutes an adverse employment action.[41]  But Marcus has failed to put forth evidence from which a reasonable factfinder could infer that defendant did not promote him because of his November 2014 complaint.  *See Blackie*, 75 F.3d at 723 ("[T]he record must enable the trier plausibly to find that a causal connection existed between the protected conduct and the adverse action." (internal quotation marks and emphasis omitted)).

As an initial matter, there is little evidence in the record that defendant was even aware that Marcus was the employee who filed the November 2014 complaint.  The Department of Labor's FLSA Narrative indicates that the investigator advised defendant's counsel that Marcus was not subject to any FLSA overtime exemption and therefore was owed back wages.  (Pl. SMF Ex. 5, at 7).  It is possible either that the investigator told defendant's counsel that Marcus filed the complaint or that defendant's counsel inferred as much based on the investigator's findings, and then defendant's counsel informed defendant that Marcus filed the complaint.  But that is tenuous evidence of knowledge at best.  Indeed, Marcus does not dispute that he "has no evidence [that defendant knew he was the one who filed a complaint with the Department of Labor] other than his knowledge that he informed the [Department of Labor] they had his permission to use his name." (Def. SMF ¶ 346).[42]  If defendant was unaware of the fact that

---

[41] The complaint alleges that Marcus also engaged in statutorily protected conduct when he filed a 2007 lawsuit against defendant for FLSA violations.  (Amended Compl. ¶¶ 19, 77).  It further alleges that several other actions by defendant constitute adverse employment actions, including "refusing to promote Marcus to the position of Field Manager; unfairly criticizing his performance; . . . and constructively discharging Marcus . . . ."  (*Id.* ¶ 78).  He did not raise, and therefore abandoned, those allegations in plaintiffs' opposition to defendant's motion for summary judgment, where he focuses exclusively on his November 2014 complaint and defendant's decision to not promote him to Director of Field Operations.  (Pl. Opp. at 26-27).

[42] The deposition testimony on which this assertion is based is not included in the record, but as noted, plaintiffs do not dispute any facts related to Marcus.

Marcus engaged in protected conduct, "any actions attributable to [it] could not plausibly have been induced by retaliatory motives." *Alvarado v. Donahoe*, 687 F.3d 453, 459 (1st Cir. 2012); *see also id.* ("Speaking commonsensically, our cases have in the past explained that, to successfully establish a claim of unlawful retaliation there must be, at a minimum, competent evidence that the alleged retaliators knew of the plaintiff's protected activity and that a retaliatory motive played a part in the adverse employment actions alleged." (internal quotation marks and alterations omitted)).

But even assuming that defendant was aware that Marcus filed the November 2014 complaint, there is insufficient evidence in the record to establish a causal link between that activity and defendant's decision to not promote him to Director of Field Operations.  First, there is a substantial gap in time between Marcus's complaint and the adverse employment action. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (per curiam) (internal quotation marks omitted) (collecting cases).  In fact, in *Breeden*, the Supreme Court stated that "[a]ction taken . . . 20 months later suggests, by itself, no causality at all."  *Id.*

Here, Hartman declined Marcus's proposal to work as Director of Field Operations on an interim basis approximately 21 months after Marcus filed the complaint.  And defendant did not hire someone else for the Director of Field Operations position until more than two-and-a-half years after that complaint.  Regardless of which event represents the adverse employment action, the length of time from Marcus's protected activity to that action, without more, is insufficient to establish a reasonable inference that the action was the result of the protected activity.  *See Abril-*

*Rivera v. Johnson*, 806 F.3d 599, 609 (1st Cir. 2015) ("[O]ver 14 months elapsed between the last EEO complaint regarding pay and the implementation of the rotational staffing system during repairs.  That is too long to support an inference that the complaints led to a decision to reduce staffing during fire-safety related repairs."); *Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010) ("Without some corroborating evidence suggestive of causation . . . a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action."); *Morón-Barradas v. Dep't of Educ. of Commonwealth of P.R.*, 488 F.3d 472, 481 (1st Cir. 2007) ("[M]ore than eight months . . . is . . . insufficient to establish temporal proximity.").

Events occurring during that extended time make such an inference even more unreasonable.  After Marcus filed his complaint, he received a promotion and multiple pay raises.  (Def. SMF ¶¶ 318, 320, 334).  In fact, he was promoted to STaC Coordinator during the Department of Labor's investigation that resulted from his complaint.  (*Id.* ¶ 318).  He also received a "meets expectation" performance rating, which equates to a 3 out of 4 on a numerical scale.  (Marcus Dep. Ex. 27, at 1).  That evaluation included several positive comments concerning his performance as STaC Coordinator.  (*See, e.g.*, *id.* at 3).  That Marcus received a promotion, pay raises, and a positive performance review after his complaint belies any reasonable inference of causation.

The countervailing evidence is weak and tenuous at best.  Plaintiffs point to defendant's decision to not promote Marcus even though he was the only candidate to be interviewed for the position.  But defendant did not hire anyone at that point; indeed, it did not fill the position ten months later—eight months after Marcus voluntarily resigned from ACBL.  And plaintiffs also point to the fact that defendant eventually hired Gary Blevins, who had no experience with the

game of bridge at all.  Hartman explained that decision as follows:

> [Blevins] had a lot of experience in -- many kinds of casino-type of
> environment. . . .  It gave a fresh perspective to the organization.  Somebody from
> outside that can -- that can look at the organization as a whole, understand what it
> really takes to organize things and look at just a freshness.  It's not somebody that
> was -- had seen it being done the same way over and over again.  As a fresh set of
> eyes.

(Hartman Dep. at 119).[43]  Defendant has thus provided a facially reasonable business

justification for hiring Blevins, even given his lack of experience.  In short, that hiring decision

does not permit an inference of a causal connection strong enough to overcome the fact that the

decision occurred two and a half years after Marcus filed his complaint.

In summary, plaintiffs have provided insufficient evidence from which a rational

factfinder could conclude that there exists a causal link between Marcus's complaint to the

Department of Labor and defendant's decision to not promote him to Director of Field

Operations.  The Court will therefore grant defendant's motion for summary judgment as to

Count 2.

## IV.   <u>Conclusion</u>

For the reasons set forth above,

1.   Defendant's Motion to Strike is GRANTED to the extent that it seeks to strike

   portions of Marcus's affidavit concerning evidence of matters occurring after

   August 2016, and is otherwise DENIED;

2.   Plaintiffs' Motion for Summary Judgment is GRANTED to the extent that it seeks

---

[43] Plaintiffs further contend that "Hartman's claim in his deposition that he had no recollection of Marcus ever having been interested in the position, and that he did not know that Marcus had ever submitted an application for the position, is scarcely credible."  (Pl. Opp. at 28).  That, however, mischaracterizes Hartman's testimony.  At his deposition, Hartman did not recall that Marcus was "an official applicant for the job."  (Hartman Dep. at 117).  But when asked whether he believed that Marcus "was not actually interested in the position," Hartman stated "[t]hat's not what I said."  (*Id.*).  The record indicates that Hartman recalled that Marcus was interested in the job, even if he was not sure whether Marcus formally applied for it.

to recover unpaid overtime for plaintiffs who worked as salaried Tournament Directors since April 24, 2017, and is otherwise DENIED;

3. Defendant's Motion for Summary Judgment as to Dianne Barton-Paine is GRANTED;

4. Defendant's Motion for Summary Judgment as to Eric Bell is GRANTED to the extent that it seeks summary judgment as to the applicable limitations period and the method of calculating overtime damages, and is otherwise DENIED;

5. Defendant's Motion for Summary Judgment as to Jennifer Carmichael is GRANTED to the extent that it seeks summary judgment as to the applicable limitations period and the method of calculating overtime damages, and is otherwise DENIED;

6. Defendant's Motion for Summary Judgment as to Susan Doe and Terry Lavender is GRANTED, except to the extent that it seeks attorneys' fees and costs;

7. Defendant's Motion for Summary Judgment as to Harry Falk is GRANTED;

8. Defendant's Motion for Summary Judgment as to John Gram is GRANTED to the extent that it seeks summary judgment as to the applicable limitations period and the method of calculating overtime damages, and is otherwise DENIED;

9. Defendant's Motion for Summary Judgment as to Arleen Harvey is GRANTED to the extent that it seeks summary judgment as to the applicable limitations period and the method of calculating overtime damages, and is otherwise DENIED;

10. Defendant's Motion for Summary Judgment as to Jeffery Jacob is GRANTED to the extent that it seeks summary judgment as to the applicable limitations period

and the method of calculating overtime damages, and is otherwise DENIED;

11. Defendant's Motion for Summary Judgment as to Matt Koltnow is GRANTED;

12. Defendant's Motion for Summary Judgment as to Candace Kuschner is GRANTED;

13. Defendant's Motion for Summary Judgment as to Peter Marcus is GRANTED;

14. Defendant's Motion for Summary Judgment as to Karl Miller is GRANTED to the extent that it seeks summary judgment as to the applicable limitations period and the method of calculating overtime damages, and is otherwise DENIED;

15. Defendant's Motion for Summary Judgment as to McKenzie Myers is GRANTED;

16. Defendant's Motion for Summary Judgment as to Joan Paradeis is GRANTED to the extent that it seeks summary judgment as to the applicable limitations period and the method of calculating overtime damages, and is otherwise DENIED;

17. Defendant's Motion for Summary Judgment as to Nancy Watkins is GRANTED to the extent that it seeks summary judgment as to the applicable limitations period and the method of calculating overtime damages, and is otherwise DENIED;

18. Defendant's Motion for Summary Judgment as to Marilyn Wells is GRANTED;

19. Defendant's Motion for Summary Judgment as to Lynn Yokel is GRANTED to the extent that it seeks summary judgment as to the applicable limitations period and the method of calculating overtime damages, and is otherwise DENIED;

20. Defendant's Motion to Dismiss the Claim of Kenneth Van Cleve is GRANTED;

21. Defendant's Motion for Summary Judgment as to Kenneth Van Cleve is DENIED

as moot; and

22. Defendant's Motion to Decertify the Class is DENIED as moot.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  March 24, 2021                    Chief Judge, United States District Court